**NIDA & ROMYN, P.C.**
Robert Nida
1900 Avenue of the Stars, Suite 650
Los Angeles, CA  90067
Telephone:  (310) 286-3400
E-Mail:  rnida@nidaromyn.com

**BUCHALTER, P.C.**
Jeffrey K. Garfinkle
18400 Von Karman Avenue, Suite 800
Irvine, CA  92612-0514
Telephone:  (949) 760-1121
E-Mail:  jgarfinkle@buchalter.com

*Counsel for Tutor Perini Building Corp.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) |
| | ) |
| | ) Chapter 11 |
| GEORGE WASHINGTON BRIDGE BUS | ) |
| STATION DEVELOPMENT VENTURE, LLC, | ) Case No. 19-13196 SCC |
| | ) |
| Debtors. | ) |
| | ) |
| | ) |

**NOTICE OF APPEAL**

Tutor Perini Building Corp. ("Tutor Perini") files this Notice of Appeal of the Order (A) Approving the Sale of Substantially All of the Debtor's Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, (B) Authorizing the Debtor to Enter Into and Perform its Obligations Under the Purchase Agreement, (C) Approving Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (D) Granting Related Relief (the "Sale Order"), Docket No. 604, a copy of which is attached hereto as Exhibit A.  The parties to the Sale Order appealed from are the following:

| Attorneys for Tutor Perini Building Corp. | Attorney for Debtor, George Washington Bridge Bus Station Development Venture, LLC |
|---|---|
| Nida & Romyn, P.C.<br>Robert Nida<br>1900 Avenue of the Stars, Suite 650<br>Los Angeles, CA  90067<br>Telephone:  (310) 286-3400<br><br>Buchalter, A Professional Corporation<br>Jeffrey K. Garfinkle<br>18400 Von Karman Avenue, Suite 800<br>Irvine, CA  92612-0514<br>Telephone:  (949) 760-1121 | Cole Schotz P.C.<br>Michael D. Sirota<br>Ryan T. Jareck<br>Mark Tsukerman<br>Rebecca W. Hollander<br>1325 Avenue of the Americas, 19th Floor<br>New York, New York 10019<br>Telephone: (212) 752-8000 |
| Attorneys for New York City Regional Center, DIP Lender and Manager of Senior Secured Creditor; George Washington Bridge Bus Station and Infrastructure Development Fund, LLC, Senior Secured Creditor | Attorneys for the Port Authority of New York and New Jersey |
| Weil, Gotshal & Manges LLP<br>Matthew S. Barr<br>David Lender<br>David J. Cohen<br>767 Fifth Avenue<br>New York, New York, 10153<br>Telephone: (212) 310-8000 | Skadden, Arps, Slate, Meagher & Flom LLP<br>Neil Rock<br>Patrick Rideout<br>Christine Okike<br>4 Times Square<br>New York, New York 10036<br>Telephone:  (212) 735-3000 |

| Attorneys for JMB Capital Partners Lending, LLC, Purchaser | Attorneys for GWB Madison Purchaser, LLC, Stalking Horse Bidder |
|---|---|
| Lowenstein Sandler LLP<br>Robert M. Hirsh<br>1251 Avenue of the Americas<br>New York, NY 10020<br>Telephone: (212) 262-6700 | Benesch, Friedlander, Coplan & Aronoff LLP<br>Michael J. Barrie<br>39 Broadway, 25th Floor<br>New York, NY 10006<br>Telephone: (302) 442-7010<br><br>Elliot M. Smith, Esq.<br>200 Public Square, Suite 2300<br>Cleveland, OH 44114<br>Telephone: (216) 363-6165 |

Respectfully submitted,

DATED:   September 8, 2021           **NIDA & ROMYN, P.C.**

/s/ *Robert Nida*
Robert Nida
1900 Avenue of the Stars, Suite 650
Los Angeles, CA  90067
Telephone:  (310) 286-3400
E-Mail:  rnida@nidaromyn.com

**BUCHALTER, P.C.**
Jeffrey K. Garfinkle
18400 Von Karman Avenue, Suite 800
Irvine, CA  92612-0514
Telephone:  (949) 760-1121
E-Mail:  jgarfinkle@buchalter.com

*Counsel for Tutor Perini Building Corp.*

# EXHIBIT A

# EXHIBIT A

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re:<br><br>GEORGE WASHINGTON BRIDGE BUS STATION DEVELOPMENT VENTURE LLC,[1]<br><br>              Debtor. | Chapter 11<br><br>Case No. 19-13196 (DSJ) |

**ORDER (A) APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, (B) AUTHORIZING THE DEBTOR TO ENTER INTO AND PERFORM ITS OBLIGATIONS UNDER THE PURCHASE AGREEMENT, (C) APPROVING ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (D) GRANTING RELATED RELIEF**

Upon the motion (the "**Motion**"),[2] of the above-captioned debtor and debtor in possession (collectively, the "**Debtor**"), for entry of an order (this "**Sale Order**") (a) authorizing and approving the entry into and performance under the terms and conditions of that certain Agreement of Purchase and Sale, substantially in the form attached hereto as **Exhibit 1** (as may be amended, supplemented or restated, the "**Purchase Agreement**"), and all other ancillary agreements (collectively, the "**Transaction Documents**"), by and among the Debtor and JMB Capital Partners Lending, LLC or its designee (the "**Purchaser**"), (b) authorizing and approving the sale of those acquired assets set forth in the Purchase Agreement (the "**Assets**") free and clear of all liens, claims, encumbrances, and other interests, except to the extent set forth in the Purchase Agreement, and the assumption of certain assumed liabilities set forth in the Purchase

---

[1] The last four digits of the debtor's federal taxpayer identification number are 8685. The debtor's business address is 626 South State Street, Newtown, Pennsylvania 18940.

[2] Capitalized terms used but not otherwise defined herein have the meaning given to such terms in the Motion or the Bidding Procedures Order (as defined herein), as applicable.

Agreement (including, without limitation, all "Assumed Liabilities" as defined in the Purchase

Agreement) or in this Sale Order (the "**Assumed Liabilities**") pursuant to the Purchase

Agreement upon the closing of the Sale (the "**Closing**"), (c) authorizing the assumption and

assignment of executory contracts and unexpired leases set forth on **Exhibit 2** attached hereto, as

the same may be subsequently modified pursuant to the terms of the Purchase Agreement (each,

an "**Assumed Contract**," and, collectively, the "**Assumed Contracts**") and the Ground Lease,

upon the Closing, subject to the payment by the Purchaser of any amounts necessary to cure any

defaults arising under any Assumed Contract or the Ground Lease (the "**Cure Amounts**"), the

provision of adequate assurance by the Debtor or the Purchaser, as applicable, that it will

promptly cure any non-monetary defaults existing prior to the Closing under the Assumed

Contracts and the Ground Lease, and the provision of adequate assurance of future performance

by the Purchaser under the Assumed Contracts and the Ground Lease, and (d) granting related

relief, all as more fully set forth in the Motion; and this Court having entered the Order (A)

Approving the Bidding Procedures in Connection with the Sale of Substantially All of the

Debtor's Assets, (B) Approving Procedures for the Assignment and Assumption of Executory

Contracts and Unexpired Leases, and (C) Granting Related Relief [Docket No. 96] (the "**Bidding**

**Procedures Order**") and the Order Granting Supplemental Motion for Entry of an Order (I)

Approving Replacement Stalking Horse Bidder, (II) Authorizing Bid Protections, and (III)

Granting Related Relief [Docket No. 557];[3] and the Debtor having conducted an auction (the

"**Auction**") for the Assets; and the Debtor having determined that the Purchaser has submitted

the highest or otherwise best bid for the Assets and determined that the Purchaser is the

---

[3] All references herein to the Bidding Procedures Order shall also be deemed to be references to the bidding procedures approved thereby (the "**Bidding Procedures**").

2

Successful Bidder; and the Court having conducted a hearing on the Motion (the "**Sale Hearing**"), at which time all interested parties were offered an opportunity to be heard with respect to the Motion; and the Court having reviewed and considered the Motion, the Purchase Agreement, and any and all objections to the Sale and the Transaction Documents filed in accordance with the Bidding Procedures Order; and the Court having heard statements of counsel and the evidence presented in support of the relief requested in the Motion at the Sale Hearing and in the Declarations of Bernard A. Katz and Jefferey Lewis; and it appearing that due notice of the Motion, the Sale Hearing, the Purchase Agreement, and the Sale has been provided; and it appearing that the relief requested in the Motion is in the best interests of the Debtor, its estate, stakeholders, and all other parties in interest; and it appearing that the Court has jurisdiction over this matter; and it appearing that the legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein; and after due deliberation, it is hereby

**FOUND, CONCLUDED, AND DETERMINED THAT:**

**Jurisdiction, Venue, and Final Order**

A.      This Court has jurisdiction to hear and determine the Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper in this District and in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.      This Sale Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Federal Rule of Civil Procedure 54(b), as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Sale Order, and expressly directs entry of judgment as set forth herein.  The findings and conclusions set forth herein constitute the Court's findings of fact

and conclusions of law pursuant to Bankruptcy Rule 7052 made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

### Notice of the Motion, Auction, Sale Hearing, Purchase Agreement and Sale and the Cure Amounts

C.       As evidenced by the Declarations of Bernard A. Katz and Jefferey Lewis and affidavits of service and publication previously filed with this Court, proper, timely, adequate, and sufficient notice of the Motion, the Auction, the Sale Hearing, the Purchase Agreement, and the Sale has been provided in accordance with sections 102(1), 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007 and 9014. The Debtor has complied with all obligations to provide notice of the Motion, the Auction, the Sale Hearing, the Purchase Agreement, and the Sale as required by the Bidding Procedures Order. The foregoing notice was good, sufficient, and appropriate under the circumstances, and no other or further notice of the Motion, the Auction, the Sale Hearing, the Purchase Agreement, or the Sale is required. With respect to entities whose identities are not reasonably ascertained by the Debtor, publication of the Sale Notice (as defined in the Motion) in the *New York Times* on December 6, 2019 was sufficient and reasonably calculated under the circumstances to reach such entities.

D.       A reasonable opportunity to object or to be heard regarding the relief requested in the Motion was afforded to all interested persons and entities.

E.       In accordance with the Bidding Procedures Order, the Debtor has served a notice of its intent to assume and assign the Assumed Contracts and the Ground Lease and of the Cure Amounts upon each counterparty to an Assumed Contract or the Ground Lease. The service and provision of such notice was good, sufficient, and appropriate under the circumstances and no

further notice need be given in respect of the assumption and assignment of the Assumed

Contracts and the Ground Lease or establishing a Cure Amount for the respective Assigned

Contracts or the Ground Lease. Counterparties to the Assumed Contracts and the Ground Lease

have had an adequate opportunity to object to the assumption and assignment of the applicable

Assumed Contracts or the Ground Lease and the Cure Amounts set forth in the notices

(including objections related to the adequate assurance of future performance and objections

based on whether applicable law excuses the counterparty from accepting performance by, or

rendering performance to, the Purchaser for purposes of section 365(c)(1) of the Bankruptcy

Code). All objections, responses, or requests for adequate assurance, if any, have been resolved,

overruled, or denied, as applicable.

       F.     The Debtor and the Purchaser, as applicable, have, including by way of entering

into the Purchase Agreement, and agreeing to the provisions relating to the Assumed Contracts

and the Ground Lease therein and in this Sale Order, (i) cured, or provided adequate assurance of

cure, of any default existing prior to the date hereof under any of the Assumed Contracts and the

Ground Lease within the meaning of section 365(b)(1)(A) of the Bankruptcy Code and (ii)

provided compensation or adequate assurance of compensation to any party for any actual

pecuniary loss to such party resulting from a default prior to the date hereof under any of the

Assumed Contracts and the Ground Lease within the meaning of section 365(b)(1)(B) of the

Bankruptcy Code and the Purchaser has, based upon the record of these proceedings, including

the evidence proffered by the Debtor at the Sale Hearing, provided adequate assurance of its

future performance of and under the Assumed Contracts and the Ground Lease pursuant to

sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code.  The Purchaser's promise under the

Purchase Agreement and this Sale Order to perform the obligations under the Assumed Contracts

and the Ground Lease after the Closing, as well as its delivery of the Guaranty of Completion and Performance (as defined in the Purchase Agreement, as amended), shall constitute adequate assurance of future performance under the Assumed Contracts and the Ground Lease being assigned to the Purchaser within the meaning of sections 365(b)(1) and 365(f)(2)(B) of the Bankruptcy Code.  The Cure Costs are hereby deemed to be the sole amounts necessary to cure any and all defaults under the Assumed Contracts under section 365(b) of the Bankruptcy Code; *provided, however*, this sentence does not apply to the Ground Lease.

## Highest and Best Offer

G.       As demonstrated by the Declarations of Bernard A. Katz and Jefferey Lewis, the evidence proffered or adduced at the Sale Hearing, and the representations of counsel made on the record at the Sale Hearing, the Debtor conducted a sale process in accordance with, and has, along with the Purchaser, complied in all respects with, the Bidding Procedures Order and afforded a full, fair, and reasonable opportunity for any interested party to make a higher or otherwise better offer to purchase the Assets and assume the Assumed Liabilities.

H.       The Debtor and its advisors engaged in a robust and extensive marketing and sale process in accordance with the Bidding Procedures Order and the sound exercise of the Debtor's business judgment.

I.       The Debtor and the Purchaser have negotiated and undertaken their roles leading to the entry into the Purchase Agreement in a diligent, non-collusive, fair, reasonable, and good-faith manner.

J.       The Debtor conducted a fair and open sale process and the sale process, the Bidding Procedures, and the Auction were non-collusive, duly noticed, and provided a full, fair, reasonable, and adequate opportunity for any entity that either expressed an interest in acquiring

the Assets, or who the Debtor believed may have had an interest in acquiring the Assets, to make an offer to purchase the Debtor's assets, including, without limitation the Assets.

      K.     The sale process conducted by the Debtor pursuant to the Bidding Procedures Order and the Bidding Procedures resulted in the highest or otherwise best value for the Assets for the Debtor and its estate, was in the best interest of the Debtor, its creditors, and all parties in interest, and any other transaction would not have yielded as favorable a result.

      L.     The Debtor has demonstrated good, sufficient, and sound business reasons and justifications for entering into the Sale and the performance of its obligations under the Purchase Agreement.

      M.     The Debtor has demonstrated sufficient basis to enter into the Purchase Agreement, sell the Assets on the terms outlined therein and assume and assign the Assumed Contracts and the Ground Lease to the Purchaser under sections 363 and 365 of the Bankruptcy Code. All such actions are appropriate exercises of the Debtor's business judgment and in the best interests of the Debtor, its creditors, its estate, and other parties in interest. Approval of the Sale pursuant to the Purchase Agreement and this Sale Order at this time is in the best interests of the Debtor, its creditors, its estate, and all other parties in interest.

      N.     The consummation of the Sale outside a plan of reorganization pursuant to the Purchase Agreement neither impermissibly restructures the rights of the Debtor's creditors nor impermissibly dictates the terms of a plan of reorganization or liquidation for the Debtor. The Sale does not constitute a sub rosa plan for which approval has been sought without the protections that a disclosure statement would afford.

O.      Entry of an order approving the Purchase Agreement and all the provisions thereof is a necessary condition precedent to Purchaser's consummation of the Sale, as set forth in and pursuant to the Purchase Agreement.

### Personal Identifiable Information

P.      The Debtor does not have a privacy policy prohibiting the transfer of personal identifiable information; therefore, the appointment of a consumer privacy ombudsman is not required.

### Good Faith of Purchaser

Q.      The consideration to be paid by the Purchaser under the Purchase Agreement, including the assumption of the Assumed Liabilities, including all liabilities for transfer taxes and related taxes incurred as a result of the sale, and  delivery of the Guaranty of Completion and Performance, was negotiated at arm's-length, in good faith, and without collusion pursuant to section 363(m) of the Bankruptcy Code and constitutes reasonably equivalent value and fair and adequate consideration for the Assets. Specifically: (i) the Purchaser recognized that the Debtor was free to deal with any other party interested in purchasing the Assets; (ii) the Purchaser complied in all respects with the provisions in the Bidding Procedures Order in negotiating and entering into the Transaction Documents, and the transactions described therein comply with the Bidding Procedures Order; (iii) the Purchaser agreed to subject any bid to the competitive bid procedures set forth in the Bidding Procedures Order; (iv) all payments made by the Purchaser in connection with the Sale have been disclosed in the Purchase Agreement; (v) no common identity of managers, directors, officers, or controlling stockholders exists among the Purchaser and the Debtor; (vi) the negotiation and execution of the Purchase Agreement and the other Transaction Documents were at arm's-length and in good faith, and at all times each of the Purchaser and the Debtor were represented by competent counsel of their choosing; (vii) the

Purchaser did not in any way induce or cause the Chapter 11 filing of the Debtor; and (viii) the Purchaser has not acted in a collusive manner with any person. The Purchaser will act in good faith within the meaning of section 363(m) of the Bankruptcy Code in closing the transactions contemplated by the Purchase Agreement and the other Transaction Documents. The terms and conditions set forth in the Purchase Agreement are fair and reasonable under the circumstances and were not entered into for the purpose of, nor do they have the effect of, hindering, delaying, or defrauding the Debtor or its creditors under any applicable laws.  To the extent that the $175,000.00 in cash held by the Debtor on account of Punch List # 753 has not been paid to the applicable contractor in respect thereof, then such funds shall be transferred to the Purchaser.

R.      The Debtor and the Purchaser, and each of their respective management, boards of directors, members, officers, directors, managers, employees, agents, and representatives, have acted in good faith. The Purchase Agreement and the other Transaction Documents, and each of the transactions contemplated therein, were negotiated, proposed, and entered into by the Debtor and the Purchaser in good faith, without collusion or fraud, and from arm's-length bargaining positions. The Purchaser is a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code, and, as such, is entitled to all the protections afforded thereby.

## No Fraudulent Transfer

S.      The consideration provided by the Purchaser pursuant to the Purchase Agreement for its purchase of the Assets and the assumption of the Assumed Liabilities constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act, and under the laws of the United States, any state, territory, possession, or the District of Columbia.

T.      Neither the Debtor nor the Purchaser (i) has entered into the Purchase Agreement or proposes to consummate the Sale for the purposes of hindering, delaying, or defrauding the

Debtor's present or future creditors or (ii) is entering into the Purchase Agreement or proposing

to consummate the Sale fraudulently, for the purpose of statutory or common law fraudulent

conveyance and fraudulent transfer claims, whether under the Bankruptcy Code or under the

laws of the United States, any state, territory, possession thereof or the District of Columbia or

any other applicable jurisdiction with laws substantially similar to the foregoing.

U.     Neither the Purchaser nor its past, present, or future subsidiaries, parents,

divisions, affiliates, agents, representatives, insurers, attorneys, successors and assigns, nor any

of its nor their respective directors, managers, officers, employees, shareholders, members,

agents, representatives, attorneys, contractors, subcontractors, independent contractors, owners,

insurance companies or partners (each, a "**Purchaser Party**" and collectively, the "**Purchaser**

**Parties**") is a continuation of the Debtor or its estate and no Purchaser Party is holding itself out

to the public as a continuation of the Debtor or its estate and the Sale does not amount to a

consolidation, merger, or de facto merger of the Purchaser (or any other Purchaser Party) and the

Debtor.

### Validity of Transfer

V.     The Debtor's sole and independent manager has authorized the execution and

delivery of the Purchase Agreement and the Sale of the Assets to the Purchaser. The Debtor

(i) has full corporate power and authority to execute and deliver the Purchase Agreement and all

other documents contemplated thereby, as applicable, (ii) has all of the power and authority

necessary to consummate the Sale, and (iii) has taken all action necessary to authorize and

approve the Purchase Agreement and to consummate the Sale, and no further consents or

approvals, other than those expressly provided for in the Purchase Agreement, are required for

the Debtor to consummate the transactions contemplated by the Purchase Agreement, except as

otherwise set forth in the Purchase Agreement. The Assets constitute property of the Debtor's

estate within the meaning of section 541(a) of the Bankruptcy Code and title thereto is presently vested in the Debtor's estate.

<div align="center">**Section 363(f) of the Bankruptcy Code is Satisfied**</div>

W.　　The Sale of the Assets to the Purchaser and the assumption and assignment to the Purchaser of the Assumed Contracts and the Ground Lease under the terms of the Purchase Agreement meets the applicable provisions of section 363(f) of the Bankruptcy Code such that the Sale of the Assets will be free and clear of any and all liens, claims, encumbrances, and interests, and will not subject any Purchaser Party to any liability for any liens, claims, encumbrances, and interests whatsoever (including, without limitation, under any theory of equitable law, antitrust, or successor or transferee liability), except as expressly provided in (a) the Purchase Agreement with respect to the Assumed Liabilities (as defined in the Purchase Agreement) or (b) this Sale Order. All holders of liens, claims, encumbrances, and interests who did not object, or withdrew their objections to the Sale, are deemed to have consented to the Sale pursuant to section 363(f)(2) of the Bankruptcy Code, and all holders of liens, claims, encumbrances, and interests are adequately protected thereby satisfying section 363(e) of the Bankruptcy Code by having their liens, claims, encumbrances, and interests, if any, attach to the proceeds of the Sale ultimately attributable to the property against or in which they assert liens, claims, encumbrances, and interests, or other specifically dedicated funds, in the same order of priority and with the same validity, force, and effect that such holder had prior to the Sale, subject to any rights, claims, and defenses of the Debtor or its estate, as applicable. Those holders of claims who did object and that have an interest in the Assets fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code.

X.　　The transfer of the Assets to the Purchaser under the Purchase Agreement will be a legal, valid, and effective transfer of all of the legal, equitable, and beneficial right, title, and

interest in and to the Assets free and clear of all liens, claims, encumbrances, and interests, except as expressly provided in the Purchase Agreement and this Sale Order with respect to the Assumed Liabilities. The Debtor may sell its interests in the Assets free and clear of all liens, claims, encumbrances, and interests because, in each case, one or more of the standards set forth in section 363(f) have been satisfied. The Purchaser would not have entered into the Transaction Documents and would not consummate the transactions contemplated thereby, including, without limitation, the Sale and the assumption and assignment of the Assumed Contracts and the Ground Lease (i) if the transfer of the Assets were not free and clear of all interest of any kind or nature whatsoever, including, without limitation, rights or claims based on any successor, transferee, derivative, or vicarious liability or any similar theory and/or applicable state or federal law or otherwise, or (ii) if the Purchaser or any of its affiliates would, or in the future could, be liable for any interests, including, without limitation, rights or claims based on any successor, transferee, derivative or vicarious liability or any similar theory and/or applicable state or federal law or otherwise, in each case subject only to the Assumed Liabilities. Not transferring the Assets free and clear of all interests of any kind or nature whatsoever, including, without limitation, rights or claims based on any successor, transferee, derivative, or vicarious liability or any similar theory and/or applicable state or federal law or otherwise (subject only to the Assumed Liabilities), would adversely impact the Debtor's efforts to maximize the value of its estate.

     Y.     The Purchaser would not have entered into the Purchase Agreement and would not have agreed to consummate the Sale, thus adversely affecting the Debtor, its estate, and its creditors, if each of (i) the Sale and (ii) the assumption and assignment of the Assumed Contracts and the Ground Lease to the Purchaser were not free and clear of all liens, claims, and interests

of any kind or nature whatsoever (with the sole exception of any Permitted Encumbrances and

Assumed Liabilities), or if the Purchaser would, or in the future could, be liable for any

Encumbrances, or liabilities associated with assets that are not Acquired Assets, Assumed

Contracts or the Ground Lease (collectively, the "**Excluded Liabilities**").

      Z.      Except as otherwise set forth herein, as of the Closing, pursuant and subject to the

terms of the Purchase Agreement and this Sale Order, the transfer of the Acquired Assets and of

the Assumed Liabilities and the Sale will effect a legal, valid, enforceable, and effective transfer

of the Acquired Assets and will vest the Purchaser with all of the Debtor's rights, title, and

interests in the Acquired Assets free and clear of all liens, claims, and interests of any kind or

nature whatsoever (with the sole exception of any Permitted Encumbrances and Assumed

Liabilities), including (i) liens, mortgages, deeds of trust, pledges, charges, security interests,

rights of first refusal, hypothecations, encumbrances, easements, servitudes, leases or subleases,

rights-of-way, encroachments, restrictive covenants, restrictions on transferability or other

similar restrictions, rights of offset or recoupment, right of use or possession, subleases, leases,

conditional sale arrangements, or other title retention arrangements, other liens (including

mechanic's, materialman's, maritime, possessory and other consensual and non-consensual liens

and statutory liens), judgments, charges of any kind or nature, if any, including any restriction on

the use, voting, transfer, receipt of income or other exercise of any attributes of ownership, or

any rights that purport to give any party a right of first refusal or consent with respect to the

Debtor's interest in the Acquired Assets or any similar rights; (ii) all claims as defined in

Bankruptcy Code section 101(5), including all rights or causes of action (whether in law or in

equity), proceedings, warranties, guarantees, indemnities, rights of recovery, setoff, recoupment,

indemnity or contribution, obligations, demands, restrictions, indemnification claims, or

liabilities relating to any act or omission of the Debtor or any other person, consent rights, options, contract rights, covenants, claims for reimbursement, exoneration, products liability, alter-ego, environmental, or tax, decrees of any court or foreign or domestic governmental entity, indentures, loan agreements, and interests of any kind or nature whatsoever (known or unknown, matured or unmatured, accrued, or contingent and regardless of whether currently exercisable), whether arising prior to or subsequent to the commencement of the above-captioned cases, and whether imposed by agreement, understanding, law, equity or otherwise; (iii) all debts, liabilities, obligations, contractual rights and claims, labor, employment and pension claims, and debts arising in any way in connection with any agreements, acts, or failures to act, in each case, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or un-matured, material or non-material, disputed or undisputed, whether arising prior to or subsequent to the commencement of this chapter 11 case, and whether imposed by agreement, understanding, law, equity or otherwise; (iv) any rights based on any successor or transferee liability, (v) any rights that purport to give any party a right or option to effect any forfeiture, modification, right of first offer or first refusal, or consents, or termination of the Debtor's or the Purchaser's interest in the Acquired Assets, or any similar rights; (vi) any rights under labor or employment agreements; (vii) any rights under mortgages, deeds of trust, and security interests; (viii) any rights related to intercompany loans and receivables between the Debtor and any non-Debtor subsidiary or affiliate; (ix) any rights under pension, multiemployer plan (as such term is defined in Section 3(37) or Section 4001(a)(3) of the Employee Retirement Income Security Act of 1974 (as amended, "**ERISA**")), health or welfare, compensation or other employee benefit plans,

agreements, practices, and programs, including, without limitation, any pension plans of the

Debtor or any multiemployer plan to which the Debtor has at any time contributed to or had any

liability or potential liability; (x) any other employee claims related to worker's compensation,

occupational disease, or unemployment or temporary disability, including, without limitation,

claims that might otherwise arise under or pursuant to (a) ERISA, (b) the Fair Labor Standards

Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e)

the National Labor Relations Act, (f) the Age Discrimination and Employment Act of 1967 and

Age Discrimination in Employment Act, as amended, (g) the Americans with Disabilities Act of

1990, (h) the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, including,

without limitation, the requirements of Part 6 of Subtitle B of Title I of ERISA and Section

4980B of the Internal Revenue Code and of any similar state law (collectively, "**COBRA**"),

(i) state discrimination laws, (j) state unemployment compensation laws or any other similar state

laws, (k) any other state or federal benefits or claims relating to any employment with the Debtor

or any of its predecessors, or (l) the WARN Act (29 U.S.C. §§ 2101 *et seq*.) (the "**WARN Act**");

(xi) any bulk sales or similar law; (xii) any tax statutes or ordinances, including, without

limitation, the Internal Revenue Code of 1986, as amended, and any taxes arising under or out of,

in connection with, or in any way relating to the operation of the Acquired Assets prior to the

Closing, including, without limitation, any *ad valorem* taxes assessed by any applicable taxing

authority; (xiii) any unexpired and executory contract or unexpired lease to which a Debtor is a

party that is not an Assigned Contract or the Ground Lease  that will be assumed and assigned

pursuant to this Sale Order and the Asset Purchase Agreement; and (xv) any other Excluded

Liabilities.

**Assumption and Assignment of the Assumed Contracts and the Ground Lease**

AA.     The assumption and assignment of the Assumed Contracts and the Ground Lease pursuant to the terms of this Sale Order are integral to the Purchase Agreement, are in the best interests of the Debtor and its estate, creditors, and other parties in interest, and represent the reasonable exercise of sound business judgment by the Debtor.

BB.     The Debtor has met all the requirements of section 365(b) of the Bankruptcy Code for each of the Assumed Contracts and the Ground Lease. The Purchaser and/or the Debtor has (i) cured and/or provided adequate assurance of prompt cure of any default existing prior to the Closing under all of the Assumed Contracts and the Ground Lease, within the meaning of section 365(b)(1)(A) of the Bankruptcy Code, (ii) provided compensation or adequate assurance of compensation to any counterparty for actual pecuniary loss to such party resulting from a default prior to the Closing under any of the Assumed Contracts and the Ground Lease, and (iii) provided adequate assurance of future performance, all within the meaning of sections 365(b)(1)(B) and (C) of the Bankruptcy Code.  The Purchaser has agreed to deliver the Guaranty of Completion and Performance, among other things, in satisfaction of its obligation to provide adequate assurance of future performance under the Ground Lease. The Purchaser has provided adequate assurance of future performance within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) and in accordance with the Bidding Procedures to the extent that any such assurance is required and not waived by the counterparties to such Assumed Contracts and the Ground Lease.

CC.     At any time prior to the rejection of an executory contract or unexpired lease, the Debtor shall have the right, in accordance with the Bidding Procedures Order, to serve a Supplemental Assumption Notice upon any non-Debtor counterparty thereto indicating the Debtor's intent to assume and assign such executory contract or unexpired lease. The objection

deadline for all Assumed Contracts and the Ground Lease, other than those subject to a
Supplemental Assumption Notice, lapsed on February 26, 2020. Objections, if any, to the
proposed assumption and assignment or the Cure Amounts proposed in any Supplemental
Assumption Notice with respect thereto, must (i) be in writing, (ii) comply with the applicable
provisions of the Bankruptcy Rules and the Local Rules, (iii) state with specificity the nature of
the objection and, if the objection pertains to a proposed Cure Amount, the correct Cure Amount
alleged by the objecting counterparty, together with any applicable and appropriate
documentation in support thereof, and (iv) be filed with the Court and served upon, so as to be
actually received by, counsel to the Debtor on or before fourteen (14) days after service of the
Supplemental Assumption Notice in question. If the parties cannot agree on a resolution, the
Debtor will seek an expedited hearing before the Court to determine the Cure Amount and
approve the assumption and assignment to Purchaser. If there is no objection prior to the
applicable objection deadline, then the counterparties will be deemed to have consented to the
assumption and assignment to Purchaser and the Cure Amount, and such assumption and
assignment to Purchaser and the Cure Amount shall be deemed approved by this Sale Order
without further order of this Court.

DD.     Without limiting the generality of the foregoing, and except as otherwise
expressly provided herein or in the Purchase Agreement, Purchaser shall not be liable for any
claims against the Debtor or any of its predecessors or affiliates, and except as otherwise
expressly provided herein or in the Purchase Agreement, Purchaser shall have no successor or
vicarious liabilities of any kind or character, including, without limitation, under any theory of
antitrust, environmental, successor, or transfer reliability, labor law, de facto merger, mere
continuation, or substantial continuity, whether known or unknown as of the Closing, now

17

existing, or hereafter arising, whether fixed or contingent, whether asserted or unasserted, whether legal or equitable, whether liquidated or unliquidated, including, without limitation, liabilities on account of warranties, intercompany loans, receivables among the Debtor and its affiliates, environmental liabilities, and any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of any of the Assets prior to the Closing. Consummation of the Sale

EE.  Based on the record of the Sale Hearing, and for the reasons stated on the record at the Sale Hearing, the sale of the Assets must be approved and consummated promptly to preserve the value of the Assets. Time, therefore, is of the essence in effectuating the Purchase Agreement. As such, the Debtor and the Purchaser intend to close the sale of the Assets as soon as reasonably practicable. The Debtor has demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the immediate approval and consummation of the sale of the Acquired Assets pursuant to the Asset Purchase Agreement and this Sale Order (the "**Sale**") as contemplated by the Assert Purchase Agreement.  In the absence of a stay pending appeal, Purchaser, being a good faith purchaser under section 363(m) of the Bankruptcy Code, may close the sale contemplated by the Asset Purchase Agreement at any time after the entry of this Sale Order . Accordingly, there is sufficient cause to waive the stay provided in the Bankruptcy Rules 6004(h) and 6006(d).

**NOW, THEREFORE, IT IS ORDERED, ADJUDGED, AND DECREED THAT:**

<u>**General Provisions**</u>

1.  The Motion is **GRANTED** to the extent set forth herein.

2.  All objections to or reservation of rights with respect to the Motion or the relief requested therein that have not been withdrawn or resolved are overruled. All persons and

entities who did not object or withdraw their objections to the Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.

3.       The Purchase Agreement and the other Transaction Documents, and all terms and conditions thereof, are hereby approved.

### Transfer of the Assets as set forth in the Purchase Agreement

4.       The Purchase Agreement, including all of the terms and conditions thereof, are hereby approved.  Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, the Debtor is authorized and directed to take any and all actions necessary to fulfill its obligations under, and comply with the terms of, the Purchase Agreement and to consummate the Sale pursuant to and in accordance with the terms and conditions of the Purchase Agreement and this Sale Order, without further leave of the Court.  The Debtor is further authorized to pay, without further order of this Court, whether before, at, or after the Closing, any expenses or costs that are required to be paid in order to consummate the transactions contemplated by the Purchase Agreement or perform its obligations under the Purchase Agreement.

5.       The Purchaser is not acquiring any of the Excluded Assets or assuming any liabilities other than the Assumed Liabilities, which Assumed Liabilities include all liabilities for transfer taxes and related taxes incurred as a result of the sale.

6.       All persons and entities are prohibited and enjoined from taking any action to adversely affect or interfere with, or which would be inconsistent with, the ability of the Debtor to transfer the Assets to the Purchaser in accordance with the Purchase Agreement, the other Transaction Documents, and this Sale Order.

7.       At Closing, all of the Debtor's right, title, and interest in and to, and possession of, the Assets shall be immediately vested in the Purchaser pursuant to sections 105(a), 363(b), 363(f), and 365 of the Bankruptcy Code. Such transfer shall constitute a legal, valid, enforceable,

and effective transfer of the Assets. All persons or entities, presently or at or after the Closing, in possession of some or all of the Assets, are directed to surrender possession of any and all portions of the Assets to the Purchaser upon the Closing or at such time thereafter as the Purchaser may request.

8.      This Sale Order (a) shall be effective as a determination that, as of the Closing, (i) no claims other than the Assumed Liabilities will be assertable against any Purchaser Party or any of its respective assets, (ii) the Assets shall have been transferred to the Purchaser free and clear of all liens, claims, encumbrances, and interests, subject only to the Assumed Liabilities, and (iii) the conveyances described herein have been effected, and (b) is and shall be binding upon and govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, registrars of patents, trademarks, or other intellectual property, administrative agencies, governmental departments, secretaries of state, federal and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement and the other Transaction Documents. The Assets are sold free and clear of any reclamation rights. All liens, claims, encumbrances, and interests on, in, or to the Assets shall attach to the proceeds of the Sale ultimately attributable to the property against which such liens, claims, encumbrances, and interests applied, or other specifically dedicated funds, in the same order of priority and with the same validity, force, and effect that such liens, claims,

encumbrances, and interests applied prior to the Sale, subject to any rights, claims, and defenses of the Debtor or its estate, as applicable, or as otherwise provided herein.

9.      Except as otherwise provided herein or in the Purchase Agreement (including with respect to the Assumed Liabilities), all persons and entities (and their respective successors and assigns), including, but not limited to, all debt security holders, equity security holders, affiliates, governmental, tax, and regulatory authorities, lenders, customers, vendors, employees, trade creditors, litigation claimants, and other creditors holding claims arising under or out of, in connection with, or in any way relating to, the Debtor, the Assets, and the ownership, sale, or operation of the Assets prior to Closing or the transfer of the Assets to the Purchaser, are hereby forever barred, estopped, and permanently enjoined from asserting such claims against any Purchaser Party and its property. Following the Closing, no holder of any claim or interest shall interfere with the Purchaser's title to or use and enjoyment of the Assets based on or related to any such claim or interest, or based on any action the Debtor may take in its Chapter 11 case.

10.      If any person or entity that has filed financing statements, mortgages, mechanic's liens, lis pendens, or other documents or agreements evidencing claims against the Debtor or in the Assets shall not have delivered to the Debtor prior to the Closing of the Sale, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, and/or releases of all liens, claims, encumbrances, and interests that the person or entity has with respect to the Debtor or the Assets or otherwise, then only with regard to the Assets that are purchased by the Purchaser pursuant to the Purchase Agreement and this Sale Order, (a) the Debtor is hereby authorized and directed to execute and file such statements, instruments, releases, and other documents on behalf of the person or entity with respect to the Assets, (b) the Purchaser is hereby authorized to file, register, or otherwise record a certified

copy of this Sale Order, which, once filed, registered, or otherwise recorded, shall constitute

conclusive evidence of the release of all liens, claims, interests, and encumbrances against the

Purchaser Parties and the Assets, and (c) upon consummation of the Sale, the Purchaser may

seek in this Court or any other court to compel appropriate parties to execute termination

statements, instruments of satisfaction, and releases of all liens, claims, encumbrances, and

interests that are extinguished or otherwise released pursuant to this Sale Order under section 363

of the Bankruptcy Code, and any other provisions of the Bankruptcy Code, with respect to the

Assets. This Sale Order is deemed to be in a recordable form sufficient to be placed in the filing

or recording system of each and every federal, state, or local government agency, department, or

office. Notwithstanding the foregoing, the provisions of this Sale Order authorizing the Sale and

assignment of the Assets free and clear of liens, claims, encumbrances, and interests shall be

self-executing and neither the Debtor nor the Purchaser shall be required to execute or file

releases, termination statements, assignments, consents, or other instruments to effectuate,

consummate, and implement the provisions of this Sale Order.

### No Successor or Transferee Liability

11.     No Purchaser Party shall be deemed, as a result of any action taken in connection

with the Purchase Agreement, the consummation of the Sale contemplated by the Purchase

Agreement, or the transfer, operation, or use of the Assets to (a) be a legal successor, or

otherwise be deemed a successor to the Debtor (other than, for the Purchaser, with respect to any

Assumed Liabilities), (b) have, de facto or otherwise, merged with or into the Debtor, or (c) be

an alter ego or a mere continuation or substantial continuation of the Debtor including, without

limitation, within the meaning of any foreign, federal, state, or local revenue law, pension law,

the ERISA , tax law, labor law, products liability law, employment law, environmental law, or

other law, rule, or regulation (including, without limitation, filing requirements under any such

laws, rules or regulations), or under any products liability law or doctrine with respect to the Debtor's liability under such law, rule, or regulation.

12. Other than as expressly set forth herein or in the Purchase Agreement (including with respect to the Assumed Liabilities), no Purchaser Party shall have any responsibility for (a) any liability or other obligation of the Debtor or related to the Assets, or (b) any claims against the Debtor or any of its predecessors or affiliates. Except as expressly provided herein or in the Purchase Agreement (including with respect to the Assumed Liabilities) with respect to the Purchaser, no Purchaser Party shall have any liability whatsoever with respect to the Debtor's (or its predecessors' or affiliates') respective businesses or operations or any of the Debtor's (or its predecessors' or affiliates') obligations (as defined herein, "**Successor Liability**") based, in whole or part, directly or indirectly, on any theory of successor or vicarious liability of any kind or character, or based upon any theory of antitrust, environmental, successor, or transferee liability, de facto merger or substantial continuity, labor and employment, or products liability, whether known or unknown as of the Closing, now existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated, including, without limitation, liabilities on account of (a) any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the Assets or the Assumed Liabilities prior to the Closing or in respect of pre-Closing periods, or (b) any plan, agreement, practice, policy, or program, whether written or unwritten, providing for pension, retirement, health, welfare, compensation or other employee benefits which is or has been sponsored, maintained or contributed to by the Debtor or with respect to which the Debtor has any liability, whether or not contingent, including, without limitation, any "multiemployer plan" (as defined in Section 3(37) of ERISA) or "pension plan" (as defined in Section 3(2) of ERISA) to which the Debtor has at any time contributed, or had

any obligation to contribute. Except to the extent expressly included in the Assumed Liabilities with respect to the Purchaser or as otherwise expressly set forth herein or in the Purchase Agreement, no Purchaser Party shall have any liability or obligation under any applicable law, including, without limitation, (a) the WARN Act (29 U.S.C. §§ 2101 et seq.), (b) the Comprehensive Environmental Response Compensation and Liability Act, (c) the Age Discrimination and Employment Act of 1967 (as amended), (d) the Federal Rehabilitation Act of 1973 (as amended), (e) the National Labor Relations Act, 29 U.S.C. § 151 et seq., or (f) any foreign, federal, state, or local labor, employment or environmental law, by virtue of the Purchaser's purchase of the Assets, assumption of the Assumed Liabilities, or hiring of certain employees of the Debtor pursuant to the terms of the Purchase Agreement. Without limiting the foregoing, no Purchaser Party shall have any liability or obligation with respect to any environmental liabilities of the Debtor or any environmental liabilities associated with the Assets except to the extent they are Assumed Liabilities set forth in the Purchase Agreement.

13.     Immediately prior to the Closing, the Purchaser was not an "insider" or "affiliate" of the Debtor, as those terms are defined in the Bankruptcy Code, and no common identity of incorporators, directors, or controlling stockholders existed between the Purchaser and the Debtor.

14.     Effective upon the Closing, except with respect to Assumed Liabilities, all persons and entities are forever prohibited and enjoined from commencing or continuing in any manner any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral, or other proceeding against any Purchaser Party or their respective assets (including, without limitation, the Assets), with respect to any (a) claim in this Chapter 11 case or in connection with or related to the Sale or the Debtor, or (b) Successor Liability including, without

24

limitation, the following actions with respect to clauses (a) and (b): (i) commencing or continuing any action or other proceeding pending or threatened; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any lien, claim, interest, or encumbrance; (iv) asserting any setoff, right of subrogation, or recoupment of any kind; (v) commencing or continuing any action, in any manner or place, that does not comply with, or is inconsistent with, the provisions of this Sale Order or other orders of this Court, or the agreements or actions contemplated or taken in respect hereof; or (vi) revoking, terminating, failing, or refusing to renew any license, permit, or authorization to operate any business in connection with the Assets or conduct any of the businesses operated with respect to such assets. For the avoidance of doubt, nothing in this paragraph shall affect the post-Closing rights and remedies of counterparties to Assumed Contracts or the Ground Lease.

15.     Notwithstanding anything to the contrary in this Order, any and all setoff and recoupment rights and related defenses of Tutor Perini Building Corp. ("**Tutor Perini**"), or its subcontractors, the Debtor, and the Purchaser, whether with respect to the Preserved Causes of Action, proof of claim no. 13, that certain pre-petition arbitration captioned Tu*tor Perini Building Corporation v. George Washington Bridge Bus Station Development Venture, LLC,* AAA Case No. 001-0002-7881, or that certain pre-petition District Court action captioned *Tutor Perini Building Corporation v. George Washington Bridge Bus Station Development Venture, LLC*, Case No. 19-05344, as each may be amended, are preserved, notwithstanding the Debtor's assignment of any of its rights, claims and defenses to Purchaser.

### **Good Faith of Purchaser**

16.     The Sale contemplated by the Purchase Agreement is undertaken by the Purchaser without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy

Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale (including, without limitation, the assumption and assignment of the Assumed Contracts and the Ground Lease), unless such authorization and consummation of such Sale are duly and properly stayed pending such appeal.

17.     Neither the Debtor nor the Purchaser have engaged in any action or inaction that would cause or permit the Sale to be avoided or costs or damages to be imposed under section 363(n) of the Bankruptcy Code.

### Assumption and Assignment of Assumed Contracts and the Ground Lease

18.     The Debtor is authorized and directed at the Closing to assume and assign each of the Assumed Contracts and the Ground Lease to the Purchaser pursuant to sections 105(a) and 365 of the Bankruptcy Code and to execute and deliver to the Purchaser such documents or other instruments as may be necessary to assign and transfer the Assumed Contracts and the Ground Lease to the Purchaser. The payment of the applicable Cure Amounts (if any), the provision of adequate assurance by the Debtor or the Purchaser, as applicable, that it will promptly cure any non-monetary defaults existing prior to Closing under the Assumed Contracts and the Ground Lease, and the provision of adequate assurance of future performance by the Purchaser under the Assumed Contracts and the Ground Lease shall (a) effect a cure of all defaults existing thereunder as of the Closing, and (b) compensate for any actual pecuniary loss to such counterparty resulting from such default.  Notwithstanding anything to the contrary in this Sale Order or in the Purchase Agreement, Purchaser shall promptly cure any non-monetary defaults existing under the Ground Lease, regardless of when such defaults arose, except to the extent any such defaults were previously expressly waived, or the obligations with respect thereto expressly modified, by the Port Authority.

26

19.     Pursuant to section 365(f) of the Bankruptcy Code, subject to the payment of the applicable Cure Amounts, the provision of adequate assurance by the Debtor or the Purchaser, as applicable, that it will promptly cure any non-monetary defaults existing prior to the Closing under the Assumed Contracts and the Ground Lease, and the provision of adequate assurance of future performance by the Purchaser under the Assumed Contracts and the Ground Lease, the Assumed Contracts and Ground Lease to be assumed and assigned under the Purchase Agreement shall be assigned and transferred to and remain in full force and effect for the benefit of, the Purchaser notwithstanding any provision in the contracts or other restrictions prohibiting their assignment or transfer. Any provisions in any Assumed Contract or the Ground Lease that prohibit or condition the assignment of such Assumed Contract or the Ground Lease to the Purchaser or allow the counterparty to such Assumed Contract or the Ground Lease to terminate, recapture, impose any penalty or condition on renewal or extension, or modify any term or condition upon the assignment of such Assumed Contract and the Ground Lease to the Purchaser, constitute unenforceable anti-assignment provisions that are void and of no force and effect with respect to the sale of the Assets set forth in the Purchase Agreement. All other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtor and assignment to the Purchaser of the Assumed Contracts and the Ground Lease have been satisfied. Upon the Closing, in accordance with sections 363 and 365 of the Bankruptcy Code, the Purchaser shall be fully and irrevocably vested with all right, title, and interest of the Debtor under the Assumed Contracts and the Ground Lease, and such Assumed Contracts and the Ground Lease shall remain in full force and effect for the benefit of the Purchaser. Each counterparty to the Assumed Contracts and the Ground Lease shall be forever barred, estopped, and permanently enjoined from (a) asserting against the Debtor or any

Purchaser Party or their respective property any assignment fee, acceleration, default, breach, claim, pecuniary loss, or condition to assignment existing, arising, or accruing as of the Closing or arising by reason of the Closing, including, without limitation, any breach related to or arising out of change-in-control provisions in such Assumed Contracts and the Ground Lease, or any purported written or oral modification to the Assumed Contracts and the Ground Lease, and (b) asserting against any Purchaser Party (or its respective property, including, without limitation, the Assets) any claim, counterclaim, defense, breach, condition, or setoff asserted, or assertable against the Debtor as of the Closing or arising by reason of the Closing, in each case, except for the Assumed Liabilities and notwithstanding anything to the contrary, and for the avoidance of doubt, the Purchaser shall maintain compliance with all provisions of the Ground Lease after the Closing, including, without limitation, the definition and use of "Prohibited Person" in the Ground Lease.

20.     Upon the Closing and the payment of the relevant Cure Amounts, if any, the provision of adequate assurance by the Debtor or the Purchaser, as applicable, that it will promptly cure any non-monetary defaults existing prior to the Closing under the Assumed Contracts and the Ground Lease, including by way of the delivery of the Guaranty of Completion and Performance, and the provision of adequate assurance of future performance by the Purchaser under the Assumed Contracts and the Ground Lease, the Purchaser shall be deemed to be substituted for the Debtor as a party to the applicable Assumed Contracts and the Ground Lease and the Debtor shall be released, pursuant to section 365(k) of the Bankruptcy Code, from any liability under the Assumed Contracts and the Ground Lease.  If the Closing occurs on August 27, 2021, upon the Closing, the Port Authority shall be paid $1,667,888.34 as a Cure Amount in respect of the Ground Lease.  If the Closing occurs on or after August 28, 2021, then,

in addition to the amount set forth in the previous sentence, upon the Closing the Port Authority shall be paid an additional $1,221.66 per day for each additional day beginning on August 28, 2021 through the Closing. There shall be no rent accelerations, assignment fees, increases, or any other fees charged to the Purchaser or the Debtor as a result of the assumption and assignment of the Assumed Contracts and the Ground Lease. The failure of the Debtor or the Purchaser to enforce at any time one or more terms or conditions of any Assumed Contract and the Ground Lease shall not be a waiver of such terms or conditions or of the right of the Debtor or the Purchaser, as the case may be, to enforce every term and condition of such Assumed Contract or the Ground Lease. Any party that may have had the right to consent to the assignment of any Assumed Contract and the Ground Lease is deemed to have consented for the purposes of section 365(e)(2)(A) of the Bankruptcy Code.

21. The Debtor or the Purchaser, as applicable, shall cure all defaults or other obligations of the Debtor under the Assumed Contracts and the Ground Lease arising or accruing after the Sale Objection Deadline and prior to the Closing (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) on the Closing, or as soon thereafter as reasonably practicable.

22. The assignments of each of the Assumed Contracts and the Ground Lease are made in good faith under sections 363(b) and 363(m) of the Bankruptcy Code.

## Other Miscellaneous Provisions

23. Purchaser shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the Purchase Agreement or any other Sale-related document. The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the preceding

sentence, provided, however, that this Court shall retain exclusive jurisdiction over any and all disputes with respect thereto.

24.     Notwithstanding anything to the contrary herein, nothing in this Sale Order or the Purchase Agreement releases, nullifies, precludes, or enjoins the enforcement of any liability to the Port Authority in its regulatory capacity (including but not limited to compliance with building code requirements), and any associated liabilities for penalties, damages, cost recovery, or injunctive relief that any entity would be subject to as the owner, lessor, lessee, or operator of the Assets. Nothing in this Sale Order or the Purchase Agreement authorizes the transfer to any purchaser of any licenses, permits, registrations, or authorizations and approvals of the Port Authority without the purchaser's compliance with all applicable legal requirements under non-bankruptcy law governing such transfers.  With respect to any claim or action brought by the Port Authority, nothing in this Sale Order divests any tribunal of any jurisdiction it may have under regulatory law to interpret this Sale Order or to adjudicate any defense asserted under this Sale Order.

25.     To the extent provided by section 525 of the Bankruptcy Code, no governmental unit may deny, revoke, suspend, or refuse to renew any permit, license, or similar grant relating to the operation of the Acquired Assets owned by the Debtor sold, transferred, or conveyed to Purchaser on account of the filing or pendency of these chapter 11 cases.

26.     Except as set forth in paragraph 24, above, with respect to the Port Authority, to the maximum extent available under applicable law and to the extent provided for under the Purchase Agreement, Purchaser shall be authorized, as of the Closing, to operate under any license, permit, registration, and governmental authorization or approval of the Debtor with respect to the Acquired Assets and, to the maximum extent available under applicable law and to the extent provided for

under the Purchase Agreement, all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been transferred to Purchaser as of the Closing. All existing licenses or permits applicable to the Acquired Assets shall remain in place for Purchaser's benefit until either new licenses and permits are obtained or existing licenses and permits are transferred in accordance with applicable administrative procedures.

27.    The terms and provisions of the Purchase Agreement, the other Transaction Documents and this Sale Order shall be binding in all respects upon the Debtor, its affiliates, its estate, all creditors of the Debtor (whether known or unknown), and all holders of equity interests in any Debtor, any holders of liens, claims, or interests (including holders of any rights or claims based on any putative successor or transferee liability) or any kind or nature whatsoever against or on all or any portion of the Assets, all counterparties to the Assumed Contracts and the Ground Lease, and the Purchaser, and all of their respective successors and assigns including, but not limited to, any subsequent trustee(s), examiner(s), or receiver(s) appointed in the Debtor's Chapter 11 case or upon conversion to a case under Chapter 7 under the Bankruptcy Code, as to which trustee(s), examiner(s), or receiver(s) such terms and provisions likewise shall be binding. The Purchase Agreement shall not be subject to rejection or avoidance by the Debtor, its estate, creditors, shareholders, or any trustee(s), examiner(s), or receiver(s).  To the extent this Sale Order conflicts with or derogates from the provisions of the Purchase Agreement, the terms of this Sale Order shall govern.

28.    The terms and provisions of this Sale Order and any actions taken pursuant hereto shall survive entry of an order which may be entered: (a) confirming any Chapter 11 plan in this Chapter 11 case; (b) converting the Chapter 11 case to a case under Chapter 7 of the Bankruptcy Code; (c) dismissing the Chapter 11 case; or (d) pursuant to which this Court abstains from

hearing the Chapter 11 case. The terms and provisions of this Sale Order, notwithstanding the entry of any such orders described in (a)-(d) above, shall continue in this Chapter 11 case or following dismissal of this Chapter 11 case.

29.　　Each and every federal, state, and local governmental agency, department, or official is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement.

30.　　The Purchase Agreement may be modified, amended, or supplemented by the parties thereto in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment, or supplement does not: (i) based on the Debtor's business judgment have a material adverse effect on the Debtor's estate or its creditors, or (ii) have an adverse effect on the Port Authority without the consent of the Port Authority. The Debtor shall provide the Port Authority with prior notice of all modifications, amendments, or supplements of the Purchase Agreement. For the avoidance of doubt, all other modifications, amendments, or supplements that have a material adverse effect on the Debtor's estate or its creditors shall require Court approval.

31.　　The Debtor is authorized to immediately direct its tenants to pay rent for the period beginning on September 1, 2021 and all periods thereafter to the Purchaser and not the Senior Secured Lender.  In the event the Sale does not close, any amounts collected by the Purchaser shall be immediately remitted to the Senior Secured Lender.

32.　　Upon closing of the Sale, the Debtor shall pay in cash in full all outstanding accrued but unpaid fees, expenses, and disbursements of the Senior Secured Lender, including all outstanding accrued but unpaid fees and expenses of Weil, Gotshal & Manges LLP under the DIP Order through the Closing.  For the avoidance of doubt, all fees and expenses of the Senior

Secured Lender payable or paid under the DIP Order shall be treated as allowed administrative expenses of the Debtors pursuant to sections 503(b)(1) and 507(a)(2) of the Bankruptcy Code, shall be non-refundable when paid, and shall not be subject to any avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether contractual, equitable, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, or any other challenges under any applicable law or regulation by any person or entity.

33.     Within two (2) business days of the Closing, the Debtor shall pay, or cause the Purchaser to pay (and in such case, the Purchaser is hereby directed to pay), GWB Madison Purchaser LLC a total cash payment of $1,000,000.00 on account of its allowed administrative expense claim for its $400,000.00 Expense Reimbursement and its $600,000.00 Break-Up Fee (as each of those terms is defined in that certain Agreement of Purchase and Sale dated March 25, 2021 between the Debtor and GWB Madison Purchaser LLC and filed with the Court at Docket No. 467-1).  For the avoidance of doubt, the Closing Payment is deemed to include such $1,000,000.00 in cash.

34.     The Purchase Agreement and the Sale contemplated hereunder shall not be subject to any bulk sales laws or any similar law of any state or jurisdiction.

35.     The failure to specifically reference any particular provisions of the Purchase Agreement or the Transaction Documents in this Sale Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the Purchase Agreement and other related documents be authorized and approved.

36.     All time periods set forth in this Sale Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

37.     Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 6006(d), 7062, and 9014 or otherwise, the terms and conditions of this Sale Order shall be effective immediately upon entry and the Debtor and the Purchaser are authorized to close the Sale immediately upon entry of this Sale Order.

38.     To the extent there is any conflict between the terms of this Sale Order and the Purchase Agreement, the terms of this Sale Order shall control. Nothing contained in any Chapter 11 plan hereinafter confirmed in this Chapter 11 case or any order confirming such Chapter 11 plan, or any other order of the Court, shall conflict with or derogate from the provisions of the Purchase Agreement or any other Transaction Document or the terms of this Sale Order.

[remainder of page left intentionally blank]

39.    The Court retains jurisdiction to, among other things, interpret, enforce and implement the terms and provisions of this Sale Order and the Purchase Agreement, all amendments thereto, any waivers and consents thereunder, and the Transaction Documents in all respects, including, but not limited to, retaining jurisdiction to:  (a) compel delivery of the Acquired Assets or performance of other obligations owed to the Purchaser; (b) compel delivery of the purchase price or performance of other obligations owed to the Debtor; (c) resolve any disputes arising under or related to the Purchase Agreement; (d) interpret, implement, and enforce the provisions of this Sale Order; and (e) protect the Purchaser and their affiliates against (i) any liens, claims and interests in or against the Debtor or the Acquired Assets of any kind or nature whatsoever and (ii) any creditors or other parties in interest regarding the turnover of the Acquired Assets that may be in their possession; *provided, however*, any retention of jurisdiction does not apply to the Ground Lease (and any related agreements and documents) after its assumption and assignment.

Dated: New York, New York
           August 25, 2021

                          *s/ David S. Jones*
                          HONORABLE DAVID S. JONES
                          UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT 1**

# AGREEMENT OF PURCHASE AND SALE

by and between

## GEORGE WASHINGTON BRIDGE BUS STATION DEVELOPMENT VENTURE LLC, a Delaware limited liability company

as Seller

and

## JMB Capital Partners Lending, LLC, a California limited liability company

as Purchaser

Date: June 25, 2021

# AGREEMENT OF PURCHASE AND SALE

**THIS AGREEMENT OF PURCHASE AND SALE** ("**Agreement**") is made as of the 25th day of June 2021 (the "**Effective Date**"), by and between **GEORGE WASHINGTON BRIDGE BUS STATION DEVELOPMENT VENTURE LLC**, a Delaware limited liability company ("**Seller**") and JMB Capital Partners Lending, LLC, a California limited liability company ("**Purchaser**") (Seller and Purchaser are also collectively referred to in this Agreement as the "**Parties**" and individually referred to in this Agreement as a "**Party**").

## R E C I T A L S

A.       On October 7, 2019, Seller commenced a voluntary bankruptcy case by filing a petition for relief under chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**").  The bankruptcy case is styled *In re George Washington Bridge Bus Station Development Venture LLC*, Case No. 19-13196 (DSJ) (the "**Bankruptcy Case**"). Seller has been operating its business and managing its property and affairs as a debtor in possession.

B.       Seller is the lessee under that certain ground lease described on Exhibit A attached hereto (the "**Ground Lease**").

C.       Pursuant to the Ground Lease, The Port Authority of New York and New Jersey (the "**Port Authority**"), the lessor thereunder, has leased to Seller the Leased Premises (as such term is defined in the Ground Lease) (the "**Leased Premises**") located at certain real property more particularly described on Exhibit B and commonly known as the George Washington Bridge Bus Station located in the Borough of Manhattan, New York City.

D.       Purchaser desires to purchase, and Seller desires to sell, all of Seller's right, title and interest in and to the Ground Lease and substantially all of Seller's other assets as set forth in this Agreement (the "**Sale**"), on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual undertakings of the parties hereto, it is hereby agreed as follows:

1.       **PURCHASE AND SALE; ASSUMED CONTRACTS**

(a)       Purchased Assets.  Upon the terms and conditions hereinafter set forth, Seller shall sell to Purchaser, and Purchaser shall purchase from Seller for the consideration set forth in Section 2 of this Agreement, the following (collectively, the "**Assets**"): (i) the Property (as hereinafter defined); (ii) all of Seller's right, title and interest in, to and under those contracts relating to the operation, maintenance and/or management of the Property set forth on Schedule 1 attached hereto and incorporated herein by reference (the "**Assumed Contracts**"); (iii) all claims or causes of action available to Seller (collectively, the "**Preserved Causes of Action**"), including, but not limited to, under chapter 5 of the

Bankruptcy Code (including sections 544, 545, 547, 548, 549, 550 and 553) or any similar actions under any other applicable law (collectively, "**Avoidance Actions**") against any of Seller's Subtenants (as hereinafter defined), vendors, suppliers, customers or trade creditors with whom Purchaser continues to conduct business in regard to the Assets after the Closing (collectively, except for Subtenants, the "**Designated Parties**"); provided, however, that it is understood and agreed by the parties that Purchaser will not pursue or cause to be pursued any Avoidance Actions against any of the Designated Parties (other than any such parties affiliated with former directors, officers, members, shareholders, or principals of Seller) (the "**Third-Party Designated Parties**") other than as a defense (to the extent permitted under applicable law) against any claim or cause of action raised by such Designated Party; and (iv) all of Seller's right, title and interest in, to and under those certain subleases and other occupancy agreements (collectively, the "**Subleases**" and each a "**Sublease**"), pursuant to which Subleases certain third parties (collectively, the "**Subtenants**" and each a "**Subtenant**") have been granted rights to occupy a portion of the Leased Premises, including, without limitation, all Preserved Causes of Action against Subtenants. For the avoidance of doubt, the Purchaser shall have the sole and exclusive right to collect all unpaid rents from the Seller's Subtenants as of the Closing (as hereinafter defined), notwithstanding whether such amounts accrued prior or after the Closing. As used herein, the term "**Affiliate**" shall mean any person, firm, corporation, association, organization, or unincorporated trade or business that, now or hereafter, directly or indirectly, controls, is controlled by, or is under common control with Seller or Purchaser, as applicable.

(b)     As used herein, the "**Property**" means all right, title and interest of Seller in and to: (i) the Ground Lease and the leasehold estate of Seller thereunder in and to the Leased Premises; (ii) all improvements, structures and fixtures located upon the Leased Premises (collectively, the "**Improvements**"; which, together with the Leased Premises, shall be herein referred to as the "**Real Property**"), which Improvements shall be conveyed to Purchaser by virtue of Purchaser's assumption of the Ground Lease as set forth in this Agreement; (iii) all equipment, machinery, and other items of tangible personal property of Seller located at the Leased Premises, including without limitation, those items forth on Schedule 7 attached hereto and incorporated herein by reference (collectively, the "**Tangible Personal Property**"); and (iv) all intangible personal property of Seller, including without limitation, those items set forth on Schedule 8 attached hereto and incorporated herein by reference (collectively, the "**Intangible Personal Property**" and, together with the Tangible Personal Property, collectively, the "**Personal Property**"), which Intangible Personal Property includes the Subtenant A/R. On the Closing Date (as that term is defined in this Agreement), Seller shall cause to be conveyed to Purchaser title to the Ground Lease by an Assignment of Ground Lease (as that term is defined in this Agreement), title to the Personal Property and Assumed Contracts by Bill of Sale (as that term is defined in this Agreement) and title to the Subleases by Assignment of Subleases (as that term is defined in this Agreement).

(c)     Assumption, Assignment and Cure Amounts. The sale shall provide for the assumption and assignment of the Ground Lease to Purchaser pursuant to section 365 and all other relevant provisions of the Bankruptcy Code. In addition, Purchaser shall have the right (but not the obligation) to designate additional executory contracts and unexpired leases to be assumed by Seller and assigned to Purchaser pursuant to section 365 and all

other relevant provisions of the Bankruptcy Code in Purchaser's sole and absolute discretion (the "**Designation Rights**"). The Assumed Contracts listed on Schedule 1 hereto and the Subleases listed on Schedule 2 hereto have been designated for assumption and assignment to Purchaser (Schedule 1 and Schedule 2 shall be referred to herein collectively as, the "**Schedule of Assumed Contracts**").

(d)     Purchaser reserves the right (i) through two days prior to the hearing on the proposed sale (the "**Sale Hearing**") to add any agreement to the Schedule of Assumed Contracts, (ii) through the Closing Date, to remove any agreement from the Schedule of Assumed Contracts, or (iii) revise any Cure Amounts. Notwithstanding the foregoing, other than with respect to the Ground Lease, if an outstanding dispute concerning a Cure Amount or other objection to assumption and assignment exists as of the Sale Hearing with respect to any contract or Sublease included on the Schedule of Assumed Contracts, then such contract or Sublease shall be deemed conditionally assumed and assigned to the Purchaser pending a resolution of such dispute that is satisfactory to the Purchaser. If the dispute cannot be resolved to the satisfaction of the Purchaser, the Purchaser may remove (or direct the Seller or subsequent estate representative to remove) such contract or Sublease from the Schedule of Assumed Contracts, and in such case, such contract or Sublease shall be deemed rejected.

(e)     Other than the Assets, all other assets of Seller, including without limitation to all cash, accounts receivable and bank deposits, are being retained by Seller and are not being sold to Purchaser under this Agreement (collectively, the "**Excluded Assets**"). The Excluded Assets include any accounts receivable owed by any one or more of the Subtenants as of the Closing Date (collectively, the "**Subtenant A/R**").

## 2.     PURCHASE PRICE AND OTHER CONSIDERATION

(a)     The consideration for the Assets shall be (i) a sum in the amount set forth on Schedule 3 hereto payable by Purchaser in United States currency via wire transfer of immediately available funds at Closing (the "**Closing Payment**"), which Closing Payment shall not be considered property of the Seller's estate and be earmarked for payments of the liabilities set forth on Schedule 3 hereto; provided, however, the Closing Payment shall not exceed Eight Million Five Hundred Thousand and 00/100 Dollars ($8,500,000.00), (ii) a credit bid in an amount equal to 100% of the Indebtedness (as defined in that certain Superpriority Senior Secured Debtor-in-Possession Loan Agreement by and among the Seller and JMB Capital Partners Lending, LLC dated August 15, 2020 (the "**DIP Credit Agreement**")) (the "**Credit Bid**") (as an offset against, and reduction in the amount of Seller's Indebtedness under the DIP Credit Agreement, pursuant to Section 363(k) of the Bankruptcy Code), (iii) no less than Seventeen Million and 00/100 Dollars ($17,000,000.00) (the "**Ground Lease Escrow**") to be funded to an escrow account, in a final amount to be agreed to by the Purchaser and the Port Authority, to be used solely in connection with curing any non-monetary defaults under the Ground Lease, including bringing the Property into compliance with law, if necessary, and maintaining it in compliance therewith, pursuant to an escrow agreement acceptable to the Port Authority and the Purchaser, each acting reasonably (the "**Escrow Agreement**") to satisfy adequate assurance of future performance under the Ground Lease as required under Section 5(a), and (iii) the assumption of the

Assumed Liabilities by Purchaser. Prior to the Closing Date, Purchaser shall have the right to designate an allocation of the Closing Payment among the assets being transferred hereunder, provided that such allocation shall be subject to the approval of Seller (which approval shall not be unreasonably withheld, conditioned or delayed). All allocations pursuant to this <u>Section 2</u> shall be deemed made in conformance with Federal and State law, and Purchaser and Seller agree to file their respective tax returns and reports (federal, state and local) consistent therewith in all respects.

(b)      No later than three (3) Business Days following the Effective Date, Purchaser shall deem a sum equal to One Million and 00/100 Dollars ($1,000,000.00) payable pursuant to the Purchaser by the Seller pursuant to the DIP Credit Agreement as a deposit. (the "**<u>Deposit</u>**"). Except as set forth in this Agreement, the Deposit shall be non-refundable to Purchaser but shall be applicable against the Closing Payment at Closing.

(c)      Not later than three (3) Business Days before the Closing Date, Seller shall deliver to Purchaser a calculation of the Closing Payment. Following Seller's delivery of the foregoing, the Parties shall work in good faith to agree upon the amount of the Closing Payment prior to Closing. Notwithstanding anything contained herein, the Closing Payment shall not include the amount of Subtenant A/R on <u>Schedule 11</u> (the "**<u>A/R Schedule</u>**"), which A/R Schedule shall be updated and delivered to Purchaser with Seller's in order to account for any additional Subtenant A/R that exists on the Closing Date. The amount received by Seller for the Subtenant A/R through and including the Closing Date shall be remitted to the Senior Secured Lender within three (3) business days of the Closing. The amount of Subtenant A/R received by the Purchaser after the Closing Date on account of Subtenant A/R shall be remitted to the Senior Secured Lender on a monthly basis. For the avoidance of doubt, the Purchaser shall have no obligation to pursue any rights or remedies under the Subleases to collect any Subtenant A/R.

3.   **<u>SALE FREE AND CLEAR; ASSUMED LIABILITIES; TITLE AND SURVEY REVIEW; THIRD PARTY REPORTS</u>**

(a)      <u>Sale free and clear</u>. Except for the Assumed Liabilities (defined below), and subject to Section 3(c) below, Purchaser is not assuming any pre-petition or post-petition debt, obligation or liability of Seller of any kind or nature whatsoever, and the Sale shall be free and clear of all liens, claims, encumbrances and interests, including without limitation, all general unsecured claims filed against Seller's bankruptcy estate, to the fullest extent permitted by sections 363(f), 1141(c), and all other relevant provisions of the Bankruptcy Code.

(b)      <u>Assumed Liabilities</u>. On the terms and subject to the conditions and limitations set forth in this Agreement, at the Closing, Purchaser shall assume, effective as of the Closing, and shall timely perform and discharge in accordance with their respective terms, only the following liabilities of Seller existing as of the Closing Date and no others (collectively, the "**<u>Assumed Liabilities</u>**"): (i) the payment of all Cure Amounts, which shall be satisfied by Seller using the proceeds of the Closing Payment; (ii) all liabilities of Seller under the Ground Lease; (iii) all liabilities of Seller under the Assumed Contracts and the assumed Subleases, in each case solely to the extent first arising after the Closing Date; (iii)

all liabilities for transfer taxes and related taxes incurred as a result of the sale of the Seller's assets under section 363 of the Bankruptcy Code; and (iv) all other liabilities of Seller that the express provisions of this Agreement state that Purchaser will have assumed from and after Closing. Purchaser shall not receive any additional consideration, and no adjustment to the Closing Payment shall be made, for the assumption of the aforementioned liabilities of Seller.

(c)    **Title**. Purchaser has received and reviewed that certain Certificate of Title, Title No. 3020-1053658 (the "**Title Commitment**") having an effective date of February 12, 2021, prepared by First American Title Insurance Company (the "**Title Insurer**"), with respect to an ALTA leasehold policy of title insurance to be issued by Title Insurer in favor of Purchaser at Closing (the "**Title Policy**"). At Closing, Seller shall convey and assign to Purchaser, the Property, free and clear of all liens, claims, encumbrances, interests, mortgages, deeds of trust, leases, ground leases, judgments, mechanics' liens or other monetary encumbrances (collectively, "**Liens and Encumbrances**") pursuant to sections 363(f) and 1141(c) and other applicable provisions of the Bankruptcy Code, except for those Liens and Encumbrances, if any, that Purchaser has approved in writing before the Closing Date (collectively, the "**Permitted Exceptions**"). Purchaser shall have the right, but not the obligation, to obtain an ALTA/NSPS survey of the Property ("**Survey**") at Purchaser's sole cost and expense. Notwithstanding anything to the contrary contained in this Agreement, and except for Seller's efforts to obtain the Sale Order (as hereinafter defined), Seller shall have no affirmative obligation hereunder to expend any funds or incur any liabilities in order to cause any title exceptions to be removed from any Title Commitment or insured over by Title Insurer.

(d)    From time-to-time prior to the Closing Date during normal hours and upon reasonable prior written notice to Seller, Seller agrees to grant Purchaser's consultants, inspectors, agents and contractors access to inspect, survey and obtain any Third Party Reports. Purchaser, at its sole cost, shall pay for all Third Party Reports. At no time will any contractors, surveyors or consultants with access to the Real Property unreasonably disturb any occupants of the Real Property. Before entry, Purchaser shall furnish to Seller a Certificate of Insurance, acceptable to Seller in its reasonable discretion, evidencing the fact that Purchaser maintains commercial general liability insurance with a reputable insurer authorized to do business in New York, or otherwise reasonably approved in writing by Seller, against claims for bodily injury, death and property damage in a single limit amount of not less than Three Million Dollars ($3,000,000.00) with respect to all claims for bodily injury or death and Five Million Dollars ($5,000,000.00) in the aggregate with respect to all claims for property damage, naming Seller as an additional insured. Inspections by Purchaser shall not unreasonably interfere with Seller's operation of the Real Property. If any inspection or test damages the Real Property, Purchaser will restore the Real Property to substantially the same condition as existed before the inspection or test. Purchaser shall defend, indemnify Seller and hold Seller, Seller's trustees, managers, officers, tenants, agents, contractors and employees (collectively, the "Seller Parties") harmless from and against any and all losses, costs, damages, claims, or liabilities, including but not limited to, mechanics' and materialmens' liens and Seller's reasonable attorneys' fees, in each case to the extent arising out of Purchaser's, or its agents', contractors', employees', or invitees' entry upon the Real Property. The license to access the Real Property shall be deemed

revoked upon termination of this Agreement. The provisions of this Section 3 shall survive the Closing or the earlier termination of this Agreement.

4. **PRORATIONS AND EXPENSES**

(a)     The following prorations, except as specifically set forth in this Agreement to the contrary, shall be made as of 12:01 a.m. on the Closing Date ("**Proration Date**"), it being agreed between the Parties that the Closing Date shall be an income and expense day for Purchaser, and shall be applied to reduce or increase the balance of the Closing Payment, as applicable:

(i)     Taxes. All general real estate taxes and other similar items (including, without limitation, special and other assessments) with respect to the Real Property not due and payable as of the Closing Date, shall be prorated as of the Closing Date based on the most recent ascertainable tax information for tax parcel numbers that are attributable to the Real Property. All prorations shall be final. Any general real estate taxes and other similar items and any installments of special or other assessments affecting the Real Property which are due and payable for the period prior to the Closing Date shall be paid by Seller at Closing with the proceeds of the Closing Payment, and any general real estate taxes and other similar items and any installments of special or other assessments affecting the Real Property which are due and payable for the period subsequent to the Closing Date shall be paid by Purchaser. The term "general real estate taxes" as used in this Section 4(a)(i) includes general assessments, including, without limitation, any payments in lieu of taxes in connection with the Real Property pursuant to any governmental abatement or exemption program, and any regular annual assessments payable to any property owners association.  Notwithstanding the foregoing or anything to the contrary in this Agreement, to the extent that no general real estate taxes are owed pursuant to the Ground Lease, there shall be no proration of general real estate taxes at Closing.

(ii)     REA Obligations. All payments and charges due and payable by Seller under any reciprocal easement agreements encumbering the Real Property (collectively, the "**REAs**").

(iii)     Ground Rents.  All base rents, percentage rents, additional rent and any other sums due from Seller under the Ground Lease (collectively, "**Ground Rents**"). Seller shall be responsible for all Ground Rents attributable to the period prior to the Closing Date.  Purchaser shall be responsible for all Ground Rents attributable to the period from and after the Closing Date.

(iv)     Retail Rents.  All base rents, percentage rents, additional rent and any tax and operating expense reimbursements and escalations due from the Subtenants under the Subleases (collectively, "**Retail Rents**"), to the extent collected from the Subtenants prior to Closing.  From and after Closing, Purchaser shall have the exclusive right to collect Retail Rents under the Subleases and Seller shall have no right to pursue claims against any Subtenants.  The terms of the immediately preceding sentence shall survive the Closing Date and not be merged therein.

(v)     Retail Pass-Throughs.  Utilities, water and sewer charges and other expenses attributable to Seller's operation of the Property (collectively, "**Operating Expenses**").  Seller shall be responsible for all Operating Expenses attributable to the period prior to the Closing Date.  Purchaser shall be responsible for all Operating Expenses attributable to the period from and after the Closing Date.  All Operating Expenses paid or payable by Subtenants in accordance with the Subleases shall be allocated between Seller and Purchaser, with Seller responsible for periods prior to the Closing Date and Purchaser responsible for all periods from and following the Closing Date.  Meters for all public utilities (including water) being used on the Property shall be ordered read by Seller on the day of giving possession to Purchaser.  To the extent that the amount of actual consumption of any utility services is not determined prior to the Closing Date, a proration shall be made at Closing based on the last available reading.  Not later than ten (10) Business Days prior to Closing, Seller shall deliver to Purchaser a reconciliation statement of the Operating Expenses for the Property for the portion of the calendar year in which the Closing occurs that the Property was owned by Seller.  Seller's reconciliation statement shall include tenant invoice calculations and reasonable Operating Expense invoice back-up, together with documentation as to the amounts actually collected by Seller from the Subtenants with respect to such Operating Expenses. Seller and Purchaser shall use commercially reasonable efforts to agree upon such reconciliation statement at or prior to Closing.  Purchaser shall be solely responsible for performing any Operating Expense reconciliations with Subtenants under the Subleases with respect to the calendar year in which Closing occurs and subsequent years, and Seller shall have no right to perform any such reconciliations.

(vi)     Any other items of income or expense, the credit or proration of which are necessary to fairly allocate the benefits and burdens of ownership of the Real Property, shall be prorated at the Closing.  All prorations shall be final.

(b)     Security Deposits.  A list of all security deposits from the Subtenants under the Subleases as of the Effective Date ("**Security Deposits**") is attached as Schedule 4 hereto and incorporated herein by reference.  At Closing, all Security Deposits shall be credited to Purchaser as a credit against the Closing Payment, and Seller shall otherwise retain any such Security Deposits.  Any Security Deposits held by Seller in the form of letters of credit shall be transferred to Purchaser and/or re-issued naming Purchaser as beneficiary thereof at Closing, and any costs associated with such transfer and/or re-issuance shall be paid by Seller.

(c)     Leasing Incentives.  A list of all unpaid leasing commissions, tenant improvement allowances and landlord work (each a "**Leasing Incentive**" and, collectively, the "**Leasing Incentives**") as of the Effective Date with respect to any Subleases is attached as Schedule 5 hereto and incorporated herein by reference.  At Closing, Purchaser shall assume the obligation for the payment of any Leasing Incentives that become due and payable after the Closing Date.  Except as set forth in the immediately preceding sentence, Purchaser shall have no liability for any Leasing Incentives.

(d)     At Closing, Purchaser shall pay: (i) the fee of the Escrow Agent (as defined in Section 8 of this Agreement); (ii) the cost of any updated Title Commitment and any related title searches and exam fees, investigations and tests; (iii) leasehold title policies and

the cost of any endorsements to such title policies; and (iv) any and all recording charges, if any. The Parties shall each be solely responsible for the fees and disbursements of their respective counsel and other professional advisors.

5. **BANKRUPTCY MATTERS; CONDITIONS TO CLOSING; COVENANTS PENDING CLOSING**

    (a)    <u>Bankruptcy Matters</u>.

    (1)    <u>Breakup Payment and Expense Reimbursement</u>. If Seller's sale process generates an all cash bid of at least Forty Five Million and 00/100 Dollars ($45,000,000.00) (such bid, an "**Alternative Bid**"), then Seller shall have the right to pursue such Alternative Bid; provided, however, that if Seller closes on such Alternative Bid, then the Deposit shall be promptly refunded to Purchaser and Seller shall pay to Purchaser as a breakup fee an amount equal to 3.0% of the Closing Payment, the Credit Bid, and the Ground Lease Escrow (the "**Breakup Fee**") and reimburse Purchaser for its expenses in an amount not to exceed Three Hundred Fifty Thousand and 00/100 Dollars ($350,000.00) (the "**Expense Reimbursement**," and with the Breakup Fee shall be referred to herein collectively as, the "**Bid Protections**"). The Purchaser may credit bid the Bid Protections in the event the Seller conducts an auction for the Purchased Assets. For the avoidance of doubt, notwithstanding anything to the contrary herein, the Bid Protections shall be deemed an administrative claim in the Bankruptcy Case and, if payable pursuant to this Section 5(a)(1), shall be paid from the first dollars of the sale proceeds generated by the closing of such Alternative Bid.

    (2)    Seller shall file an expedited motion seeking approval of the Bankruptcy Court of the Bid Protections as soon as practicable following the Effective Date, but in no event later than three (3) Business Days after the Effective Date. If no objection to such motion is filed and served on Seller by 4:00 p.m. (prevailing Eastern Time), three (3) Business Days following service of such motion, Seller shall file a certificate of no objection with the Bankruptcy Court and a proposed form of order approving Seller's selection of the stalking horse bidder and the Bid Protections. If an objection is timely filed and served, Seller will request an expedited hearing to consider approval of this Agreement and the Bid Protections. Any order approving the Bid Protections (the "**Bid Protections Order**") must be in form and substance reasonably acceptable to Purchaser, and shall provide, among other things: (1) that it is enforceable immediately upon entry; (2) that Purchaser may rely on the same for purposes of providing the Deposit as contemplated by this Agreement; (3) that the Bid Protections are granted administrative expense priority status; and (4) that the amount of such Bid Protections shall be paid from the first dollars of the sale proceeds of any sale that closes pursuant to an Alternative Bid, if such Bid Protections have not been paid sooner.

> (3) <u>Adequate Assurance of Future Performance</u>. At least one (1) Business Day prior to the Sale Hearing, Purchaser shall, in furtherance of the Debtor's obligation to demonstrate adequate assurance of future performance under Section 365(b)(1)(C) of the Bankruptcy Code, fund the Ground Lease Escrow to be held in accordance with the terms and conditions of the Escrow Agreement.

(b) <u>Seller Conditions Precedent</u>. In addition to any other conditions and/or contingencies set forth in this Agreement, Seller's obligation to close on Purchaser's purchase of the Property is subject to each and all of the following conditions precedent (collectively, together with such other conditions and/or contingencies set forth in this Agreement, the "**Seller Conditions Precedent**" and each a "**Seller Condition Precedent**"):

> (i) All of Purchaser's representations and warranties contained in this Agreement shall be true and correct as of the Closing in all material respects; provided however Seller shall, promptly upon becoming aware of same, advise Purchaser if it believes that any of Purchaser's representations and warranties contained in this Agreement are not true and correct in any material respects, and Purchaser shall thereupon have fifteen (15) Business Days to cure any purported breach of its representations and warranties;

> (ii) All obligations of Purchaser that were to have been performed on or before the Closing Date have been timely and duly performed;

> (iii) Entry by the Bankruptcy Court of an Order approving the sale transaction with Purchaser (the "**Sale Order**") in the Bankruptcy Case, which Sale Order shall (x) be in form and substance reasonably acceptable to Purchaser with respect to this Agreement and the Sale transaction contemplated herein, and (y) not have been reversed, stayed, amended, modified, dismissed, vacated or reconsidered and remains in full force and effect at the time of the Closing; and

> (iv) Purchaser shall have funded the Closing Payment and the Ground Lease Escrow.

If there is a failure of any of the Seller Conditions Precedent set forth above by the Closing Date, then Seller, as Seller's sole and exclusive remedy, shall have the right to terminate this Agreement upon written notice to Purchaser, whereupon this Agreement shall terminate and thereafter the Parties shall have no further obligations under this Agreement other than those that by their terms specifically survive termination of this Agreement. Notwithstanding the foregoing, in the event that this Agreement is terminated as a result of the failure of any of the Seller Conditions Precedent (other than pursuant to subsection (iii) above), the Deposit shall immediately inure for the benefit of the Seller and reduce the Seller's obligations to the Buyer pursuant to the DIP Credit Agreement. In the event this Agreement is terminated as a result of the failure of the Seller Condition Precedent set forth in subsection (iii) above, the Deposit shall immediately become payable to the Purchaser pursuant to the terms of the DIP Credit Agreement.

(c)     Purchaser Conditions Precedent.  In addition to any other conditions and/or contingencies set forth in this Agreement, Purchaser's obligation to close the purchase of the Property is subject to each and all of the following conditions precedent (collectively, together with such other conditions and/or contingencies set forth in this Agreement, the "**Purchaser Conditions Precedent**" and each a "**Purchaser Condition Precedent**"):

(i)      All of Seller's representations contained in this Agreement shall be true and correct as of the Closing in all material respects; provided however Purchaser shall, promptly upon becoming aware of same, advise Seller if it believes that any of Seller's representations and warranties contained in this Agreement are not true and correct as of the Closing in all material respects, and Seller shall thereupon have fifteen (15) Business Days to cure any purported breach of its representations and warranties;

(ii)     All obligations of Seller that were to have been performed on or before the Closing Date have been timely and duly performed;

(iii)    The Bid Protections Order shall have been entered, approving the Bid Protections;

(iv)    Entry by the Bankruptcy Court of the Sale Order in the Bankruptcy Case, which Sale Order shall (x) be in form and substance reasonably acceptable to Purchaser with respect to this Agreement and the Sale transaction contemplated herein, and (y) not have been reversed, stayed, amended, modified, dismissed, vacated or reconsidered and remains in full force and effect at the time of the Closing;

(v)     The deadline to assume the Ground Lease has not expired and has not been terminated for any reason, whether by the Port Authority, an order of the Bankruptcy Court, applicable law, or otherwise;

(vi)    The Port Authority has not terminated the Ground Lease or delivered written notice to Seller of its intention to terminate the Ground Lease;

(vii)   No person or entity has obtained relief from the automatic stay with respect to the Property, which has resulted in a material disruption to the Seller's business;

(viii)  No order of the Bankruptcy Court has been entered that discontinues or materially changes the manner in which the Seller operates the Property;

(ix)    The Bankruptcy Case shall not have been converted to a chapter 7 liquidation or dismissed; and

(x)     The pending appeal by Tutor Perini Building Corp. ("**Tutor Perini**") with respect to the Cure Amount for the Ground Lease captioned *Tutor Perini Bldg. Corp. v. George Washington Bridge Bus Station Dev. Venture, LLC, et al.*, Case No. 20-07433-JSR (S.D.N.Y.) shall not have been decided in a manner that requires the payment of any Cure Amount to Tutor Perini.

If there is a failure of any of the Purchaser Conditions Precedent to be satisfied by the time period for the satisfaction of such Purchaser Condition Precedent set forth above, then Purchaser, as Purchaser's sole and exclusive remedy, shall have the right to terminate this Agreement upon written notice to Seller, whereupon the Deposit shall immediately become payable to the Purchaser pursuant to the terms of the DIP Credit Agreement, this Agreement shall terminate and thereafter the Parties shall have no further obligations under this Agreement other than those that by their terms specifically survive termination of this Agreement.

(d)     In the event that the Closing does not occur by August 31, 2021 (the "**Outside Closing Date**") or such later date as may be agreed upon by the parties for the Closing Date, either Party may terminate this Agreement upon written notice to the other Party, provided, however, that the Party seeking to terminate this Agreement is not itself in default hereunder beyond any applicable notice or cure periods.  If this Agreement is terminated pursuant to this Section 5(d), then unless Purchaser is then in default under this Agreement, the Deposit shall immediately be returned to Purchaser and thereafter this Agreement shall terminate and the Parties shall have no further obligations under this Agreement other than those that by their terms specifically survive termination of this Agreement.

(e)     From and after the Effective Date until the Closing or earlier termination of this Agreement in accordance with the terms hereof:

(i)     Seller shall not, without the consent of Purchaser, which consent shall not be unreasonably withheld, conditioned or delayed, modify in any respects, cancel, terminate, extend or otherwise change, the terms, covenants or conditions of the Ground Lease, any Subleases, any Assumed Contracts, any insurance policy insuring the Property, or any REAs or create or encumber any other property of the Seller with other Liens and Encumbrances in excess of $10,000.00.

(ii)     Seller shall not, without the consent of Purchaser, which consent shall not be unreasonably withheld, conditioned or delayed, enter into any contracts for services in excess of $10,000.00 that may be binding upon the Property following Closing or upon Purchaser, nor shall Seller enter into any new Subleases.

(iii)     Seller shall not create or permit to be created, or modify or permit to be modified, any Liens and Encumbrances.

(iv)     subject to any order that has been entered into with respect to the Bankruptcy Cases, Seller shall continue to operate and maintain the Property in the same manner, in all material respects, as Seller has prior to the Effective Date, including continuing to cooperate with the collection of payments from the Subtenants under the Subleases and maintaining all of Seller's existing insurance policies with respect to the Property in full force and effect, and Seller shall comply, in all material respects, with all of Seller's obligations under the Ground Lease, Subleases and Assumed Contracts.

(v)     Seller shall not apply any Security Deposits (other than with respect to the return of any Security Deposits under the Subleases pursuant to the terms thereof).

(vi)     If Seller becomes aware that any of Seller's representations or warranties set forth in this Agreement are no longer true in any respects, then within two (2) Business Days after Seller obtains such awareness, Seller shall deliver written notice to Purchaser indicating the manner in which such representations or warranties are no longer true and the reasons therefor.

(vii)     Seller shall continue to pay all post-petition administrative claims in the ordinary course of business up to Closing, and shall not take any action in the Bankruptcy Case that is inconsistent with the terms of this Agreement or interferes with Seller's or Purchaser's ability to consummate the Sale as provided for herein.

(viii)     To the extent applicable, Seller shall timely and accurately file any New York City Real Property Income and Expense Statements with respect to the Property  ("**RPIEs**") that are required to be filed before Closing and will deliver copies of such RPIEs to Purchaser not later than three (3) business days after the filing thereof.

(ix)     Not less than ten (10) business days before the Closing Date, Purchaser shall deliver to Seller a completed New York State Department of Taxation and Finance ("**NYS Tax Department**") Form AU-196.10 for Seller's review and approval, which approval shall not be unreasonably withheld, conditioned or delayed. If Seller has not delivered such approval or a written notice of disapproval (specifying Seller's reasons for disapproval in reasonable detail) within three (3) Business Days after Seller's receipt of such Form AU-196.10, then Seller shall be deemed to have approved such Form AU-196.10. Not later than two (2) Business Days after Seller's approval or deemed approval of such Form AU-196.10, Purchaser shall deliver such Form AU-196.10 to the NYS Tax Department as required. Seller agrees to reasonably cooperate with Purchaser to the extent necessary to obtain a Form AU-197.1 from the NYS Tax Department.

6.     **CLOSING**

(a)     Provided all conditions and/or contingencies to Closing described in this Agreement have been fulfilled or waived in writing, the closing of the transactions contemplated by this Agreement (the "**Closing**") shall take place in escrow through the Escrow Agent, on the date that is the earlier of ten (10) Business Days after the entry of the Approval Order or the Outside Closing Date, or such other date mutually agreed to by Purchaser and Seller in writing (the "**Closing Date**").

(b)     On or before the Closing Date, Seller shall deliver or cause to be delivered to Purchaser the following Closing documents:

(i)     A certified copy of the Sale Order;

(ii)     Two (2) duly executed and acknowledged original counterparts of an Assignment and Assumption of Ground Lease (the "**Assignment of Ground Lease**") substantially in the form of Exhibit C;

(iii)    An original FIRPTA Affidavit in accordance with the Foreign Investment in Real Property Tax Act, 26 U.S.C. § 1445, duly executed by Seller and in a form reasonably acceptable to Seller and Purchaser;

(iv)    Two (2) duly executed original counterparts of a Bill of Sale and General Assignment executed by Seller conveying and transferring to Purchaser all of Seller's right, title and interest in the Personal Property, the Assumed Contracts and all certificates, licenses, approvals, permits, warranties and other rights relating to the Property, to the extent the same are assignable ("**Bill of Sale**") substantially in the form of Exhibit D;

(v)     Two (2) duly executed and acknowledged original counterparts of an assignment and assumption of Subleases executed by Seller assigning and transferring to Purchaser all of Seller's right, title and interest in the Subleases ("**Assignment of Subleases**") substantially in the form of Exhibit E-1;

(vi)    Counterparts of notice letters to the Subtenants notifying them of the sale of the Property to Purchaser ("**Subtenant Notices**") substantially in the form of Exhibit E-2;

(vii)   All keys, access, security, and alarm codes for the Real Property;

(viii)  A certificate certifying to Purchaser that Seller's representations and warranties are true, accurate and complete as of the Closing Date, subject, in all respects, to any materiality qualifiers set forth therein; and

(ix)    Such other instruments, certificates, affidavits, transfer tax returns and other documents as are required to effect the transfer of the Property under applicable state or local law.

(c)     On the Closing Date (or such earlier date as is required under the terms of this Agreement), Purchaser shall deliver or cause to be delivered to Seller the following for Closing:

(i)     The Closing Payment, subject to the prorations, credits and adjustments set forth in this Agreement;

(ii)    Two (2) duly executed original counterparts of the Bill of Sale executed by Purchaser;

(iii)   Two (2) duly executed and acknowledged original counterparts of the Assignment of Ground Lease executed by Purchaser;

(iv)    Two (2) duly executed and acknowledged original counterparts of the Assignment of Subleases executed by Purchaser;

(v)      Counterparts of the Subtenant Notices;

(vi)     A certificate certifying to Seller that Purchaser's representations and warranties are true, accurate and complete as of the Closing Date, subject, in all respects, to any materiality qualifiers set forth therein

(vii)    Two (2) duly executed original counterparts of the Escrow Agreement executed by Purchaser; and

(viii)   Such other documents, certificates, instruments, affidavits, transfer tax returns and other documents as are required to effect the transfer of the Property under applicable state or local law.

(d)     On the Closing Date:

(i)      Purchaser shall pay (i) all transfer and recording taxes imposed upon the sale of the Property as contemplated herein, (ii) applicable sales and use taxes, if any, on the transfer of the Personal Property pursuant to this Agreement (but not any sales or use taxes attributable to Seller's period of ownership of the Property), (iii) the title premium for any owner's title policy and the cost of any endorsements thereto, (iv) all fees, costs or expenses in connection with Purchaser's due diligence reviews hereunder, and (v) all fees, costs or expenses in connection with any financing obtained by Purchaser in connection with the transaction contemplated hereby.

(ii)     Any other Closing costs shall be allocated in accordance with local custom except as otherwise provided in this Agreement. Seller and Purchaser shall pay their respective shares of prorations as hereinafter provided.

(e)     On or before the Closing Date, Seller and Purchaser shall jointly execute and deliver or cause to be executed and delivered an agreed closing proration statement and all other documents reasonably required by the Title Insurer in order to consummate the Closing as contemplated in this Agreement.

## 7.    __CLOSING ESCROW__

(a)     The Closing shall take place through escrow at the Escrow Agent in accordance with the provisions of this <u>Section 7</u>. All documents required to be provided by Purchaser and Seller pursuant to this Agreement and otherwise appropriate to consummate the sale and purchase transaction contemplated by this Agreement shall be delivered to the Escrow Agent on or before Closing. Notwithstanding the foregoing, the Parties agree that the Closing may be set up remotely and/or in a manner so that the Parties and their respective attorneys, or any of them, need not be physically present and may deliver all necessary documents by overnight mail or other means, in which event the Parties agree to complete all arrangements for Closing not later than the Closing Date so that all requirements, with the exception of the Closing Payment, for Closing are in place by the scheduled time for the Closing.

(b)  This Agreement shall serve as escrow instructions to the Escrow Agent, subject to the Escrow Agent's standard conditions of acceptance of escrow where not contrary to the terms hereof.  The Escrow Agent is hereby authorized to close this transaction in accordance with the terms of this Agreement and to make all prorations and allocations which, in accordance with this Agreement, are to be made between the Parties hereto. Escrow Agent is acting solely as a stakeholder and depository, and is not responsible or liable in any manner whatsoever for the sufficiency, correctness, genuineness, or validity of the subject matter of the escrow.  In addition, the following provisions shall apply with respect to Escrow Agent:

(i)  Each of Purchaser and Seller agrees to indemnify, defend and hold harmless the Escrow Agent from and against any loss, cost, damage, expense and attorney's fees in connection with or in any way arising out of this Agreement, other than expenses resulting from the Escrow Agent's own negligence or willful misconduct; provided, however, that neither Purchaser nor Seller shall be obligated to indemnify Escrow Agent for the other's acts or omissions.

(ii)  In the event of a dispute concerning the Deposit, Escrow Agent may continue to hold the Deposit pursuant to the terms hereof, or may, after giving Purchaser and Seller at least fifteen (15) days' advance written notice, at the joint and several cost of Purchaser and Seller, deposit the same in a court of competent jurisdiction.  Escrow Agent may dispose of the Deposit in accordance with a court order, and shall be fully protected if it acts in accordance with any such court order.

(iii)  Escrow Agent may, at its own expense, consult with legal counsel in the event of any dispute or questions as to the construction of any provisions hereof or its duties hereunder, and it shall be fully protected in acting in accordance with the opinion or instructions of such counsel.

(iv)  Escrow Agent shall be protected in acting upon any written notice, request, waiver, consent, certificate, receipt, authorization, power of attorney or other document Escrow Agent in good faith believes to be genuine and what it purports to be.

(v)  If Seller delivers written notice to Escrow Agent indicating that Seller is entitled to the Deposit under this Agreement (a "**Seller EM Demand**"), then Escrow Agent shall disburse the Deposit to Seller; provided, however, that: (A) Escrow Agent shall, within one (1) Business Day after receipt of the Seller EM Demand, deliver a copy of such Seller EM Demand to Purchaser in accordance with Section 12 of this Agreement; (B) if Escrow Agent receives written notice from Purchaser objecting to such Seller EM Demand within five (5) Business Days after the date on which Escrow Agent provided a copy of the Seller EM Demand to Purchaser, then Escrow Agent shall not be obligated to honor such Seller EM Demand and the provisions of Section 7(b)(ii) above shall apply; and (C) if Escrow Agent does not receive written notice from Purchaser objecting to such Seller EM Demand within such five (5) Business Day period (or if Purchaser otherwise agrees that Seller is entitled to the Deposit), then Purchaser shall be deemed to have waived

Purchaser's right to object to such Seller EM Demand, and Escrow Agent shall be obligated and authorized to disburse the Deposit to Seller in accordance with the Seller EM Demand.

(vi)     If Purchaser delivers written notice to Escrow Agent indicating that Purchaser is entitled to the Deposit under this Agreement (a "**Purchaser EM Demand**"), then Escrow Agent shall disburse the Deposit to Purchaser; provided, however, that: (A) Escrow Agent shall, within one (1) Business Day after receipt of the Purchaser EM Demand, promptly deliver a copy of such Purchaser EM Demand to Seller in accordance with <u>Section 12</u> of this Agreement; (B) if Escrow Agent receives written notice from Seller objecting to such Purchaser EM Demand within five (5) Business Days after the date on which Escrow Agent provided a copy of the Purchaser EM Demand to Seller, then Escrow Agent shall not be obligated to honor such Purchaser EM Demand and the provisions of <u>Section 7(b)(ii)</u> above shall apply; and (C) if Escrow Agent does not receive written notice from Seller objecting to such Purchaser EM Demand within such five (5) Business Day period (or if Seller otherwise agrees that Purchaser is entitled to the Deposit), then Seller shall be deemed to have waived Seller's right to object to such Purchaser EM Demand, and Escrow Agent shall be obligated and authorized to disburse the Deposit to Purchaser in accordance with the Purchaser EM Demand.

(c)     On the Closing Date, the Escrow Agent shall cause the Title Commitment to be updated by the Title Company and if and when (i) the Title Company will issue the Title Policy in accordance with this Agreement, (ii) the Escrow Agent has received all funds and documents required to be deposited hereunder, and (iii) all of the terms and conditions of this Agreement have been satisfied or waived as provided herein, then the Escrow Agent shall cause the Assignment of Ground Lease to be filed for record and the Closing Payment to be disbursed in accordance with this Agreement.

(d)     Escrow Agent shall timely file all forms, notices and documents required to be filed with the Internal Revenue Service in connection with the sale of real property.

8.     **REPRESENTATIONS AND WARRANTIES**

(a)     Seller represents and warrants to Purchaser that as of the date hereof and as of the Closing Date:

(i)     Provided that the Sale Order is entered and has become final and non-appealable, Seller will have by the Closing Date, full right, power and authority to execute, deliver and perform this Agreement and all documents to be executed by Seller pursuant hereto, and all required action and approvals therefor have been duly taken and obtained. The individuals signing this Agreement and all other documents executed or to be executed pursuant hereto on behalf of Seller are and shall be duly authorized to sign the same on Seller's behalf and to bind Seller thereto, subject to entry of the Sale Order.  Subject to entry of the Sale Order, this Agreement and all documents required hereby to be executed by Purchaser hereunder are and shall be valid, legally binding obligations of and enforceable against Purchaser in accordance with their terms. To Seller's Knowledge, the execution and

delivery of this Agreement and performance by Seller will not conflict with or result in a violation of, or breach of, or constitute a default under, any law or administrative regulation or any of the terms, conditions or provisions of any judgment, decree, loan agreement, bond, note, resolution, indenture, mortgage, deed of trust, contract or other agreement or instrument to which Seller is a party or which affects the Property.

(ii)      Seller has good and marketable title to the Property.

(iii)      To Seller's Knowledge, Seller is not required to file any Real Property Income and Expense Statements with the City of New York.

(iv)      Seller is not a "foreign person", "foreign partnership", "foreign trust" or "foreign estate", as those terms are defined in Section 1445 of the Internal Revenue Code.

(v)      Except for the Bankruptcy Case and those matters set forth on Schedule 10, to Seller's Knowledge, there are no legal actions, suits or similar proceedings pending and served, nor has any legal action, suit or similar proceeding been threatened, against Seller or the Property.

(vi)      There are no pending, nor to Seller's Knowledge, are there any threatened, actions by any governmental or quasi-governmental authority having the power of condemnation or eminent domain that might result in all or any portion of the Property or any interest therein being taken by eminent domain, condemnation or conveyed in lieu thereof.

(vii)      Except as set forth on Schedule 9, to Seller's Knowledge (A) Seller has not received written notice of actual or threatened cancellation or suspension of any utility services or certificates of occupancy for any portion of the Property, and (B) Seller has not received written notice of actual or threatened special assessments or reassessments of the Property or any "Impositions" (as defined in the Ground Lease).

(viii)      Except for the Ground Lease, the Subleases set forth on the rent roll attached as Schedule 6 hereto and incorporated herein by reference (the "**Rent Roll**") are the only leases, subleases and occupancy agreements in effect with respect to the Property or any portion thereof, and except for the Ground Lease and Subleases, there are no other leases, subleases or possessory rights of others regarding the Property, including any oral leases. To Seller's Knowledge, the Subtenant A/R indicated on Schedule 11 attached hereto is a true, accurate and complete list of the unpaid rent under the Subleases as of the Effective Date (and as may be amended, as of the Closing Date). To Seller's Knowledge, the copies of the Ground Lease and Subleases provided to Purchaser (including amendments, modifications, extensions, renewals, side letters, guarantees and other documents relating thereto) and the information contained in the Rent Roll are true, accurate and complete in all material respects. To Seller's Knowledge, except the Sublease with Lerner New York, Inc. d/b/a New York & Company and the Sublease with FFC Accounting Inc., all Subtenants under the Subleases are in possession of their respective premises, subject to governmental orders from the State of New York and/or City of New York related to the COVID-19 pandemic. To Seller's Knowledge, no Subtenant has paid any rent, fees, or other charges

for more than one month in advance which would result in any Subtenant's ability to credit such advance payment against any payment due by such Subtenant after the Closing Date, nor to Seller's Knowledge is any Subtenant entitled to any free rent, abatement of rent or similar concession, except in each case, as disclosed on the Rent Roll.  To Seller's Knowledge, the Subleases are in full force and effect, and to Seller's Knowledge, except as expressly stated in the Blink Cure Objection, Marshalls Cure Objection, the Cooling Tower Disputes and the Subtenant A/R indicated on <u>Schedule 11</u> attached hereto, there are no material defaults under any of the Subleases.  To Seller's Knowledge, except for ongoing disputes with Marshalls of MA, Inc. and GW&L Food Corp. d/b/a Fine Fare, concerning charges related to the Cooling Tower and the supply of chilled water for air conditioning (the "**Cooling Tower Disputes**"), no Subtenant has contested any operating cost or other escalation payments, occupancy charges or any other amounts payable under its Sublease. To Seller's Knowledge, all work required to be performed in connection with the Subleases has been completed and fully paid for, and to Seller's Knowledge, each Subtenant has unconditionally accepted its premises.  Except as set forth on <u>Schedule 5</u> attached hereto, to Seller's Knowledge, all Leasing Incentives payable under the Subleases are fully paid for, whether such payment obligations accrue before or after the Closing Date.  Except as set forth on <u>Schedule 4</u> attached hereto, to Seller's Knowledge, there are no security deposits under the Subleases.    Except for the Bankruptcy Case, the Blink Cure Objection, the Marshalls Cure Objection or as disclosed on <u>Schedule 10</u> attached hereto, to Seller's Knowledge, there are no actions or proceedings pending or threatened in writing by any Subtenant against Seller or by Seller against any Subtenant under any Sublease.

(ix)    To Seller's Knowledge, except for this Agreement, there is no agreement of sale, option, right of first refusal, right of first offer or similar agreement with respect to the Property giving any party (including, without limitation, the Subtenants under the Subleases) a right to purchase all or any interest in the Property.

(x)    Except as set forth on <u>Schedule 5</u> attached hereto, to Seller's Knowledge, there are no lease brokerage agreements, leasing commission agreements or other agreements providing for payments of any amounts for leasing activities or procuring subtenants with respect to the Property, nor is any tail period currently in effect with respect to any of the foregoing agreements.  Except as set forth on <u>Schedule 5</u> attached hereto, to Seller's Knowledge, no brokerage commission or other compensation is payable (or will, with the passage of time or occurrence of any event, or both, be payable) with respect to any Sublease, including in connection with the exercise of any options to extend or renew (whether previously or hereafter exercised).  Except for the commission payable to the Broker (hereinafter defined) pursuant to the Brokerage Agreement (hereinafter defined), no fee, commission or other compensation is or will be payable to any third party broker in connection with the Closing.  The Brokerage Agreement shall not be binding upon Purchaser or the Property after Closing.

(xi)    To Seller's Knowledge, the copy of each Assumed Contract (including amendments, modifications, extensions, renewals, side letters, guarantees and other documents relating thereto) delivered to Purchaser is true, accurate and complete in all material respects, and except for the Ground Lease, Subleases or as listed on <u>Schedule 1</u>

attached hereto, to Seller's Knowledge, no other unrecorded contracts exist with respect to the Property.

(xii) To Seller's Knowledge, except for the Phase I Environmental Site Assessment Report dated December 10, 2019 prepared by AEI Consultants, Project No. 415276, Seller has not received any written reports indicating the presence of hazardous substances on the Property in violation of applicable environmental laws.

(xiii) Seller is not, and will not become, a person or entity with whom U.S. persons are restricted from doing business with under the regulations of the Office of Foreign Asset Control ("**OFAC**") of the Department of Treasury (including those named on OFAC's Specially Designated and Blocked Persons list) or under any statute, executive order (including the September 24, 2001 Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism), the USA Patriot Act (hereinafter defined) or other governmental action.

(xiv) To Seller's Knowledge, none of the funds used by Seller to operate the Property is or shall be subject to 18 U.S.C. §§ 1956 1957 (Laundering of Money Instruments), 18 U.S.C. §§ 981 986 (Federal Asset Forfeiture), 18 U.S.C. §§ 881 (Drug Property Seizure), Executive Order Number 13224 on Terrorism Financing, effective September 24, 2001, or the United and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, H.R. 3162, Public Law 107 56 (the "**USA Patriot Act**").

(xv) As of the Effective Date, Seller has no employees, and Seller will not hire any employees before the Closing Date.

(xvi) To Seller's Knowledge, each of the list of Tangible Personal Property contained in Schedule 7 attached hereto and the list of Intangible Personal Property contained in Schedule 8 attached hereto is true, accurate and complete in all material respects.

For purposes of this Section 8(a), "Seller's Knowledge" shall mean the actual knowledge of Bernard Katz, and shall not be construed to refer to the knowledge of any other partner, officer, director, agent, employee or representative of Seller, or any affiliate of Seller, or to impose upon Bernard Katz any duty to investigate the matter to which such actual knowledge or the absence thereof pertains, or to impose upon Bernard Katz any individual personal liability.

Notwithstanding anything contained herein to the contrary, except as expressly provided by Section 13 of this Agreement, Purchaser hereby acknowledges and agrees that no officer, employee, member or manager (including without limitation, Bernard Katz) of Seller will have any personal liability to Purchaser for any obligations of Seller under this Agreement (including without limitation, as a result of a breach of any representation or warranty hereunder), or for any claim based on, in respect of, or by reason of, such obligations, whether arising before or after the Closing. Except as expressly provided by Section 13 of this Agreement, Purchaser hereby expressly waives and releases all such

liability, and agrees that its sole recourse after Closing for a breach of any representation or warranty hereunder is to any representation and warranty insurance policy that Purchaser, at its sole cost and expense, may obtain. The foregoing waiver and release are part of the consideration for the purchase and sale of the Assets.

(b)  Purchaser represents and warrants to Seller that as of the date hereof and as of the Closing Date:

(i)  Purchaser has full right, power and authority to execute, deliver and perform this Agreement and all documents to be executed by Purchaser pursuant hereto, and all required action and approvals therefor have been duly taken and obtained. Neither the execution of this Agreement nor the performance of Purchaser's obligations hereunder will conflict with, or with or without notice or the passage of time or both, result in a breach of, violate any term or provision of, or constitute a default under any of Purchaser's organizational documents. The individuals signing this Agreement and all other documents executed or to be executed pursuant hereto on behalf of Purchaser are and shall be duly authorized to sign the same on Purchaser's behalf and to bind Purchaser thereto.

(ii)  Purchaser is not in default under any agreement or instrument to which Purchaser is a party where the liability thereunder might adversely affect Purchaser's ability to perform its obligations under this Agreement.

(iii)  This Agreement and all documents required hereby to be executed by Purchaser hereunder are and shall be valid, legally binding obligations of and enforceable against Purchaser in accordance with their terms.

(iv)  As of the Closing Date, Purchaser shall not have commenced, within the meaning of Title 11 of the U.S. Code, or any similar state law for the relief of debtors ("**Bankruptcy Law**") a voluntary case, nor shall there have been commenced against Purchaser an involuntary case, nor shall Purchaser have consented to the appointment of a receiver, trustee, assignee, liquidator or similar official under any Bankruptcy Law (a "**Custodian**") of it or for all or any part of its property, nor shall a court of competent jurisdiction have entered an order or decree under any Bankruptcy Law that is for relief against Purchaser in an involuntary case or appoints a Custodian of Purchaser for all or any part of its property.

(v)  Prior to the Closing Date, Purchaser will not create any easements, liens, mortgages or other encumbrances with respect to the Property.

(vi)  Seller has not, directly or indirectly, solicited Purchaser for the sale of the Seller's assets or offered for sale the Seller's assets.

(c)  The continued validity in all material respects of all representations and warranties of Seller and all representations and warranties of Purchaser set forth in this Agreement shall be conditions precedent to the performance of Seller's and Purchaser's respective obligations hereunder.  All representations and warranties of Seller and all representations and warranties of Purchaser set forth in this Agreement shall be continuing and shall be true and correct, in all material respects, on and as of the Closing Date with the

same force and effect as if made at that time; provided however, a Party (the "**Non-Breaching Party**") shall promptly provide written notice to the other Party (the "**Breaching Party**") after becoming aware that any of the Breaching Party's representations and warranties contained in this Agreement are not true and correct in all material respects, and the Breaching Party shall thereupon have a fifteen (15) Business Days to cure any purported breach of its representations and warranties. If the Breaching Party fails to cure the breach within such fifteen (15) Business Day period, the Non-Breaching Party shall have the right to (1) terminate this Agreement by giving written notice thereof to the Breaching Party (and in the event the Non-Breaching Party is the Purchaser, the Deposit shall be promptly refunded to Purchaser), this Agreement shall terminate and thereafter neither Party shall have any further obligations under this Agreement except for such obligations that expressly survive the termination of this Agreement; or (2) waive the condition in writing and proceed to Closing. Further, all representations and warranties of Seller and all representations and warranties of Purchaser set forth in this Section 8 shall not survive Closing. Upon consummation of Closing, Seller and Purchaser shall have no further liability with respect to any claim which Purchaser or Seller may have against the other party for a breach of any such representation or warranty, whether such breach is known or unknown.

(d)     EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT OR ANY DOCUMENT DELIVERED BY THE SELLER PURSUANT TO THIS AGREEMENT: (I) SELLER MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, RELATING TO ITS BUSINESS, THE GROUND LEASE, THE ASSUMED CONTRACTS, THE PROPERTY OR THE ASSUMED LIABILITIES, INCLUDING ANY REPRESENTATION OR WARRANTY AS TO VALUE, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR FOR ORDINARY PURPOSES, OR ANY OTHER MATTER, (II) SELLER MAKES NO, AND HEREBY DISCLAIMS ANY, OTHER REPRESENTATION OR WARRANTY REGARDING ITS BUSINESS, THE GROUND LEASE, THE ASSUMED CONTRACT, THE PROPERTY OR THE ASSUMED LIABILITIES, AND (III) THE GROUND LEASE, THE ASSUMED CONTRACT, THE PROPERTY AND THE ASSUMED LIABILITIES ARE CONVEYED ON AN "AS IS, WHERE IS" BASIS AS OF THE CLOSING, AND THE PURCHASER SHALL RELY UPON ITS OWN EXAMINATION THEREOF. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT OR ANY DOCUMENT DELIVERED BY THE SELLER PURSUANT TO THIS AGREEMENT, SELLER MAKES NO REPRESENTATION OR WARRANTY REGARDING ANY BUSINESS OTHER THAN ITS BUSINESS, ANY ASSETS OTHER THAN THE GROUND LEASE, THE PROPERTY AND THE ASSUMED CONTRACTS OR ANY LIABILITIES OTHER THAN THE ASSUMED LIABILITIES, AND NONE SHALL BE IMPLIED AT LAW OR IN EQUITY.

9.     **AS IS/NO WARRANTIES**

(a)     Purchaser expressly acknowledges that, except as otherwise provided for in the representations and warranties in this Agreement or any document delivered by Seller pursuant to this Agreement, Purchaser is buying the Property in an "AS IS" "WHERE IS" "WITH ALL FAULTS CONDITION" with regard to the physical condition of the Property

or the existence of any non-monetary defaults under the Ground Lease (including whether the Property complies with applicable law) without warranty or representation of any kind by Seller or any of Seller's employees, agents or contractors (the "**Seller's Related Parties**"), including specifically and without limitation, any warranty or representation as to the presence or absence of any Hazardous Material. As used in this Agreement, the term "**Hazardous Material**" shall mean asbestos, petroleum, polychlorinated biphenyl and any other materials defined as a hazardous substance, hazardous waste, hazardous constituents or solid waste in (a) the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. §9601 et seq., and any amendments thereto and regulations thereunder, (b) the Resource Conservation and Recovery Act, 42 U.S.C. §6901 et seq., and any amendments thereto and regulations thereunder, (c) Section 311 of the Federal Water Pollution Control Act, 33 U.S.C. §1251 et seq. (33 U.S.C. §1321), and (d) any other federal, state or local environmental statute or regulation. Notwithstanding anything to the contrary herein, all obligations under the Ground Lease shall be treated as Assumed Liabilities hereunder and the Purchaser shall perform in accordance with the terms of the Ground Lease.

(b)     Purchaser warrants, acknowledges to, and agrees with Seller that Purchaser is purchasing the Property in "AS IS" "WHERE IS" "WITH ALL FAULTS CONDITION", and specifically and expressly without any warranties, representations or guarantees, either express or implied, of any kind, nature, or type whatsoever from, or on behalf of, Seller, except as otherwise provided for in the representations and warranties in this Agreement or any document delivered by Seller pursuant to this Agreement. Purchaser acknowledges that Purchaser's agreement hereunder to purchase the Property in its "AS IS" "WHERE IS" "WITH ALL FAULTS CONDITION" was bargained for in the consideration given under this Agreement. Without in any way limiting the generality of the immediately preceding sentences, Purchaser and Seller further acknowledge and agree that in entering into this Agreement and closing the transactions hereunder, except as otherwise provided for in the representations and warranties in this Agreement or any document delivered by Seller pursuant to this Agreement:

(i)     Seller expressly disclaims, has not made, will not, and does not, make, any warranties or representations, express or implied, with respect to the Property, the physical condition, existence or repair or disrepair thereof, the value, profitability or marketability thereof, or of any of the appurtenances, facilities or equipment thereon;

(ii)     Seller expressly disclaims, has not made, will not, and does not, make, any warranties, express or implied, of merchantability, habitability or fitness for a particular use; and

(iii)     Upon the Closing, Purchaser shall be deemed to have made such legal, factual and other inquiries and investigations as Purchaser deems necessary, desirable or appropriate with respect to the Property, the value and marketability thereof, and of the appurtenances, facilities and equipment thereof. Such inquiries and investigations of Purchaser shall be deemed to include, but shall not be limited to, the physical components of all portions of the Real Property, the environmental condition of the Real Property, the compliance of the elevators in the Leased Premises with applicable law, the condition of

repair of the Real Property (including responsibility, to the extent the tenant's responsibility under the Ground Lease, for any leaks in various portions of the structures and improvements located on the Real Property), such state of facts as an accurate survey would show, and the present and future zoning, ordinances, resolutions and regulations of the City, County, and State where the Real Property are located.

(c)     WITHOUT IN ANY WAY LIMITING THE GENERALITY OF THE PRECEDING SUBSECTIONS 9(A) AND 9(B), SUBJECT TO THE PROVISIONS OF SECTION 13 OF THIS AGREEMENT, PURCHASER SPECIFICALLY ACKNOWLEDGES AND AGREES THAT IT HEREBY WAIVES, RELEASES AND DISCHARGES ANY CLAIM IT HAS, MIGHT HAVE HAD, OR MAY HAVE, AGAINST THE SELLER AND SELLER'S RELATED PARTIES RELATING TO, ARISING OUT OF OR WITH RESPECT TO (i) THE CONDITION OF THE PROPERTY, EITHER PATENT OR LATENT, (ii) PURCHASER'S ABILITY, OR INABILITY, TO OBTAIN OR MAINTAIN TEMPORARY OR FINAL CERTIFICATES OF OCCUPANCY, PERMITS OR OTHER LICENSES FOR THE USE OR OPERATION OF THE REAL PROPERTY, AND/OR CERTIFICATES OF COMPLIANCE FOR THE REAL PROPERTY, (iii) THE ACTUAL OR POTENTIAL INCOME, OR PROFITS, TO BE DERIVED FROM THE PROPERTY, (iv) THE REAL ESTATE, OR OTHER, TAXES OR SPECIAL ASSESSMENTS, NOW OR HEREAFTER PAYABLE ON ACCOUNT OF, OR WITH RESPECT TO, THE PROPERTY, (v) PURCHASER'S ABILITY OR INABILITY TO DEMOLISH THE IMPROVEMENTS OR OTHERWISE DEVELOP THE REAL PROPERTY, OR (vi) ANY OTHER MATTER RELATING TO THE PROPERTY. NOTWITHSTANDING THE FOREGOING AND FOR THE AVOIDANCE OF DOUBT, IN NO EVENT SHALL THE PROVISIONS OF THIS SECTION 9(C) BE DEEMED TO LIMIT PURCHASER'S RIGHTS AND REMEDIES TO ENFORCE THE PROVISIONS OF THIS AGREEMENT AGAINST SELLER.

10.     **NON-FOREIGN SELLER CERTIFICATION**

Seller represents that Seller is not a foreign person as defined in Section 1445 of the Internal Revenue Code of 1986, as amended (the "**Code**"), and the regulations promulgated thereunder, and is therefore exempt from the withholding requirements of said Section.  At Closing, Seller will deliver to Purchaser the certification set forth in Section 1445 of the Code and regulations.

11.     **DEFAULT AND REMEDIES; TERMINATION**

If Seller fails or refuses to comply with the terms of this Agreement within fifteen (15) Business Days of receipt by Seller of notice of such default (the "**Seller Cure Period**") for any reason other than Purchaser's uncured default hereunder (following the expiration of the applicable Purchaser Cure Period (hereinafter defined)), then Purchaser shall have as its sole and exclusive remedy, the right to terminate the Agreement upon written notice to Seller, whereupon the Deposit shall be promptly returned to Purchaser and thereafter this Agreement shall be terminated and of no further force or effect except as to any obligations that by their terms specifically survive termination of this Agreement.

If Purchaser fails or refuses to comply with the terms of this Agreement within fifteen (15) Business Days of receipt by Purchaser of notice of such default (the "**Purchaser Cure Period**") for any reason other than Seller's uncured default (following the expiration of the applicable Seller Cure Period), then Seller shall have as its sole and exclusive remedy, the right to terminate the Agreement, whereupon the Deposit shall be disbursed to, and retained by, Seller and this Agreement shall be terminated and of no further force or effect except as to any obligations that by their terms specifically survive termination of this Agreement.

Notwithstanding anything contained herein to the contrary, Seller may terminate this Agreement if the manager of Seller determines, based upon consultation with Seller's advisors, that proceeding with the transactions contemplated herein would be inconsistent with its fiduciary duties under applicable law in light of any material event, change, development or occurrence arising after the date of this Agreement that was not known to the manager of Seller, including without limitation, with respect to an Alternative Bid. In the event Seller terminates this Agreement in accordance with the preceding sentence, the Deposit shall be promptly returned to Purchaser and thereafter this Agreement shall be terminated and of no further force or effect except as provided for in this Agreement.

12. **NOTICES**

Any notice which either Party desires or is required to give hereunder shall be in writing and effective and deemed properly served (a) when hand delivered, provided that the addressee of such notices signs an acknowledgement of receipt of such notice, or (b) when received if sent with the United States Postal Service, as registered or certified mail, return receipt requested, bearing adequate postage, or (c) when received if sent with a reputable overnight courier service for guaranteed next day delivery with required signature acknowledgement of receipt to the Parties, or (d) when sent if sent via email (provided that notices sent via email shall not be deemed effective unless such notice is concurrently sent via another permitted means of delivery set forth in this sentence), at the following addresses:

|              |                                                           |
|--------------|-----------------------------------------------------------|
| To Seller:   | George Washington Bridge Bus Station Development Venture LLC |
|              | c/o Cole Schotz PC                                        |
|              | 1325 Avenue of the Americas, 19th Floor                   |
|              | New York, New York 10019                                  |
|              | Attention: Michael Sirota, Esq.                           |
|              | Ryan Jareck, Esq.                                         |
|              | Email: msirota@coleschotz.com;                            |
|              | rjareck@coleschotz.com                                    |
|              |                                                           |
| To Purchaser:| c/o JMB Capital Partners Lending, LLC                     |
|              | 205 S. Martel Avenue                                      |
|              | Los Angeles, California 90036                             |
|              | Attention: Vikas Tandon                                   |

|  | Email: | vikas@jmbcapital.com |
|---|---|---|

With a required copy to:      Lowenstein Sandler LLP
1251 Avenue of the Americas
New York, New York 10020
Attention: Robert M. Hirsh, Esq.
            Phillip Khezri, Esq.
Email:     rhirsh@lowenstein.com
          pkhezri@lowenstein.com

Notice of change of address for receipt of notices shall be sent in the manner set forth in this Section 12. Notices sent by counsel to a Party on such Party's behalf shall be deemed notice sent by the Party itself.

13. **MUTUAL RELEASES.**

Effective as of the Closing, and other than with respect to any claims pursuant to, and subject to the terms, conditions and limitations of, the terms and conditions of this Agreement, each of Seller and Purchaser, on behalf of itself and each of its Affiliates, hereby releases (i) Purchaser and its Affiliates, and their current and former officers, directors, stockholders, employees, agents, representatives, attorneys, investors, parents, predecessors, subsidiaries, successors and assigns (collectively, the "**Purchaser Released Parties**") and (ii) Seller and its managing member, attorneys, accountants, financial advisor and investment banker as of the Closing (collectively, the "**Seller Released Parties**"), respectively, from any and all liabilities, actions, rights of action, contracts, Indebtedness, obligations, claims, causes of action, suits, damages, demands, costs, expenses and attorneys' fees whatsoever, of every kind and nature, known or unknown, disclosed or undisclosed, accrued or unaccrued, existing at any time, in all circumstances arising at or prior to the Closing, that such Seller or Purchaser, respectively, or any of their respective Affiliates or any of their respective successors and assigns, have or may have against any of the Purchaser Released Parties or the Seller Released Parties, respectively; provided, however, that this Section 13 shall not apply to any causes of action arising from the fraud or willful misconduct of the Purchaser Released Parties or the Seller Released Parties, as applicable, or brought to enforce rights under this Agreement.

14. **ENTIRE CONTRACT, AMENDMENTS AND WAIVERS**

This Agreement contains the entire agreement and understanding of the Parties with respect to the subject matter hereof, and the same may not be amended, modified or discharged nor may any of its terms be waived except by an instrument in writing signed by the Party to be bound thereby.

15. **FURTHER ASSURANCES**

The Parties each agree to do, execute, acknowledge and deliver all such further acts, instruments and assurances and to take all such further action before or after the Closing as shall be necessary or desirable to fully carry out this Agreement and to fully consummate and effect the transaction contemplated hereby.

16. **SURVIVAL AND BENEFIT**

Except to the extent specifically stated to the contrary elsewhere in this Agreement, all representations, warranties, agreements and obligations of the Parties contained in this Agreement shall not survive the Closing. Wherever in this Agreement there is a reference to termination of this Agreement, such termination shall not be construed to terminate the obligations of the Parties with respect to any representations, warranties and obligations of the Parties contained in this Agreement which by their terms to the extent specifically stated in this Agreement shall survive termination of this Agreement.

17. **CONFIDENTIALITY**

(a) Purchaser agrees that all terms of this Agreement as well as any information provided to Purchaser pertaining to Seller (the "**Seller Confidential Information**") will remain confidential and will not be divulged by Purchaser without the written consent of Seller. Notwithstanding anything contained in this Agreement to the contrary, the obligation of confidentiality does not apply to (a) Seller Confidential Information which is now, or in the future becomes, part of the public domain, other than by breach of the terms of this Section 17(a), (b) Seller Confidential Information lawfully obtained from independent sources, and (c) disclosure specifically authorized by Seller in writing. Without limiting the foregoing, Purchaser agrees and acknowledges that no copies, summaries, abstracts or other reproductions of this Agreement or its terms will be provided to any third party not subject to substantially the same confidentiality obligation as Purchaser; provided, however, that for the avoidance of doubt, Purchaser shall have the right to disclose Seller Confidential Information to Purchaser's managers, partners, directors, officers, employees, agents, representatives and advisors (including, without limitation, financial advisors, accountants, legal advisors and consultants), equity or debt investors, or other debt or equity financing sources. In the event Purchaser breaches the terms of this Section, Purchaser acknowledges and agrees that Seller will be irreparably harmed, but that Seller's damages are difficult to calculate and, therefore, Seller shall be entitled to pursue an action for equitable relief, including, but not limited to, temporary or permanent injunctions, against any actual or threatened breach of this Section 17(a), in addition to Seller's rights and remedies under Section 11 of this Agreement or otherwise available at law or in equity; provided, however, that if Seller exercises Seller's remedy to retain the Deposit under Section 11 above, then (i) the amount of the Deposit shall offset against any damages to which Seller may be entitled pursuant to this Section 17(a), and (ii) if Seller does not prevail in any action brought against Purchaser under this Section 17(a), then Seller shall promptly return the Deposit to Purchaser.

(b) Seller agrees that all terms of this Agreement as well as any information provided to Seller pertaining to Purchaser (the "**Purchaser Confidential Information**") will remain confidential and will not be divulged by Seller without the written consent of

Purchaser. Notwithstanding anything contained in this Agreement to the contrary, the obligation of confidentiality does not apply to (a) Purchaser Confidential Information which is now, or in the future becomes, part of the public domain, other than by breach of the terms of this Section 17(b), (b) Purchaser Confidential Information lawfully obtained from independent sources, and (c) disclosure specifically authorized by Purchaser in writing. Without limiting the foregoing, Seller agrees and acknowledges that no copies, summaries, abstracts or other reproductions of this Agreement or its terms will be provided to any third party not subject to the same confidentiality obligation as Seller. In the event Seller breaches the terms of this Section, Seller acknowledges and agrees that Purchaser will be irreparably harmed, but that Purchaser's damages are difficult to calculate and, therefore, Purchaser shall be entitled to pursue an action for equitable relief, including, but not limited to, temporary or permanent injunctions, against any actual or threatened breach of this Section 17(b), in addition to all other rights and remedies set forth in this Agreement or otherwise available at law or in equity.

(c) Notwithstanding the foregoing provisions of this Section 17 or anything to the contrary in this Agreement, the Parties agree that this Agreement will be publicly filed with the Bankruptcy Court in connection with obtaining approval hereof, and the mere filing of this Agreement with the Bankruptcy Court in connection with the Bankruptcy Case by either Party shall not be deemed a breach of the terms of this Section 17.

(d) The provisions of this Section 17 shall survive the termination of this Agreement for a period of one (1) year but shall not survive the Closing.

18. **BROKERAGE**

Seller hereby indemnifies, protects and defends and holds Purchaser harmless from and against all losses, claims, costs, expenses, damages (including, but not limited to, attorneys' fees of counsel selected by the indemnified party) resulting from the claims of any broker (including any broker representing Seller), finder, or other such party claiming by, through or under the acts or agreements of Seller. Purchaser hereby indemnifies, protects and defends and holds Seller harmless from and against all losses, claims, costs, expenses, damages (including, but not limited to, attorneys' fees of counsel selected by the indemnified party) resulting from the claims of any broker (other than any broker representing Seller), finder, or other such party claiming by, through or under the acts or agreements of Purchaser. Any commission or other compensation due any broker representing Seller or Purchaser shall be the sole responsibility of Seller or Purchaser, as applicable, and any broker representing Seller or Purchaser shall be paid at the Closing in accordance with separate agreements between such broker and Seller or Purchaser, as applicable. Notwithstanding the foregoing provisions of this Section 18, if and only if Closing occurs, then at Closing, Seller shall pay the commission owed to Houlihan Lokey Capital, Inc. ("**Broker**") pursuant to a separate agreement between Seller and Broker (the "**Brokerage Agreement**").

19. **ASSIGNMENT**

Purchaser may not assign or transfer its rights or obligations under this Agreement without Seller's prior written consent, the granting or denial of which consent shall not be unreasonably withheld, conditioned or delayed; provided, however, that no consent shall be required to an assignment by Purchaser to any affiliate of Purchaser or entity controlling, controlled by or under common control with Purchaser. No transfer or assignment by Purchaser in violation of the provisions hereof shall be valid or enforceable.

20. **NO THIRD-PARTY BENEFITS**

This Agreement is for the sole and exclusive benefit of the Parties hereto and their respective successors and permitted assigns, and no third party is intended to or shall have any rights hereunder. This Agreement is binding upon and inures to the benefit of the successors and assigns of the Parties.

21. **INTENTIONALLY OMITTED**

22. **SEVERABILITY**

In the event that any one or more of the provisions contained in this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision in this Agreement, and this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained in the Agreement.

23. **GOVERNING LAW**

This Agreement shall be construed and governed in accordance with the laws of the State of New York without regard to its conflicts of laws principles.

24. **COUNTERPARTS**

This Agreement may be signed in several counterparts, each of which shall be deemed an original, and all such counterparts shall constitute one and the same instrument. Any counterpart to which is attached the signatures of all Parties shall constitute an original of this Agreement. Any counterpart of this Agreement executed by a Party may be delivered via facsimile, email or other electronic transmission, and shall be legally binding upon the Parties to the same extent as delivery of an original counterpart of this Agreement executed by a Party.

25. **SUCCESSORS AND ASSIGNS**

This Agreement shall be binding upon and inure to the benefit of the respective successors and permitted assigns of the Parties to this Agreement; provided, however, that Purchaser may only assign this Agreement in accordance with the provisions of <u>Section 18</u> of this Agreement.

26. **NO RECORDING**

Purchaser agrees not to record this Agreement or any memorandum or short form of this Agreement. Any such recording by Purchaser shall be a default under this Agreement and shall entitle Seller to terminate this Agreement in accordance with the terms hereof.

27.  **TIME FOR PERFORMANCE**

All references in this Agreement to "**days**" shall mean calendar days unless specifically stated. Notwithstanding the foregoing, whenever any expiration of a time limit or specific date provided in this Agreement falls on a Saturday, Sunday, or other day on which national banks in the State of New York are authorized or required to be closed, then that date is extended to the next day that is not a Saturday, Sunday, or other day on which national banks in the State of New York are authorized or required to be closed. The term "**Business Day**" as used in this Agreement means any day that is not a Saturday, Sunday, legal holiday or other day on which national banks in the State of New York are authorized or required to be closed.

28.  **TIME OF THE ESSENCE**

Time is of the essence of this Agreement.

29.  **CONDEMNATION AND CASUALTY**

In the event of any taking, or notice is given of the intention to take any of the Real Property by the exercise of the power of eminent domain of all or a substantial portion (hereinafter defined) of the Real Property prior to the Closing Date, Purchaser shall have the right to terminate this Agreement by giving written notice to Seller within five (5) business days after receipt by Purchaser of written notification of any such condemnation. If Purchaser elects to terminate this Agreement, then the Deposit shall be promptly returned to Purchaser and thereafter this Agreement shall be terminated and of no further force or effect except as to any obligations that by their terms specifically survive termination of this Agreement, and all awards and compensation arising out of said condemnation shall be the property of Seller. If Purchaser elects not to terminate this Agreement or fails to give Seller notice of termination within said five (5) Business Day period, said right to terminate shall be deemed waived and, effective as of Closing, Purchaser shall be assigned all of Seller's right, title, and interest to all awards and compensation arising out of said condemnation, and Purchaser shall remain obligated to purchase the Property, with no reduction in the consideration provided hereunder.

In the event of any damage to all or any substantial portion of the Real Property, Purchaser shall have the right to terminate this Agreement by giving written notice to Seller within five (5) Business Days after receipt by Purchaser of written notification from Seller of any such damage. If Purchaser elects to terminate this Agreement, then the Deposit shall be promptly returned to Purchaser and this Agreement shall be terminated and of no further force or effect except as to any obligations that by their terms specifically survive termination of this Agreement, and all insurance proceeds arising out of or payable in connection with said casualty shall be the property of Seller. If Purchaser elects not to terminate this Agreement or fails to give Seller notice of termination within said five (5)

Business Day period, said right to terminate shall be deemed waived and, effective as of Closing, Purchaser shall be assigned all of Seller's right, title, and interest to all insurance proceeds arising out of or payable in connection with said casualty, and Purchaser shall remain obligated to purchase the Property, with no reduction in the consideration provided hereunder.

For purposes of this Section 29, a "**substantial portion**" of the Real Property shall mean a portion of the Real Property that: (a) has a value reasonably determined by Purchaser to be equal to not less than ten percent (10%) of the Purchase Price; (b) the condemnation or damage of which would give a Major Subtenant the right to terminate its Sublease; (c) the condemnation or damage of which would result in the termination of the Ground Lease or the Port Authority having the right to terminate the Ground Lease; or (d) otherwise materially affects access to the Property or its use or operation.

30.    **SECTION HEADINGS**

The section headings contained in this Agreement are for convenience only and shall in no way enlarge or limit the scope or meaning of the various and several sections hereof

31.    **INTERPRETATION**

Whenever used in this Agreement, the singular number shall include the plural, the plural the singular, and the use of any gender shall include all genders.

32.    **JURY TRIAL**

SELLER AND PURCHASER HEREBY RESPECTIVELY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM WHETHER IN CONTRACT, TORT OR OTHERWISE, RELATING DIRECTLY OR INDIRECTLY TO THIS CONTRACT AND THE OBLIGATIONS AND CONTRACTS CONTAINED IN THIS CONTRACT.

33.    **AMENDMENTS**

No agreement, amendment, modification, understanding or waiver of or with respect to this Agreement or any term, provision, covenant or condition hereof; nor any approval or consent given under or with respect to this Agreement, shall be effective for any purpose unless contained in writing and executed by each Party hereto. However, such amendments and/or supplements may be executed in counterparts, all of which shall be deemed to constitute one document.

34.    **ENTIRE CONTRACT**

The Parties acknowledge and agree that at all times they have intended that none of the preliminary negotiations concerning this transaction would be binding on either Party, and that they would be bound to each other only by a single, formal, comprehensive document containing this Section and all of the agreements of the Parties, in final form, which has been executed and delivered by Purchaser and Seller. The Parties acknowledge

that none of the prior oral agreements between them (and none of the representations on which either of them has relied) relating to the subject matter of this Agreement shall have any force or effect whatever, except as and to the extent that such agreements and representations have been incorporated in this Agreement.

35. **PATRIOT ACT**

To Seller's knowledge, neither Seller nor its parent, subsidiary or affiliated entities are (i) in violation of any laws relating to terrorism or money laundering, or (ii) among the individuals or entities identified on any list compiled pursuant to Executive Order 13224 for the purpose of identifying suspected terrorists or on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control. Purchaser certifies that its name is JMB Capital Partners Lending, LLC, and to Purchaser's knowledge, neither Purchaser or affiliated entities are (i) in violation of any laws relating to terrorism or money laundering, or (ii) among the individuals or entities identified on any list compiled pursuant to Executive Order 13224 for the purpose of identifying suspected terrorists or on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control.

36. **FIDUCIARY OBLIGATIONS.**

Nothing in this Agreement, or any document related to the transactions contemplated hereby, will require Seller or any of its managers, directors, officers or members, in each case, in their capacity as such, to take any action, or to refrain from taking any action, to the extent inconsistent with their fiduciary obligations. For the avoidance of doubt, Seller retains the right to pursue any transaction or restructuring strategy that, in Seller's business judgment, will maximize the value of its estate, subject to the obligations to return the Deposit to Purchaser as provided for herein.

37. **EXCULPATION; LIMITATION OF LIABILITY.**

Notwithstanding anything to the contrary contained in this Agreement, no officer, director, shareholder, employee, agent, manager, member or partner of Seller or Purchaser shall have any personal liability with respect to any of the obligations contained in this Agreement. Under no circumstances shall Seller or Purchaser be responsible for consequential, special or punitive damages, and Seller and Purchaser hereby waive any and all such claims against the other for such consequential, special or punitive damages. The provisions of this Section 37 shall survive the expiration of the term or any earlier termination of this Agreement.

*[Remainder of Page Intentionally Left Blank; Signature Page Follows]*

**IN WITNESS WHEREOF**, the Parties have executed this Agreement of Purchase and Sale as of the date first above written.

<div style="margin-left: 50%;">

**SELLER:**

**GEORGE WASHINGTON BRIDGE
BUS STATION DEVELOPMENT
VENTURE LLC**, a Delaware limited
liability company

By: _____
Name:  BERNARD A. KATZ
Title:  MANAGER


**PURCHASER:**

**JMB CAPITAL PARTNERS
LENDING, LLC**, a California limited
liability company


By: _____
Name:
Title:

</div>

<div style="text-align: center;">

**(Signature Page to Agreement of Purchase and Sale)**

</div>

**IN WITNESS WHEREOF**, the Parties have executed this Agreement of Purchase and Sale as of the date first above written.

**SELLER:**

**GEORGE WASHINGTON BRIDGE BUS STATION DEVELOPMENT VENTURE LLC**, a Delaware limited liability company

By: _____
Name:
Title:

**PURCHASER:**

**JMB CAPITAL PARTNERS LENDING, LLC**, a California limited liability company

By: _____
Name: Vikas Tandon
Title: Manager

**ESCROW CONSENT AND ACKNOWLEDGMENT**

The undersigned agrees to act as the Title Insurer and Escrow Agent for the transaction described in the above Agreement as provided herein. Receipt of the Deposit is hereby acknowledged. The undersigned agrees to hold and deliver the Deposit in accordance with the terms of this Agreement.

FIRST AMERICAN TITLE INSURANCE COMPANY

Escrow No. _____        By:    _____

                                 _____ (Print Name)

                                 Authorized Representative

Date: _____, 2021

First American Title Insurance Company
666 Third Avenue
New York, New York 10017
Attn: Larissa Kravanja, Esq. (lkravanja@firstam.com)

## EXHIBITS / SCHEDULES

Exhibit A:       Ground Lease
Exhibit B:       Legal Description
Exhibit C:       Form of Assignment of Ground Lease
Exhibit D:       Form of Bill of Sale
Exhibit E-1:    Form of Assignment of Subleases
Exhibit E-2:    Form of Subtenant Notices
Schedule 1:     Assumed Contracts
Schedule 2:     Subleases
Schedule 3:     Closing Payment Calculation
Schedule 4:     Security Deposits
Schedule 5:     Leasing Incentives
Schedule 6:     Rent Roll
Schedule 7:     Tangible Personal Property
Schedule 8:     Intangible Personal Property
Schedule 9:     Written Notices
Schedule 10:   Litigation
Schedule 11:   Subtenant A/R

# EXHIBIT A

### Ground Lease

1.    Agreement of Lease by and between The Port Authority of New York and New Jersey and George Washington Bridge Bus Station Development Venture LLC dated July 21, 2011, as amended and supplemented by the First Amendment to the Agreement of Lease dated September 19, 2011, a letter agreement dated January 14, 2016, a subsequent letter agreement dated October 31, 2016, a subsequent letter agreement dated November 30, 2016, a subsequent letter agreement dated December 31, 2016, a subsequent letter agreement dated January 31, 2017, the Second Amendment to Lease dated May 15, 2017, a Waiver under Agreement of Lease and a Commitment to Provide Community Space at the GWBBS, each dated October 1, 2018, the Third Amendment to Agreement of Lease dated January 10, 2019, a settlement letter agreement dated January 10, 2019, and the Fourth Amendment to Agreement of Lease dated October 2, 2019.

2.    Memorandum of Lease made by and between The Port Authority of New York and New Jersey and George Washington Bridge Bus Station Development Venture LLC dated as of July 21, 2011, and recorded on August 2, 2011 as CRFN 2011000271826

48036/0050-40878634v2
48036/0050-40972636v2
61576/0001-41024593v2

## EXHIBIT B

## LEGAL DESCRIPTION

BLOCK 2163 LOT 1:

**ALL THAT CERTAIN** plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Borough of Manhattan, City, County and State of New York, bounded and described as follows:

BEGINNING at the corner formed by the intersection of the northerly side of West 178th Street and the easterly side of Broadway;

RUNNING THENCE northerly along the easterly side of Broadway a distance of 204 feet 2 inches to the corner formed by the intersection of the easterly side of Broadway and the southerly side of West 179th Street;

THENCE easterly along the southerly side of West 179th Street a distance of 260 feet 8 7/8 inches to the corner formed by the intersection of the southerly side of West 179th Street and the westerly side of Wadsworth Avenue;

THENCE southerly along the westerly side of Wadsworth Avenue a distance of 200 feet to the corner formed by the intersection of the westerly side of Wadsworth Avenue and the northerly side of West 178th Street;

THENCE westerly along the northerly side of West 178th Street a distance of 301 feet 9 1/2 inches to the corner formed by the intersection of the northerly side of West 178th Street and the easterly side of Broadway to the point or place of BEGINNING.

SAID premises being more particularly bounded and described as follows:

**ALL THAT CERTAIN** plot, piece or parcel of land, being Tax Lot I in Tax Block 2163, situate, lying and being in the Borough of Manhattan, City, County and State of New York, being more particularly bounded and described as follows:

BEGINNING at the corner formed by the intersection of the southeasterly side of Broadway (100 feet wide) with the southwesterly side of West 179th Street (60 feet wide), as the streets are laid out on the Borough President of Manhattan Final Sectional Map No. 30, said point having the Memorial Church coordinates of North 24122.640 East 5478.278 (NAD 83 New York East coordinates of North 734630.813 East 647889.374);

RUNNING THENCE southeasterly along the southwesterly side of West 179th Street, a distance of 260.76 feet to the corner formed by the intersection of the southwesterly side of West 179th Street with the northwesterly side of Wadsworth Avenue (80 feet wide) said line forming an interior angle of 101 degrees 36 minutes 38 seconds with the southeasterly side of Broadway;

RUNNING THENCE southwesterly along the northwesterly side of Wadsworth Avenue, a distance of 200.00 feet to the corner formed by the intersection of the northwesterly side of Wadsworth Avenue with the northeasterly side of West 178th Street (60 feet wide); said line forming an interior angle of 89 degrees 58 minutes 55 seconds with the southwesterly side of West 179th Street;

48036/0050-40878634v2
48036/0050-40972636v2
61576/0001-41024593v2

RUNNING THENCE northwesterly along the northeasterly side of West 178th Street, a distance of 301.79 feet to the corner formed by the intersection of the northeasterly side of West 178th Street with the southeasterly side of Broadway; said line forming an interior angle of 90 degrees 00 minutes 53 seconds with the northwesterly side of Wadsworth Avenue;

RUNNING THENCE northeasterly along the southeasterly side of Broadway, a distance of 204.16 feet to the place and point of BEGINNING; said line forming an interior angle of 78 degrees 23 minutes 34 seconds with the northeasterly side of West 178th Street, to the point or place of BEGINNING.

BLOCK 2176 LOT 17:

**ALL THAT CERTAIN** plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Borough of Manhattan, City, County and State of New York, bounded and described as follows:

BEGINNING at the corner formed by the intersection of the northerly side of West 178th Street and the westerly side of Broadway;

RUNNING THENCE northerly along the westerly side of Broadway a distance of 206 feet and 0 1/2 inches to the corner formed by the intersection of the westerly side of Broadway and the southerly side of West 179th Street;

THENCE westerly along the southerly side of West 179th Street a distance of 423 feet 9 7/8 inches to the corner formed by the intersection of the southerly side of West 179th Street and the easterly side of Fort Washington Avenue;

THENCE southerly along the easterly side of Fort Washington Avenue a distance of 185 feet 2 1/4 inches to the corner formed by the intersection of the easterly side of Fort Washington Avenue and the northerly side of West 178th Street;

THENCE easterly along the northerly side of West 178th Street a distance of 341 feet 3 1/8 inches to the corner formed by the intersection of the northerly side of West 178th Street and the westerly side of Broadway to the point or place of BEGINNING.

EXCEPTING therefrom so much of the premises that may be taken for widening of West 178th Street and West 179th Street.

SAID premises being more particularly bounded and described as follows:

**ALL THAT CERTAIN** plot, piece or parcel of land, being Tax Lot 17 in Tax Block 2176, situate, lying and being in the Borough of Manhattan, City, County and State of New York, being more particularly bounded and described as follows:

BEGINNING at a point on the southeasterly side of Fort Washington Avenue (80 feet wide) extended northeasterly 20.02 feet, distant from the corner formed by the intersection of the southeasterly side of Fort Washington Avenue with the southwesterly side of West 179th Street (60 feet wide), as the streets are laid out on the Borough President of Manhattan Final Sectional Map No. 30, said point having the Memorial Church coordinates of North 24251.823 East 4956.112 (NAD 83 New York East coordinates of North 734756.743 East 647366.432);

Exhibit B – Page 2 of 3

48036/0050-40878634v2
48036/0050-40972636v2
61576/0001-41024593v2

RUNNING THENCE southeasterly along the northerly line of said Parcel B, a distance of 423.73 feet to an angle point on the northwesterly side of Broadway (100 feet wide) extended northeasterly; said line forming an interior angle of 92 degrees 32 minutes 33 seconds with the southeasterly side of Fort Washington Avenue extended northeasterly;

RUNNING THENCE southwesterly along the northwesterly side of Broadway extended, a distance of 205.98 feet to an angle point; said line forming an interior angle of 63 degrees 52 minutes 49 seconds with the last mentioned course;

RUNNING THENCE northwesterly along the southerly line of said Parcel B, a distance of 341.28 feet to an angle point on the southeasterly side of Fort Washington Avenue extended southwesterly; said line forming an interior angle of 116 degrees 07 minutes 57 seconds with the northwesterly side of Broadway extended southwesterly;

RUNNING THENCE northeasterly along the southeasterly side of Fort Washington Avenue extended, a distance of 185.22 feet to the place and point of BEGINNING; said line forming an interior angle of 87 degrees 26 minutes 41 seconds with the last mentioned course.

Exhibit B – Page 3 of 3

48036/0050-40878634v2
48036/0050-40972636v2
61576/0001-41024593v2

## EXHIBIT C

## FORM OF ASSIGNMENT OF GROUND LEASE

See attached

Exhibit C – Page 1 of 7

48036/0050-40878634v2
48036/0050-40972636v2
61576/0001-41024593v2

## ASSIGNMENT AND ASSUMPTION OF GROUND LEASE

THIS AGREEMENT, made as of _____, 2021, between **GEORGE WASHINGTON BRIDGE BUS STATION DEVELOPMENT VENTURE LLC** (the "Assignor"), a limited liability company organized and existing under the laws of the State of Delaware and having an office at _____ and _____ (the "Assignee"), a _____ organized and existing under the      laws      of _____ and having an office at _____.

### WITNESSETH, THAT:

**WHEREAS**, the Assignor desires to assign to the Assignee that certain Agreement of Lease dated as of July 21, 2011, made by and between The Port Authority of New York and New Jersey, a body corporate and politic created by compact between the States of New York and New Jersey with the consent of the Congress of the United States of America, and the Assignor (as the same may heretofore have been amended or extended, the "Lease"), a Memorandum of which dated as of July 21, 2011 was recorded August 2, 2011 in (as) CRFN 2011000271826, covering premises located within the Borough of Manhattan, the City of New York, as more particularly described in **Exhibit A** annexed hereto (the "Premises").

**NOW, THEREFORE**, in consideration of the covenants and mutual promises herein contained, the Assignor and the Assignee hereby agree as follows:

1.      The Assignor does hereby assign, convey, transfer and set over the Lease and the leasehold estate created thereby, and all right, title and interest of the Assignor in and to the Premises, to the Assignee, its legal representatives, successors and permitted assigns, to its and their own proper use, benefit and behoof, to have and to hold the same unto the Assignee, its legal representatives, successors and permitted assigns, from the date hereof (the "Effective Date"), for and during all the rest, residue and remainder of the term of the letting under the Lease, subject nevertheless to all the terms, provisions, covenants and conditions therein contained.

2.      The Assignee does hereby, effective from and after the Effective Date, assume the performance of and does hereby agree to perform, observe and be subject to all the terms, provisions, covenants and conditions, including without limitation the obligations to pay Rental, contained in the Lease which are to be performed or observed by or are applicable to the Lessee thereunder regardless of when the same arose, except that the Assignee shall have no liability or obligation with respect to any Rental that was due and payable prior to the Effective Date, in each case, however, subject to the provisions of Section 17.11 of the Lease, which is incorporated in this Agreement by reference.

3.      The Assignor agrees that this assignment of the Lease shall not in any way whatsoever affect or impair the liability of the Assignor to perform all the terms, provisions, covenant and conditions of the Lease (including without limitation thereto the obligation to pay Rental) on the part of the Lessee to be performed prior to the Effective Date, subject to the provisions of Section 17.11 and 25.3 of the Lease.  However, the Assignor shall be, and hereby is, relieved of all liability and obligations accruing under the Lease on and after the Effective Date.

Exhibit C – Page 2 of 7

48036/0050-40878634v2
48036/0050-40972636v2
61576/0001-41024593v2

4.  The provisions of this Agreement shall be binding upon, and shall inure to the benefit of, the successors and assigns of Assignor and Assignee, respectively.

5.  This Assignment of Lease may be executed in counterparts and once fully executed in counterparts, it shall be in full force and effect as if all parties hereto executed the same original.

6.  Assignor, in compliance with Lien Law Section 13, agrees that Assignor will receive the consideration for this conveyance and will hold the right to receive that consideration as a trust fund to be applied first to pay the cost of the improvement before using any part of it for any other purpose.

**BALANCE OF PAGE INTENTIONALLY LEFT BLANK**

Exhibit C – Page 3 of 7

48036/0050-40878634v2
48036/0050-40972636v2
61576/0001-41024593v2

**IN WITNESS WHEREOF,** the Assignor and the Assignee have executed this Agreement as of the date first hereinabove set forth.

ASSIGNOR:

GEORGE WASHINGTON BRIDGE BUS
STATION DEVELOPMENT VENTURE
LLC, a Delaware limited liability company

By:_____
Name:
Title:

ASSIGNEE:

_____

a _____

By:_____
Name:
Title:

[notary blocks to be inserted]

Exhibit C – Page 4 of 7

**EXHIBIT A**

**LEGAL DESCRIPTION**

<u>BLOCK 2163 LOT 1</u>:

**ALL THAT CERTAIN** plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Borough of Manhattan, City, County and State of New York, bounded and described as follows:

BEGINNING at the corner formed by the intersection of the northerly side of West 178th Street and the easterly side of Broadway;

RUNNING THENCE northerly along the easterly side of Broadway a distance of 204 feet 2 inches to the corner formed by the intersection of the easterly side of Broadway and the southerly side of West 179th Street;

THENCE easterly along the southerly side of West 179th Street a distance of 260 feet 8 7/8 inches to the corner formed by the intersection of the southerly side of West 179th Street and the westerly side of Wadsworth Avenue;

THENCE southerly along the westerly side of Wadsworth Avenue a distance of 200 feet to the corner formed by the intersection of the westerly side of Wadsworth Avenue and the northerly side of West 178th Street;

THENCE westerly along the northerly side of West 178th Street a distance of 301 feet 9 1/2 inches to the corner formed by the intersection of the northerly side of West 178th Street and the easterly side of Broadway to the point or place of BEGINNING.

SAID premises being more particularly bounded and described as follows:

**ALL THAT CERTAIN** plot, piece or parcel of land, being Tax Lot I in Tax Block 2163, situate, lying and being in the Borough of Manhattan, City, County and State of New York, being more particularly bounded and described as follows:

BEGINNING at the corner formed by the intersection of the southeasterly side of Broadway (100 feet wide) with the southwesterly side of West 179th Street (60 feet wide), as the streets are laid out on the Borough President of Manhattan Final Sectional Map No. 30, said point having the Memorial Church coordinates of North 24122.640 East 5478.278 (NAD 83 New York East coordinates of North 734630.813 East 647889.374);

RUNNING THENCE southeasterly along the southwesterly side of West 179th Street, a distance of 260.76 feet to the corner formed by the intersection of the southwesterly side of West 179th Street with the northwesterly side of Wadsworth Avenue (80 feet wide) said line forming an interior angle of 101 degrees 36 minutes 38 seconds with the southeasterly side of Broadway;

RUNNING THENCE southwesterly along the northwesterly side of Wadsworth Avenue, a distance of 200.00 feet to the corner formed by the intersection of the northwesterly side of Wadsworth Avenue with the northeasterly side of West 178th Street (60 feet wide); said line forming an interior angle of 89 degrees 58 minutes 55 seconds with the southwesterly side of West 179th Street;

Exhibit C – Page 5 of 7

48036/0050-40878634v2
48036/0050-40972636v2
61576/0001-41024593v2

RUNNING THENCE northwesterly along the northeasterly side of West 178th Street, a distance of 301.79 feet to the corner formed by the intersection of the northeasterly side of West 178th Street with the southeasterly side of Broadway; said line forming an interior angle of 90 degrees 00 minutes 53 seconds with the northwesterly side of Wadsworth Avenue;

RUNNING THENCE northeasterly along the southeasterly side of Broadway, a distance of 204.16 feet to the place and point of BEGINNING; said line forming an interior angle of 78 degrees 23 minutes 34 seconds with the northeasterly side of West 178th Street, to the point or place of BEGINNING.

BLOCK 2176 LOT 17:

**ALL THAT CERTAIN** plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Borough of Manhattan, City, County and State of New York, bounded and described as follows:

BEGINNING at the corner formed by the intersection of the northerly side of West 178th Street and the westerly side of Broadway;

RUNNING THENCE northerly along the westerly side of Broadway a distance of 206 feet and 0 1/2 inches to the corner formed by the intersection of the westerly side of Broadway and the southerly side of West 179th Street;

THENCE westerly along the southerly side of West 179th Street a distance of 423 feet 9 7/8 inches to the corner formed by the intersection of the southerly side of West 179th Street and the easterly side of Fort Washington Avenue;

THENCE southerly along the easterly side of Fort Washington Avenue a distance of 185 feet 2 1/4 inches to the corner formed by the intersection of the easterly side of Fort Washington Avenue and the northerly side of West 178th Street;

THENCE easterly along the northerly side of West 178th Street a distance of 341 feet 3 1/8 inches to the corner formed by the intersection of the northerly side of West 178th Street and the westerly side of Broadway to the point or place of BEGINNING.

EXCEPTING therefrom so much of the premises that may be taken for widening of West 178th Street and West 179th Street.

SAID premises being more particularly bounded and described as follows:

**ALL THAT CERTAIN** plot, piece or parcel of land, being Tax Lot 17 in Tax Block 2176, situate, lying and being in the Borough of Manhattan, City, County and State of New York, being more particularly bounded and described as follows:

BEGINNING at a point on the southeasterly side of Fort Washington Avenue (80 feet wide) extended northeasterly 20.02 feet, distant from the corner formed by the intersection of the southeasterly side of Fort Washington Avenue with the southwesterly side of West 179th Street (60 feet wide), as the streets are laid out on the Borough President of Manhattan Final Sectional Map No. 30, said point having the Memorial Church coordinates of North 24251.823 East 4956.112 (NAD 83 New York East coordinates of North 734756.743 East 647366.432);

Exhibit C – Page 6 of 7

48036/0050-40878634v2
48036/0050-40972636v2
61576/0001-41024593v2

RUNNING THENCE southeasterly along the northerly line of said Parcel B, a distance of 423.73 feet to an angle point on the northwesterly side of Broadway (100 feet wide) extended northeasterly; said line forming an interior angle of 92 degrees 32 minutes 33 seconds with the southeasterly side of Fort Washington Avenue extended northeasterly;

RUNNING THENCE southwesterly along the northwesterly side of Broadway extended, a distance of 205.98 feet to an angle point; said line forming an interior angle of 63 degrees 52 minutes 49 seconds with the last mentioned course;

RUNNING THENCE northwesterly along the southerly line of said Parcel B, a distance of 341.28 feet to an angle point on the southeasterly side of Fort Washington Avenue extended southwesterly; said line forming an interior angle of 116 degrees 07 minutes 57 seconds with the northwesterly side of Broadway extended southwesterly;

RUNNING THENCE northeasterly along the southeasterly side of Fort Washington Avenue extended, a distance of 185.22 feet to the place and point of BEGINNING; said line forming an interior angle of 87 degrees 26 minutes 41 seconds with the last mentioned course.

Exhibit C – Page 7 of 7

48036/0050-40878634v2
48036/0050-40972636v2
61576/0001-41024593v2

# EXHIBIT D

# FORM OF BILL OF SALE

See attached

48036/0050-40878634v2
48036/0050-40972636v2
61576/0001-41024593v2

## BILL OF SALE, ASSIGNMENT AND ASSUMPTION

      FOR VALUABLE CONSIDERATION, receipt of which is hereby acknowledged, as of this \_\_\_\_ day of _____, 2021, the undersigned, _____, a Delaware limited liability company ("**Seller**"), hereby sells, transfers, assigns and conveys to _____, a Delaware limited liability company ("**Buyer**"), with respect to the "Property" (as hereinafter defined), the following:

      1.    <u>Personal Property</u>.  All right, title and interest of Seller in and to the "Personal Property" (as hereinafter defined).

      2.    <u>Assumed Contracts</u>.  All right, title and interest of Seller in and to the "Assumed Contracts" (as hereinafter defined).

      3.    <u>Other Rights</u>.  All right, title and interest of Seller, to the extent assignable, in and to all certificates, licenses, approvals, permits, warranties and other rights relating to the Property.

      This Bill of Sale, Assignment and Assumption is given pursuant to that certain Agreement of Purchase and Sale (the "**APA**") dated as of _____, by and between Seller and Buyer, providing for the sale of the Property.  Buyer hereby accepts the foregoing assignment and agrees to assume and discharge, in accordance with the terms thereof, all of the obligations of Seller under the Assumed Contracts, to the extent the same arise on or after the date hereof.  This Bill of Sale, Assignment and Assumption shall inure to the benefit of and shall be binding upon Seller and Buyer, and their respective successors and assigns.  As used herein, the terms "Assumed Contracts", "Personal Property" and "Property" shall have the respective meanings set forth for the same in the APA.

      This Bill of Sale, Assignment and Assumption may be executed in one or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same document.

      *[remainder of this page intentionally left blank]*

Exhibit D – Page 2 of 3

SELLER:

GEORGE WASHINGTON BRIDGE BUS
STATION DEVELOPMENT VENTURE
LLC, a Delaware limited liability company


By:_____
Name:
Title:

BUYER:

_____

a _____


By:_____
Name:
Title:

Exhibit D – Page 3 of 3

# EXHIBIT E-1

## FORM OF ASSIGNMENT OF SUBLEASES

See attached

48036/0050-40878634v2
48036/0050-40972636v2
61576/0001-41024593v2

## ASSIGNMENT AND ASSUMPTION OF SUBLEASES

THIS ASSIGNMENT AND ASSUMPTION OF SUBLEASES ("*Assignment*") is entered into as of _____, 20__ ("*Effective Date*") by and between GEORGE WASHINGTON BRIDGE BUS STATION DEVELOPMENT VENTURE LLC, a Delaware limited liability company ("*Assignor*"), and _____ ("*Assignee*").

### R E C I T A L S :

A.        Assignor is the lessee under that certain Agreement of Lease dated as of July 21, 2011, made by and between The Port Authority of New York and New Jersey, a body corporate and politic created by compact between the States of New York and New Jersey with the consent of the Congress of the United States of America, and the Assignor (as the same may have been amended, modified or extended, the "*Ground Lease*"), covering premises located within the Borough of Manhattan, the City of New York, as more particularly described on **Exhibit A** attached hereto and incorporated herein by reference (the "*Property*").

B.        Assignor has agreed to sell to Assignee and Assignee has agreed to purchase Assignor's interest in the Ground Lease in accordance with the terms and conditions of a certain Agreement of Purchase and Sale between Assignor and _____ dated as of _____, 20__ (as the same may have been amended, modified and/or assigned, the "*Agreement*").

C.        The Property is currently subject to those certain subleases set forth on Exhibit "B" attached hereto and incorporated herein by reference (collectively, the "*Leases*").

D.        Assignor desires to assign Assignor's rights under the Subleases to Assignee and Assignee desires to assume Assignor's obligations thereunder from and after the Effective Date.

NOW, THEREFORE, for and in consideration of the sum of One Dollar ($1.00), paid by Assignee to Assignor, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.        Effective as of the Effective Date, Assignor does hereby assign, transfer and set over to Assignee all of Assignor's right, title and interest in and to the Subleases, subject, however, to all of the covenants, terms, conditions and provisions thereof.

2.        Assignee covenants and agrees to assume, keep and perform, from and after the Effective Date, all of the terms, covenants and conditions contained in the Subleases required to be kept and performed by the owner or landlord thereunder first arising on or after the Effective Date.

3.        This Assignment shall be governed and construed in accordance with the laws of the State of New York, without giving effect to any conflicts of laws provisions thereof.

4.        This Assignment shall be binding upon and inure to the benefit of Assignor and Assignee and their respective successors and assigns.

48036/0050-40878634v2
48036/0050-40972636v2
61576/0001-41024593v2

     5.     This Assignment may be executed in multiple identical counterparts all of which, when taken together, shall constitute one document.

48036/0050-40878634v2
48036/0050-40972636v2
61576/0001-41024593v2

IN WITNESS WHEREOF, Assignor and Assignee have executed this Assignment as of the Effective Date.

**ASSIGNOR**:

GEORGE WASHINGTON BRIDGE BUS STATION DEVELOPMENT VENTURE LLC, a Delaware limited liability company

By:_____
Name:_____
Title: _____

**ASSIGNEE**:

_____,
a _____

By:_____
Name:_____
Title: _____

[notary blocks and exhibits to be inserted]

Exhibit E-1 – Page 4 of 4

## **EXHIBIT E-2**

## **FORM OF SUBTENANT NOTICES**

See attached

48036/0050-40878634v2
48036/0050-40972636v2
61576/0001-41024593v2

# **NOTICE LETTER**


_____, 2021

[TENANT NAME]
[TENANT ADDRESS]

Re:     Your Lease at George Washington Bridge Bus Station, New York, NY ("<u>Lease</u>")  –
        Notice of Change of Ownership and 1099 Reporting Information for Calendar Year
        2021


Dear Tenant,

You are hereby notified by George Washington Bridge Bus Station Development Venture LLC,
a Delaware limited liability company ("<u>Seller</u>"), and [_____], a [_____] limited
liability company (the "<u>New Landlord</u>"), as follows:

       On _____, 2021 (the "<u>Transfer Date</u>"), Seller conveyed its interest in and to
that certain Agreement of Lease by and between The Port Authority of New York and New Jersey,
as lessor, and Seller, as lessee, dated July 21, 2011 (as the same may have been amended and/or
modified before the Transfer Date, the "<u>Ground Lease</u>") to New Landlord.  By virtue of this
conveyance, New Landlord is now the lessee under the Ground Lease and the landlord under your
Lease.

       Effective as of the Transfer Date, your landlord, payment address, W-9 reporting
requirements, and insurance certificate will change.  Please see below for additional instructions.

## **New Landlord:**

       As of the Transfer Date, the landlord under your Lease is now **[_____]**, a
[_____] limited liability company.  Please reference the copy of the Assignment and Assumption
of the Ground Lease between Seller and New Landlord attached as <u>Exhibit A</u> for proof of transfer.

## **New Bank Account/Payment Information:**

       As of the Transfer Date, rental payments to be made via Electronic Automated Clearing
House ("<u>ACH</u>") payment method should be immediately changed to the following new bank
account information:

|  |  |
|---|---|
| Bank Name: | _____ |
| ABA: | _____ |
| Account Number: | _____ |
| Account Name: | _____ |

Exhibit E-2 – Page 2 of 1

If you currently do not make rental payments via ACH but would like to do so, please contact _____ via email at _____ or call _____.

Rental payments made by check should be mailed to:

[_____]
_____
_____
_____

### 2021 W-9 Reporting Requirements:

Pursuant to the assignment of the Ground Lease on the Transfer Date, all payments reported on IRS Form 1099 for the period commencing on the Transfer Date and all future reporting periods should show the recipient's name and TIN as that of _____. Attached as Exhibit B is the W-9 reflecting the recipient's name on Line 1 and the TIN applicable for such period.

### Insurance Certificate Change:

In addition, please contact your insurance broker and notify them to send a revised certificate of insurance with both the New Landlord's name ([_____]) and the Managing Agent's name ([_____]) as additional named insureds, along with any other additional named insured as required by your Lease. The revised certificates of insurance are due within 10 days of receipt of this letter and may be sent via USPS or email to the following contact in our office:

[_____]
_____
_____
_____

Sales reports should be emailed to [_____] or mailed to our corporate office's address listed below, to the attention of Tenant Sales Department.

All correspondence and notifications should be mailed to our corporate offices at the address listed below:

[_____]
_____
_____
_____

Exhibit E-2 – Page 3 of 1

With a copy to:

[_____]
_____
_____
_____


With copies of all Legal Notices to:

[_____]
_____
_____
_____


With a copy to:

[_____]
_____
_____
_____


If there is a security deposit with respect to your Lease, it has been transferred to the New Landlord, and the New Landlord will be responsible for holding the same in accordance with the terms of your lease.

We appreciate your attention to these details. If you have any questions, please do not hesitate to reach out to _____.

This Notice Letter may be executed by Seller and New Landlord in counterparts, and once fully executed in counterparts, it shall be in full force and effect as if Seller and New Landlord executed the same original.

*[remainder of this page intentionally left blank; signature page follows]*

48036/0050-40878634v2
48036/0050-40972636v2
61576/0001-41024593v2

**SELLER:**

**GEORGE WASHINGTON BRIDGE BUS
STATION DEVELOPMENT VENTURE LLC,**
a Delaware limited liability company

By: _____
Name:
Title:

**NEW LANDLORD:**

[_____],
a [_____] limited liability company

By: _____
Name:
Title:

[Exhibits A and B to be attached]

48036/0050-40878634v2
48036/0050-40972636v2
61576/0001-41024593v2

# SCHEDULE 1

## ASSUMED CONTRACTS

| Agreement | Counterparty | Counterparty Address |
|---|---|---|
| Elevator Advertising Agreement | Hispanic Indoor Media | 5547 Main Street, Williamsville, NY 14221 |
| Elevator Maintenance Agreement | KONE Inc. | Metro New York, 1384 Broadway, 21st Floor, New York, NY 10018 |
| Fire Prevention Contract | Sirina Fire Protection Corp. | 151 Herricks Road, New Hyde Park, NY 11040 |
| Fire Preventive Maintenance Agreement | DavED Fire Systems, Inc. | 307 West Pleasant View Avenue, Hackensack, NJ 07601 |
| General Liability Policy | Underwriters Lloyds London(IL) | CRC Swett, 1 North Franklin - 14th FL, Chicago, IL 60606 |
| Insurance Policy - Commercial | Starr Surplus Lines Insurance Company | 399 Park Avenue - 8th FL, New York, NY 10022 |
| Insurance Policy - Excess Liability | Fireman's Fund Insurance Company, AmWins Brokerage of New Jersey | Raritan Plaza, 110 Fieldcrest Avenue, Edison, NJ 08837 |
| Insurance Policy - Excess Liability | Navigators Insurance Company, AmWins Brokerage of New Jersey | Raritan Plaza, 110 Fieldcrest Avenue, Edison, NJ 08837 |
| Insurance Policy - Excess Liability | North River Insurance Company, AmWins Brokerage of New Jersey | Raritan Plaza, 110 Fieldcrest Avenue, Edison, NJ 08837 |
| Insurance Policy - Excess Liability | Westchester Fire Insurance Company, AmWins Brokerage of New Jersey | Raritan Plaza, 110 Fieldcrest Ave, Edison, NJ 08837 |
| Insurance Policy - Excess Property | Homeland Insurance Company of Delaware, CRC Swett | 1 Financial Sq - Suite 401, New York, NY 10005 |
| Insurance Policy - General Liability | Hiscox Insurance Company Inc. | 104 South Michigan Avenue - Suite 600, Chicago, IL 60603 |
| Insurance Policy - Terrorism | Miller Insurance Services LLP | 70 Mark Lane, London EC3R 7NQ, United Kingdom |
| Insurance Policy - Terrorism | Underwriters Lloyds London(IL) | CRC Swett, 32 Old Slip, New York, NY 10005 |
| Insurance Premium Financing Agreement | Bank Direct Capital Finance, a division of Texas Capital Bank, N.A. | 150 North Field Drive - Suite 190, Lake Forest, IL 60045 |
| Water Treatment Contract | The Metro Group, Inc. | 50-23 Twenty-Third Street, Long Island City, NY 11101 |
| Professional Cleaning Services | Facility Value | 5030 Broadway, Suite 633, New York, NY 10034 |

**SCHEDULE 2**

**SUBLEASES**

| Agreement | Counterparty | Counterparty Address |
|---|---|---|
| Lease between Blink Broadway Marketplace Inc. and George Washington Bridge Bus Station Development Venture LLC dated 10/28/2010<br><br>Guaranty by Equinox Holdings, Inc. and Blink Holdings, Inc. dated 10/28/2010<br><br>Limited Guaranty by Equinox Holdings, Inc. dated 10/28/2010<br><br>Limited Guaranty No. 2 by Blink Holdings, Inc. dated 10/28/2010<br><br>First Amendment to Lease between Tenant and Landlord dated 11/16/2015<br>Second Amendment to Lease between Tenant and Landlord dated 6/__/2017 | Blink Broadway Marketplace, Inc. d/b/a Blink Fitness | 895 Broadway - 3rd FL, New York, NY 10003 |
| Lease between Café Buunni, GWB Inc. and George Washington Bridge Bus Station Development Venture LLC dated 04/09/2014<br><br>Guaranty by Sarina Prabasi and Elias Gurmu in favor of Landlord dated 03/15/2014<br><br>First Amendment to Lease between Tenant and | Cafe Buunni, GWB Inc. | 213 Pinehurst Avenue, New York, NY 10033 |

Schedule 2 – Page 2 of 7

| | | |
|---|---|---|
| Landlord dated 10/__/2017<br><br>Confidentiality Agreement and Lease Amendment between Tenant and Landlord dated 09/__/2018 | | |
| Lease between Citibank, N.A., a national banking association and George Washington Bridge Bus Station Development Venture LLC, a Delaware limited liability company dated 12/17/2016<br><br>First Amendment to Lease between Tenant and Landlord dated 10/03/2017 | Citibank, N.A. | 4201 Broadway - Space #E 1.4, New York, NY 10033 |
| Lease between Cobbler & Shine 4211 GWB, LLC and George Washington Bridge Bus Station Development Venture LLC dated 3/23/2015<br><br>Assignment and Assumption of Lease between Original Tenant and Miranda International Inc. dated 2/__/2016<br><br>Consent to Assignment and Assumption of Lease between Landlord, Original Tenant, and Tenant dated 5/11/2016<br><br>Guaranty executed by William Miranda dated 4/6/2016<br><br>First Amendment to Lease between Landlord and Tenant dated 10/4/2017 | Cobbler & Shine 4211 GWB, LLC<br><br>Miranda International Inc. | PO Box 671089, Flushing, NY 11367<br><br>509 Madison Avenue, Lower Level, New York, NY 10022 |
| Lease between Orthodontic Management Company, LLC and | Orthodontic Management Company, LLC d/b/a Diamond Braces | |

Schedule 2 – Page 3 of 7

| | | |
|---|---|---|
| George Washington Bridge Bus Station Development Venture LLC dated October__, 2019 | | |
| [No documents reviewed/not in Box/DataSite] | FFC Accounting, Inc. | 5030 Broadway - Suite 711, New York, NY 10034 |
| Lease between First Financial Consulting Corp. ("Tenant") and George Washington Bridge Bus Station Development Venture LLC dated 10/31/2014<br><br>Guaranty of Annie Rodriguez dated 11/4/2014<br><br>Letter Agreement supplementing Lease between Tenant and Landlord dated ___/___/2016<br><br>First Amendment to Lease Agreement between Tenant and Landlord dated 2/24/2018 | First Financial Consulting Corp. | 5030 Broadway - Suite 711 New York, NY 10034 |
| Lease between Tombar International, Inc. and George Washington Bridge Bus Station Development Venture LLC dated ___/___/2011 | Tombar International, Inc. d/b/a Gateway Newstands | c/o Tobmar International, Inc., 240 Chrislea Road, Woodbridge, Ontario, Canada L4L 8V1 |
| Lease Agreement between GW&L Food Corp. and George Washington Bridge Bus Station Development Venture LLC dated 7/___/2010<br><br>Limited Guaranty of Miguel Luna dated 7/30/2010<br><br>First Amendment to Lease Agreement between | GW&L Food Corp. d/b/a Fine Fare | 4211 Broadway, New York, NY 10033 |

Schedule 2 – Page 4 of 7

| | | |
|---|---|---|
| Tenant and Landlord dated 9/30/2011 | | |
| Lease between GWB 4971, Corp. and George Washington Bridge Bus Station Development Venture LLC dated September 18, 2014<br><br>Modification Letter from Landlord dated March 30, 2015<br><br>First Amendment to Lease between Tenant and Landlord dated October ___, 2017<br><br>Guaranty by Victor Sidberry dated August 28, 2014 | GWB 4971 d/b/a VS Berry | 730 East 165th Street, Bronx, NY 10456 |
| Lease between Inho Beauty Inc. and George Washington Bridge Bus Station Development Venture LLC dated 2/18/2018<br><br>Guaranty executed by Inho Shin dated 2/13/2018<br><br>First Amendment to Lease between Tenant and Landlord dated 9/10/2018 | Inho Beauty Inc. d/b/a In Beauty Supply | c/o Inho Beauty Inc., 1429 St. Nicholas Avenue, New York, NY 10033 |
| Lease between Juan Pablo Duarte Foundation and George Washington Bridge Bus Station Development Venture LLC dated 06/___/2019 | Juan Pablo Duarte Foundation | 4211 Broadway - Suite 23A, Attn: Laura Acosta, New York, NY 10033 |
| Lease Agreement between Marshalls of MA, Inc. and George Washington Bridge Bus Station Development Venture LLC dated 08/18/10 | Marshalls of MA, Inc. | 770 Cochituate Road, Framingham, MA 01701 |

Schedule 2 – Page 5 of 7

| First Amendment to Lease between Tenant and Landlord dated 08/30/11<br><br>Second Amendment to Lease between Tenant and Landlord dated 04/05/13<br><br>Third Amendment to Lease between Tenant and Landlord dated 12/13/13<br><br>Fourth Amendment to Lease between Tenant and Landlord dated 07/31/15<br><br>Fifth Amendment to Lease between Tenant and Landlord dated 02/12/18 | | |
|---|---|---|
| Lease between PNC Bank, National Association and George Washington Bridge Bus Station Development Venture LLC  dated 07/31/2016<br><br>First Amendment to Lease between Tenant and Landlord dated 07/25/2017 | PNC Bank, National Association | c/o PNC Realty Service, Two PNC Plaza, 620 Liberty Avenue - 19th FL, Pittsburgh, PA 15222-2401 |
| Lease between RCBS Media Group, LLC and George Washington Bridge Bus Station Development Venture LLC  dated 1/29/2016<br><br>Guaranty by Angel Cardenas dated 1/13/2016 | RCBS Media Group, LLC | 236 Fulton Avenue - Suite 214, Hempstead, NY 11550 |
| Standard Form of Store Lease between The Gap, Inc. and George Washington Bridge Bus Station Development Venture LLC dated 09/30/2014<br><br>Subordination, Non-Disturbance and | The Gap, Inc. | 2 Folsom Street, San Francisco, CA 94105 |

<center>Schedule 2 – Page 6 of 7</center>

| | | |
|---|---|---|
| Attornment Agreement between Overlandlord, as Mortgagee, Tenant, and Landlord, as Landlord, dated 10/16/2014<br><br>First Lease Modification Agreement between Tenant and Landlord dated 09/30/2015 | | |
| Lease between Time Warner Cable New York City LLC and George Washington Bridge Bus Station Development Venture LLC dated 10/22/2014<br><br>Subordination, Non-Disturbance and Attornment Agreement among George Washington Bridge Bus Station and Infrastructure Development Fund, LLC, Tenant and Landlord dated 12/11/2014<br><br>Subordination Agreement; Acknowledgement of Lease Assignment Attornment and Non-Disturbance Agreement among Landlord, Tenant and GSNMF Sub-CDE 12, LLC dated __/__/2014<br><br>First Amendment to Lease between Tenant and Landlord dated 02/10/2016 SNDA Consent to First Amendment from Mortgagee to Landlord dated 03/15/2016 | Time Warner Cable New York City LLC | 120 East 23rd Street, New York, NY 10010 |
| Lease between Vista Eyecare, PLLC ("Tenant") and George Washington Bridge Bus | Vista Eyecare, PLLC | 817-819 West 181st Street, New York, NY 10033 |

Schedule 2 – Page 7 of 7

| | | |
|---|---|---|
| Station Development Venture LLC dated 8/31/2015<br><br>Guaranty by Boris Nemirovskiy dated 7/27/2015<br><br>Guaranty by Eugene Orloff dated 7/27/2015<br><br>Guaranty by Michael Orloff dated 7/27/2015<br><br>Guaranty by Vladimir Dvoretsky dated 7/27/2015 | | |
| Lease between GWB Juice Bar LLC and George Washington Bridge Bus Station Development Venture LLC dated October 31, 2014<br><br>Modification Letter from Landlord dated March 30, 2015<br><br>First Amendment to Lease between Tenant and Landlord dated November 17, 2017<br><br>Consent to Assignment of Lease Interests between Landlord, Luis Perez and Tenant dated November 17, 2017<br><br>Guaranty by Ingrid Amparo and Nayla Mejia dated October 13, 2014 | GWB Juice Bar LLC | 275 West 238th, Unit 5, Bronx New York 10463 |

Schedule 2 – Page 8 of 7

## **SCHEDULE 3**

### **Closing Payment Calculation**

See attached

48036/0050-40878634v2
48036/0050-40972636v2
61576/0001-41024593v2

**George Washington Bridge - Estimated Closing Payment**
*$ in millions*

*PRIVILEGED AND CONFIDENTIAL*

| Estimated Closing Payment Detail | | | | |
|---|---|---|---|---|
| | **Low**[1] | | **High**[1] | |
| **Port Cure / Admin Claims:** | | | | |
| Estimated Settlement Agreement Cure | $ | 1.2 | - $ | 1.2 |
| Monthly Expenses Post-Agreement | | 0.4 | - | 0.4 |
| Admin / Contingency | | 0.2 | - | 0.4 |
| Priority Claim / Admin Claim Reserve | | 0.2 | - | 0.3 |
| Monarch Breakup Fee / Expense Reimbursement | | 0.4 | - | 1.0 |
| Professional Fees | | 2.5 | - | 2.5 |
| **Total**[2][3] | $ | **4.9** | **- $** | **5.8** |

(1) Both the Low and High Scenarios assume an August 31, 2021 transaction close

(2) Pursuant to the APA, Total shall not exceed $8.5 million

(3) Total excludes transfer taxes. Purchaser is responsible for transfer taxes as a result of the sale transaction; however, pursuant to the APA, transfer taxes are an Assumed Liability and therefore are not included within the Closing Payment calculation.

# SCHEDULE 4

# SECURITY DEPOSITS

Security Deposits – Detail Transaction Activity

| Tenant | Date | Amount | Tenant Total |
|--------|------|--------|--------------|
| Café Buunni | 4/5/2014 | 7,125.00 | 7,125.00 |
| Dr. Shine | 3/27/2015 | 3,667.67 | |
| Dr. Shine | 5/13/2016 | 11,000.00 | 14,667.67 |
| FFC / Credit City | 11/6/2014 | 4,787.50 | |
| FFC / Credit City | 3/27/2015 | 5,000.00 | |
| FFC / Credit City | 9/9/2016 | 5,000.00 | |
| FFC / Credit City | 11/9/2016 | 2,000.00 | 16,787.50 |
| GWB Juice Bar | 11/6/2014 | 1,991.67 | |
| GWB Juice Bar | 2/23/2015 | 1,991.67 | 3,983.34 |
| INHO Beauty | 2/15/2018 | 51,400.00 | 51,400.00 |
| RCBS | 3/17/2016 | 15,000.00 | 15,000.00 |
| Vista Eye Care | 10/6/2015 | 20,933.34 | 20,933.34 |
| Vs Berry | 10/6/2014 | 6,500.00 | |
| Vs Berry | 12/29/2014 | 6,500.00 | 13,000.00 |
| Orthodontic Mgmt. | 9/16/2020 | 7,934.00 | 7,934.00 |
| | | 150,830.85 | 150,830.85 |

Schedule 4 – Page 1 of 1

48036/0050-40878634v2
48036/0050-40972636v2
61576/0001-41024593v2

# **SCHEDULE 5**

# **LEASING INCENTIVES**

None.

48036/0050-40878634v2
48036/0050-40972636v2
61576/0001-41024593v2

## **SCHEDULE 6**

## **RENT ROLL**

See attached

48036/0050-40878634v2
48036/0050-40972636v2
61576/0001-41024593v2

**George Washington Bridge - NTM Rent Roll Beginning July 2021**
*($ in actuals unless otherwise specified)*

PRIVILEGED AND CONFIDENTIAL

NTM Rent Roll Beginning July 1, 2021

| Tenants | Area Sq. Ft. | % of Total GLA | Beginning '21 Rent PSF | Beginning '21 Rent | Jul-21 | Aug-21 | Sep-21 | Oct-21 | Nov-21 | Dec-21 | Jan-22 | Feb-22 | Mar-22 | Apr-22 | May-22 | Jun-22 | NTM Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1.1 (Vacant) - Previously NY&Co. | 1,215 | 1.2% | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 1.2A VistaCare | 629 | 0.6% | 208 | 130,882 | 10,907 | 10,907 | 10,907 | 11,125 | 11,125 | 11,125 | 11,125 | 11,125 | 11,125 | 11,125 | 11,125 | 11,125 | 132,846 |
| 1.2B PNC | 540 | 0.5% | 200 | 108,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 108,000 |
| 1.4 CitiBank | 1,800 | 1.7% | 208 | 374,544 | 31,836 | 31,836 | 31,836 | 31,836 | 31,836 | 31,836 | 31,836 | 32,473 | 32,473 | 32,473 | 32,473 | 32,473 | 385,219 |
| 1.6 RCBS Media Group | 420 | 0.4% | 146 | 61,200 | 5,100 | 5,100 | 5,100 | 5,202 | 5,202 | 5,202 | 5,202 | 5,202 | 5,202 | 5,202 | 5,202 | 5,202 | 62,118 |
| 2.1 (Vacant) - Previously NY&Co. | 8,016 | 7.7% | | | | | | | | | | | | | | | |
| 3.1 Blink Fitness | 15,369 | 14.9% | 31 | 472,500 | 39,375 | 39,375 | 39,375 | 39,375 | 39,375 | 39,375 | 39,375 | 39,375 | 39,375 | 39,375 | 39,375 | 39,375 | 472,500 |
| **Total East Building - Leasable** | **27,989** | **27.1%** | **$ 41** | **$ 1,147,126** | **$ 96,218** | **$ 96,218** | **$ 96,218** | **$ 96,538** | **$ 96,538** | **$ 96,538** | **$ 96,538** | **$ 97,175** | **$ 97,175** | **$ 97,175** | **$ 97,175** | **$ 97,175** | **$ 1,160,682** |
| 1.1 GAP | 3,318 | 3.2% | $ 93 | $ 309,166 | $ 25,764 | $ 25,764 | $ 26,537 | $ 26,537 | $ 26,537 | $ 26,537 | $ 26,537 | $ 26,537 | $ 26,537 | $ 26,537 | $ 26,537 | $ 26,537 | $ 316,895 |
| 1.2 Time Warner | 5,023 | 4.9% | 198 | 994,554 | 82,880 | 82,880 | 82,880 | 82,880 | 82,880 | 82,880 | 82,880 | 82,880 | 82,880 | 82,880 | 82,880 | 82,880 | 994,554 |
| 1.3 In Beauty Supply | 2,255 | 2.2% | 128 | 288,000 | 24,000 | 24,000 | 24,000 | 24,000 | 24,000 | 24,000 | 24,000 | 24,000 | 24,000 | 25,680 | 25,680 | 25,680 | 293,040 |
| 1.5A Doctor Shine | 440 | 0.4% | 102 | 44,880 | 3,740 | 3,740 | 3,740 | 3,740 | 3,815 | 3,815 | 3,815 | 3,815 | 3,815 | 3,815 | 3,815 | 3,815 | 45,478 |
| 1.5B (Vacant) | 500 | 0.5% | - | | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 1.6 (Vacant) | 942 | 0.9% | - | | | | | | | | | | | | | | |
| 1.7 Fine Fare | 15,116 | 14.6% | 30 | 450,000 | 37,500 | 37,500 | 37,500 | 37,500 | 37,500 | 37,500 | 37,500 | 37,500 | 37,500 | 37,500 | 37,500 | 37,500 | 450,000 |
| 1.8 (Vacant)[1] | 1,785 | 1.7% | 85 | 152,600 | - | - | - | - | - | - | 12,717 | 12,717 | 12,717 | 12,717 | 12,717 | 12,717 | 76,300 |
| 1.9 A Previously Gateway News - Subject to Future Negotiations[2] | 150 | 0.1% | - | | | | | | | | | | | | | | |
| 1.9 B Café Buunni | 150 | 0.1% | 102 | 15,300 | 1,275 | 1,275 | 1,275 | 1,275 | 1,301 | 1,301 | 1,301 | 1,301 | 1,301 | 1,301 | 1,301 | 1,301 | 15,504 |
| 1.9 C (Vacant) | 259 | 0.3% | - | | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 1.10 A FFC Accounting Inc.[3] | 761 | 0.7% | - | | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 1.10 B First Financial Consulting Corp.[3] | 766 | 0.7% | 80 | 61,200 | 5,100 | 5,100 | 5,100 | 5,100 | 5,100 | 5,202 | 5,202 | 5,202 | 5,202 | 5,202 | 5,202 | 5,202 | 61,914 |
| 1.11 (Vacant) | 1,200 | 1.2% | - | | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 2.1 GAP | 6,357 | 6.1% | 93 | 592,334 | 49,361 | 49,361 | 50,842 | 50,842 | 50,842 | 50,842 | 50,842 | 50,842 | 50,842 | 50,842 | 50,842 | 50,842 | 607,143 |
| 2.2 Marshall's | 29,225 | 28.3% | 35 | 1,022,875 | 85,240 | 85,240 | 85,240 | 85,240 | 85,240 | 85,240 | 85,240 | 85,240 | 85,240 | 85,240 | 85,240 | 85,240 | 1,022,875 |
| 2.3 A JPDF Community Center | 919 | 0.9% | 113 | 104,079 | 8,673 | 8,673 | 8,673 | 8,673 | 8,673 | 8,673 | 8,673 | 8,673 | 8,673 | 8,673 | 8,673 | 8,673 | 104,079 |
| 2.3 B JPDF Community Center | 606 | 0.6% | 113 | 68,631 | 5,719 | 5,719 | 5,719 | 5,719 | 5,719 | 5,719 | 5,719 | 5,719 | 5,719 | 5,719 | 5,719 | 5,719 | 68,631 |
| 2.3 C Café Buunni | 705 | 0.7% | 102 | 71,910 | 5,993 | 5,993 | 5,993 | 5,993 | 6,112 | 6,112 | 6,112 | 6,112 | 6,112 | 6,112 | 6,112 | 6,112 | 72,869 |
| 2.4 A VS Berry | 780 | 0.8% | 102 | 79,560 | 6,630 | 6,630 | 6,630 | 6,630 | 6,763 | 6,763 | 6,763 | 6,763 | 6,763 | 6,763 | 6,763 | 6,763 | 80,621 |
| 2.4 B (Vacant) | 796 | 0.8% | - | | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 2.5 Previously Gateway News - Subject to Future Negotiations[2] | 547 | 0.5% | - | | | | | | | | | | | | | | |
| 2.6 Diamond Braces[4] | 556 | 0.5% | 86 | 47,600 | - | 3,967 | 3,967 | 3,967 | 3,967 | 3,967 | 3,967 | 3,967 | 3,967 | 3,967 | 3,967 | 3,967 | 43,633 |
| 2.7 (Vacant) | 992 | 1.0% | - | | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 2.8 GWB Juice Bar | 239 | 0.2% | 102 | 24,378 | 2,032 | 2,032 | 2,032 | 2,072 | 2,072 | 2,072 | 2,072 | 2,072 | 2,072 | 2,072 | 2,072 | 2,072 | 24,744 |
| 2.9 (Vacant) | 1,070 | 1.0% | - | | | | | | | | | | | | | | |
| **Total West Building - Leasable** | **75,457** | **72.9%** | **$ 57** | **$ 4,327,067** | **$ 343,906** | **$ 347,872** | **$ 350,126** | **$ 350,167** | **$ 350,519** | **$ 350,621** | **$ 363,338** | **$ 363,338** | **$ 363,338** | **$ 365,018** | **$ 365,018** | **$ 365,018** | **$ 4,278,279** |
| **Total Building - Leasable** | **103,446** | **100.0%** | **$ 53** | **$ 5,474,193** | **$ 440,124** | **$ 444,090** | **$ 446,344** | **$ 446,705** | **$ 447,058** | **$ 447,160** | **$ 459,876** | **$ 460,513** | **$ 460,513** | **$ 462,193** | **$ 462,193** | **$ 462,193** | **$ 5,438,961** |

| Memo: Rent Abatements | | | | | Jul-21 | Aug-21 | Sep-21 | Oct-21 | Nov-21 | Dec-21 | Jan-22 | Feb-22 | Mar-22 | Apr-22 | May-22 | Jun-22 | NTM Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| GAP | | | | | $ (18,781) | $ (18,781) | $ (19,345) | $ (19,345) | $ (19,345) | $ (19,345) | $ (19,345) | $ (19,345) | $ (19,345) | $ (19,345) | $ (19,345) | $ (19,345) | $ (231,009) |
| Time Warner | | | | | (14,434) | (14,434) | (14,434) | (14,434) | (14,434) | (14,434) | (14,434) | (14,434) | (14,434) | (14,434) | (14,434) | (14,434) | (173,202) |
| Diamond Braces | | | | | | | (3,967) | (3,967) | (3,967) | (1,983) | (1,983) | (1,983) | (1,983) | (1,983) | (1,983) | (1,983) | (173,202) |
| Blink Fitness | | | | | | | | | | | | | | (39,375) | | | (39,375) |
| European Wax Center[1] | | | | | | | | | | | (12,717) | (12,717) | (12,717) | (12,717) | (12,717) | (12,717) | (76,300) |
| **Total Building - Abated Rent** | | | | | **$ (33,215)** | **$ (37,181)** | **$ (37,745)** | **$ (37,745)** | **$ (35,762)** | **$ (35,762)** | **$ (48,478)** | **$ (48,478)** | **$ (48,478)** | **$ (87,853)** | **$ (48,478)** | **$ (48,478)** | **$ (547,653)** |
| **Total Building - Net Rent Collected** | | | | | **$ 406,909** | **$ 406,909** | **$ 408,599** | **$ 408,960** | **$ 411,296** | **$ 411,398** | **$ 411,398** | **$ 412,035** | **$ 412,035** | **$ 374,340** | **$ 413,715** | **$ 413,715** | **$ 4,891,308** |

(1) While the Company and European Wax Center have been in late-stage negotiations regarding space W 1.8, a finalized and executed leasehold agreement has not been reached. The latest draft of the leasehold agreement contemplates beginning monthly rent of approximately $12.7k, and it is expected that rent will commence January 1, 2022 with rent fully offset by TI credit through 2022.

(2) In the fall of 2020, Gateway News, the subtenant leasing spaces 1.9A and 2.5, notified the Debtor of its plan to dissolve operations and terminate its lease. The individual who previously operated the Gateway franchise at those locations approached the Debtor about entering into a lease agreement with the Debtor but, in light of the amount the individual was able to pay during COVID and the fact that the Debtor was in the midst of a sale process, the Debtor was unwilling to enter into a long-term lease agreement at that time. The Debtor and Hari-OM Newstand Inc. subsequently entered into a short-term license agreement that provided for monthly $2.0k payments covering both the 1.9A and 2.5 spaces. This agreement is set to expire after Jun 30, 2021. Any future agreement will be negotiated by the Debtor in conjunction with the Purchaser.

(3) The same individual signed the leases for spaces 1.10A (FFC Accounting Inc.) and 1.10B (First Financial Consulting Corp.). Build-out of the FFC Accounting Inc. space has not been completed and, due to financial constraints, the Company does not believe this tenant will be able to build out its space. In exchange for rent concessions with respect to First Financial Consulting Corp., the Company asked for FFC Accounting Inc. to surrender the 1.10A space and terminate its lease. Although First Financial Consulting Corp. has since paid the reduced rent provided for in the Company's offer, FFC Accounting Inc., to-date, has not returned the draft surrender agreement the Company sent.

(4) Assumes a Rent Commencement Date of August 1, 2021, and pursuant to

## SCHEDULE 7

## TANGIBLE PERSONAL PROPERTY

1- HP Officejet Pro X576dw MFP
1- Toshiba E45t-A4100 Windows 8.1 Laptop
1- HP Pavilion Notebook V0q02ua-aba Windows 10
5- Motorola DTR550 Walkie Talkies with charging bases
1- ATT Cordless Desk Phone with 1 extension for Anthony's desk
1- Dymo LabelWriter
1- Seagate & Synology Server given to us by SJM
1- Anker USB Charging Stand
1- Brother P-touch label printer
1- Sony XBR-49X800E TV
1- Magic Chef small refrigerator
1- Amazon Basic Shredder
2- Racks for drawings
1- Key Storage Box
2- Desk with Credenza
5- Folding Chairs
1- Wire Shelving unit
1- White Board
1- Cork Board
1- Wire Small Basket
1- Staples Stapler
1- Scotch Tape dispenser
1- Global Salt Spreader
11- QMark 208V/3Ph 42Amp 15kw Electric Heaters (2 New in a Box, 9 Units Used)

48036/0050-40878634v2
48036/0050-40972636v2
61576/0001-41024593v2

## SCHEDULE 8

## INTANGIBLE PERSONAL PROPERTY

1.　　　Trade names:　　　The George Washington Bridge Market Place/GWB Mercado
GWB Market/Mercado

2.　　　The Subtenant A/R

48036/0050-40878634v2
48036/0050-40972636v2
61576/0001-41024593v2

## SCHEDULE 9

## WRITTEN NOTICES

None.

48036/0050-40878634v2
48036/0050-40972636v2
61576/0001-41024593v2

## SCHEDULE 10

## LITIGATION

| 1. | George Washington Bridge Bus Station Development Venture, LLC v. Tutor Perini Building Corp.<br>American Arbitration Association<br>Case No. 001-0002-7881 |
|---|---|
| 2. | Tutor Perini Building Corp. v. George Washington Bridge Bus Station Development Venture, LLC, et al.<br>United States District Court, Southern District of New York<br>Case No. 19-05344 |
| 3. | Stempel Bennett Claman & Hochberg, P.C. v. George Washington Bridge Bus Station Development Venture, LLC<br>Supreme Court, New York County<br>Index No. 651809/2016 |
| 4. | Perez v. Port Authority of New York and New Jersey et al.<br>Supreme Court, New York County<br>Index No. 154910/2018 |
| 5. | George Washington Bridge Bus Station and Infrastructure Development Fund, LLC v. George Washington Bridge Bus Station Development Venture LLC et al.<br>Supreme Court, New York County<br>Index No. 850155/2019 |
| 6. | SRS Real Estate Partners-Northeast, L.L.C. v. George Washington Bridge Bus Station Development Venture LLC<br>Supreme Court, New York County<br>Index No. 653405/2019 |
| 7. | Green v. Port Authority of New York and New Jersey et al.<br>Supreme Court, New York County<br>Index No. 153931/2017 |
| 8. | Williams v. Port Authority of New York and New Jersey et al.<br>Supreme Court, New York County<br>Index No. 154033/2017 |
| 9. | Ayars v. Port Authority of New York and New Jersey et al.<br>Supreme Court, New York County<br>Index No. 158178/2017 |
| 10. | Wortham v. George Washington Bridge Bus Station Development Venture LLC |

48036/0050-40878634v2
48036/0050-40972636v2
61576/0001-41024593v2

|     | Supreme Court, New York County<br>Index No. 159755/2018 |
| --- | --- |
| 11. | Mahoney v. George Washington Bridge Bus Station Development Venture LLC et al.<br>Supreme Court, Bronx County<br>Index No. 33198/2018E |
| 12. | FTI Consulting, Inc. v. George Washington Bridge Bus Station Development Venture LLC<br>Supreme Court, New York County<br>Index No. 655425/2019 |
| 13. | Café at 178th LLC et al. v. George Washington Bridge Bus Station Development Venture LLC<br>Supreme Court, New York County<br>Index No. 652001/2019 |
| 14. | Padilla v. The City of New York<br>Supreme Court, New York County<br>Index No. 159235/2019 |
| 15. | Castro v. Port Authority of New York and New Jersey et al.<br>Supreme Court, Bronx County<br>Index No. 24002/2015E |
| 16. | Valverde v. Marshall's et al.<br>Supreme Court, New York County<br>Index No. 150692/2020 |
| 17. | Any and all litigation arising under or relating to the Seller's Bankruptcy Case including any and all litigation with Tutor Perini Building Corporation. |

48036/0050-40878634v2
48036/0050-40972636v2
61576/0001-41024593v2

**SCHEDULE 11**

**SUBTENANT A/R**

See attached

Schedule 11 – Page 1 of 1

# GWB Bus Station Development Venture LLC
## A/R Aging Summary
### As of June 23, 2021

| | Current | 1 - 30 | 31 - 60 | 61 - 90 | 91 and over | Total |
|---|---|---|---|---|---|---|
| E1.1 - New York & Company | | | | | 27,201.68 | 27,201.68 |
| E1.2 - Vista Eyecare | | | | | 33,818.85 | 33,818.85 |
| E1.6 - RCBS Media Group | | | | | 500.00 | 500.00 |
| E2.1 - New York & Company | | | | | 179,465.00 | 179,465.00 |
| E3.1 - Blink Fitness | | 22,249.00 | 22,249.00 | 22,249.00 | 129,252.00 | 195,999.00 |
| W1.10B - Credit City Corp. | | | | | 11,150.07 | 11,150.07 |
| W1.2 - Time Warner Cable | | | | | 6,772.42 | 6,772.42 |
| W1.3 - INHO Beauty Inc. | | 27,708.88 | 12,000.00 | 12,000.00 | | 51,708.88 |
| W1.5A - Cobbler & Shine 4211 GWB, LLC | | 3,881.78 | 3,881.78 | 3,881.78 | 28,615.20 | 40,260.54 |
| W1.7 - Fine Fare Fresh Supermarket | | | | 110,169.06 | 106,801.72 | 216,970.78 |
| W1.9A - GateWay News Stands | | | | | 3,983.92 | 3,983.92 |
| W2.1 - Gap | | | | 10,005.88 | | 10,005.88 |
| W2.2 - Marshalls | | | | 33,849.33 | 90,524.93 | 124,374.26 |
| W2.4A - GWB 4971, Corp. VS Berry | | 1,501.34 | | | 5,415.20 | 6,916.54 |
| W2.5 - GateWay News Stands | | | | | 8,949.20 | 8,949.20 |
| **TOTAL** | $ 0.00 | $ 55,341.00 | $ 38,130.78 | $ 192,155.05 | $ 632,450.19 | $ 918,077.02 |

Wednesday, Jun 23, 2021 10:18:41 AM GMT-7

# FIRST AMENDMENT TO
## AGREEMENT OF PURCHASE AND SALE

**THIS FIRST AMENDMENT TO AGREEMENT OF PURCHASE AND SALE** (this "**Amendment**") is entered into on August 23, 2021, by and between **GEORGE WASHINGTON BRIDGE BUS STATION DEVELOPMENT VENTURE LLC**, a Delaware limited liability company ("**Seller**") and **JMB CAPITAL PARTNERS LENDING, LLC**, a California limited liability company ("**Purchaser**") (Seller and Purchaser are also collectively referred to in this Agreement as the "**Parties**" and individually referred to in this Agreement as a "**Party**").

## WITNESSETH:

**WHEREAS**, Seller and Purchaser are parties to that certain Agreement of Purchase and Sale dated June 25, 2020 (the "**Purchase Agreement**");

**WHEREAS**, pursuant to the terms of the Purchase Agreement, Seller desires to sell to Buyer, and Buyer desires to purchase from Seller, all of Seller's right, title and interest in and to that certain ground lease described on <u>Exhibit A</u> attached to the Purchase Agreement and substantially all of Seller's other assets as set forth in the Purchase Agreement; and

**WHEREAS**, Seller and Purchaser desire to amend the Purchase Agreement to reflect the modifications set forth in this Amendment.

**NOW, THEREFORE,** in consideration of the mutual covenants and agreements contained in the Purchase Agreement, the Parties hereto, intending to be legally bound, agree as follows:

1. <u>Amendment to Section 2(a)</u>: Section 2(a) of the Purchase Agreement is hereby amended by deleting it in its entirety and replacing it with the following:

> The consideration for the Assets shall be (i) a sum in the amount set forth on <u>Schedule 3</u> hereto payable by Purchaser in United States currency via wire transfer of immediately available funds at Closing (the "**Closing Payment**"), which Closing Payment shall not be considered property of the Seller's estate and be earmarked for payments of the liabilities set forth on <u>Schedule 3</u> hereto; provided, however, the Closing Payment shall not exceed Eight Million Five Hundred Thousand and 00/100 Dollars ($8,500,000.00), (ii) a credit bid in an amount equal to 100% of the Indebtedness (as defined in that certain Superpriority Senior Secured Debtor-in-Possession Loan Agreement by and among the Seller and JMB Capital Partners Lending, LLC dated August 15, 2020 (the "**DIP Credit Agreement**")) (the "**Credit Bid**") (as an offset against, and reduction in the amount of Seller's Indebtedness under the DIP Credit Agreement, pursuant to Section 363(k) of the Bankruptcy Code), (iii) a guaranty of completion and performance (the "**Guaranty of Completion and Performance**"), from an entity (the "**Guarantor**") and in a form that is acceptable to the Port Authority, to be used solely to guaranty the payment and performance of Purchaser's obligations to cure any non-monetary defaults under the Ground Lease, including bringing the Property into compliance with law, if

necessary, and maintaining it in compliance therewith, as set forth in more detail therein, and to satisfy adequate assurance of future performance under the Ground Lease as required under Section 5(a), and (iv) the assumption of the Assumed Liabilities by Purchaser.[1]  Prior to the Closing Date, Purchaser shall have the right to designate an allocation of the Closing Payment among the assets being transferred hereunder, provided that such allocation shall be subject to the approval of Seller (which approval shall not be unreasonably withheld, conditioned or delayed).  All allocations pursuant to this <u>Section 2</u> shall be deemed made in conformance with Federal and State law, and Purchaser and Seller agree to file their respective tax returns and reports (federal, state and local) consistent therewith in all respects.

2.     <u>Amendment to Section 5(a)(1)</u>:  Section 5(a)(1) of the Purchase Agreement is hereby amended by deleting it in its entirety and replacing it with the following:

> <u>Breakup Payment and Expense Reimbursement</u>.  If Seller's sale process generates an all cash bid of at least Forty Five Million and 00/100 Dollars ($45,000,000.00) (such bid, an "**Alternative Bid**"), then Seller shall have the right to pursue such Alternative Bid; provided, however, that if Seller closes on such Alternative Bid, then the Deposit shall be promptly refunded to Purchaser and Seller shall pay to Purchaser as a breakup fee an amount equal to 3.0% of the Closing Payment and the Credit Bid (the "**Breakup Fee**") and reimburse Purchaser for its expenses in an amount not to exceed Three Hundred Fifty Thousand and 00/100 Dollars ($350,000.00) (the "**Expense Reimbursement**," and with the Breakup Fee shall be referred to herein collectively as, the "**Bid Protections**"). The Purchaser may credit bid the Bid Protections in the event the Seller conducts an auction for the Purchased Assets. For the avoidance of doubt, notwithstanding anything to the contrary herein, the Bid Protections shall be deemed an administrative claim in the Bankruptcy Case and, if payable pursuant to this Section 5(a)(1), shall be paid from the first dollars of the sale proceeds generated by the closing of such Alternative Bid.

3.     <u>Amendment to Section 5(a)(3)</u>:  Section 5(a)(3) of the Purchase Agreement is hereby amended by deleting it in its entirety and replacing it with the following:

> <u>Adequate Assurance of Future Performance</u>.  At the Closing, Guarantor shall, in furtherance of the Debtor's obligation to demonstrate adequate assurance of future performance under Section 365(b)(1)(C) of the Bankruptcy Code, deliver the Guaranty of Completion and Performance.

4.     <u>Amendment to Section 5(b)(iv)</u>:  Section 5(b)(iv) of the Purchase Agreement is hereby amended by deleting it in its entirety and replacing it with the following:

---

[1] For the avoidance of doubt, the Guaranty of Completion and Performance shall be governed by the terms therein and is only referenced herein for descriptive purposes.  To the extent of any inconsistency between this Amendment and the Guaranty of Completion and Performance, the Guaranty of Completion and Performance shall govern with respect to the Guarantor's obligations.

Purchaser shall have funded the Closing Payment and delivered the Guaranty of Completion and Performance.

5.      Amendment to Section 6(c)(vii):  Section 6(c)(vii) of the Purchase Agreement is hereby amended by deleting it in its entirety and replacing it with the following:

Two (2) duly executed original counterparts of the Guaranty of Completion and Performance executed by Guarantor; and

6.      Integration of Amendment and Purchase Agreement.  From and after the effective date of this Amendment, the Purchase Agreement and this Amendment shall be read as one agreement.  Except as set forth in this Amendment, all other terms and conditions of the Purchase Agreement are not being modified or amended and shall remain in full force and effect. To the extent of any inconsistency between the terms and conditions of this Amendment and the terms and conditions of the Purchase Agreement, the terms and conditions of this Amendment shall prevail.  Capitalized terms used, but not otherwise defined herein, shall have the meanings ascribed to them in the Purchase Agreement.

7.      Counterparts.  This Amendment may be executed in any number of counterparts, and each when so executed and delivered shall be an original, but all the counterparts shall together constitute one and the same instrument.  Facsimile signatures shall be sufficient for execution of this Amendment.

[remainder of page left intentionally blank]

**IN WITNESS WHEREOF,** the undersigned have executed this Amendment as of the day and year first above written.

**SELLER:**

**GEORGE WASHINGTON BRIDGE BUS STATION DEVELOPMENT VENTURE LLC**, a Delaware limited liability company

By: _____

Name:     BERNARD A. KATZ

Title:        MANAGER

**PURCHASER:**

**JMB CAPITAL PARTNERS LENDING, LLC**, a California limited liability company

By: _____

Name:

Title:

**IN WITNESS WHEREOF,** the undersigned have executed this Amendment as of the day and year first above written.

<div style="margin-left:45%">

**SELLER:**

**GEORGE WASHINGTON BRIDGE BUS STATION DEVELOPMENT VENTURE LLC,** a Delaware limited liability company


By: _____
Name:
Title:


**PURCHASER:**

**JMB CAPITAL PARTNERS LENDING, LLC,** a California limited liability company


By: _____
Name: VIKAS TANEJA
Title: MANAGER

</div>

**EXHIBIT 2**

**ASSUMED CONTRACTS**

| Agreement | Counterparty | Counterparty Address |
|---|---|---|
| Elevator Advertising Agreement | Hispanic Indoor Media | 5547 Main Street, Williamsville, NY 14221 |
| Elevator Maintenance Agreement | KONE Inc. | Metro New York, 1384 Broadway, 21st Floor, New York, NY 10018 |
| Fire Prevention Contract | Sirina Fire Protection Corp. | 151 Herricks Road, New Hyde Park, NY 11040 |
| Fire Preventive Maintenance Agreement | DavED Fire Systems, Inc. | 307 West Pleasant View Avenue, Hackensack, NJ 07601 |
| General Liability Policy | Underwriters Lloyds London(IL) | CRC Swett, 1 North Franklin - 14th FL, Chicago, IL 60606 |
| Insurance Policy - Commercial | Starr Surplus Lines Insurance Company | 399 Park Avenue - 8th FL, New York, NY 10022 |
| Insurance Policy - Excess Liability | Fireman's Fund Insurance Company, AmWins Brokerage of New Jersey | Raritan Plaza, 110 Fieldcrest Avenue, Edison, NJ 08837 |
| Insurance Policy - Excess Liability | Navigators Insurance Company, AmWins Brokerage of New Jersey | Raritan Plaza, 110 Fieldcrest Avenue, Edison, NJ 08837 |
| Insurance Policy - Excess Liability | North River Insurance Company, AmWins Brokerage of New Jersey | Raritan Plaza, 110 Fieldcrest Avenue, Edison, NJ 08837 |
| Insurance Policy - Excess Liability | Westchester Fire Insurance Company, AmWins Brokerage of New Jersey | Raritan Plaza, 110 Fieldcrest Ave, Edison, NJ 08837 |
| Insurance Policy - Excess Property | Homeland Insurance Company of Delaware, CRC Swett | 1 Financial Sq - Suite 401, New York, NY 10005 |
| Insurance Policy - General Liability | Hiscox Insurance Company Inc. | 104 South Michigan Avenue - Suite 600, Chicago, IL 60603 |
| Insurance Policy - Terrorism | Miller Insurance Services LLP | 70 Mark Lane, London EC3R 7NQ, United Kingdom |
| Insurance Policy - Terrorism | Underwriters Lloyds London(IL) | CRC Swett, 32 Old Slip, New York, NY 10005 |
| Insurance Premium Financing Agreement | Bank Direct Capital Finance, a division of Texas Capital Bank, N.A. | 150 North Field Drive - Suite 190, Lake Forest, IL 60045 |
| Water Treatment Contract | The Metro Group, Inc. | 50-23 Twenty-Third Street, Long Island City, NY 11101 |
| Professional Cleaning Services | Facility Value | 5030 Broadway, Suite 633, New York, NY 10034 |

**SUBLEASES**

| Agreement | Counterparty | Counterparty Address |
|---|---|---|
| Lease between Blink Broadway Marketplace Inc. and George Washington Bridge Bus Station Development Venture LLC dated 10/28/2010<br><br>Guaranty by Equinox Holdings, Inc. and Blink Holdings, Inc. dated 10/28/2010<br><br>Limited Guaranty by Equinox Holdings, Inc. dated 10/28/2010<br><br>Limited Guaranty No. 2 by Blink Holdings, Inc. dated 10/28/2010<br><br>First Amendment to Lease between Tenant and Landlord dated 11/16/2015<br>Second Amendment to Lease between Tenant and Landlord dated 6/__/2017 | Blink Broadway Marketplace, Inc. d/b/a Blink Fitness | 895 Broadway - 3rd FL, New York, NY 10003 |
| Lease between Café Buunni, GWB Inc. and George Washington Bridge Bus Station Development Venture LLC dated 04/09/2014<br><br>Guaranty by Sarina Prabasi and Elias Gurmu in favor of Landlord dated 03/15/2014<br><br>First Amendment to Lease between Tenant and | Cafe Buunni, GWB Inc. | 213 Pinehurst Avenue, New York, NY 10033 |

| | | |
|---|---|---|
| Landlord dated 10/__/2017

Confidentiality Agreement and Lease Amendment between Tenant and Landlord dated 09/__/2018 | | |
| Lease between Citibank, N.A., a national banking association and George Washington Bridge Bus Station Development Venture LLC, a Delaware limited liability company dated 12/17/2016

First Amendment to Lease between Tenant and Landlord dated 10/03/2017 | Citibank, N.A. | 4201 Broadway - Space #E 1.4, New York, NY 10033 |
| Lease between Cobbler & Shine 4211 GWB, LLC and George Washington Bridge Bus Station Development Venture LLC dated 3/23/2015

Assignment and Assumption of Lease between Original Tenant and Miranda International Inc. dated 2/__/2016

Consent to Assignment and Assumption of Lease between Landlord, Original Tenant, and Tenant dated 5/11/2016

Guaranty executed by William Miranda dated 4/6/2016

First Amendment to Lease between Landlord and Tenant dated 10/4/2017 | Cobbler & Shine 4211 GWB, LLC

Miranda International Inc. | PO Box 671089, Flushing, NY 11367

509 Madison Avenue, Lower Level, New York, NY 10022 |
| Lease between Orthodontic Management Company, LLC and | Orthodontic Management Company, LLC d/b/a Diamond Braces | |

| | | |
|---|---|---|
| George Washington Bridge Bus Station Development Venture LLC dated October__, 2019 | | |
| [No documents reviewed/not in Box/DataSite] | FFC Accounting, Inc. | 5030 Broadway - Suite 711, New York, NY 10034 |
| Lease between First Financial Consulting Corp. ("Tenant") and George Washington Bridge Bus Station Development Venture LLC dated 10/31/2014 <br><br> Guaranty of Annie Rodriguez dated 11/4/2014 <br><br> Letter Agreement supplementing Lease between Tenant and Landlord dated ___/___/2016 <br><br> First Amendment to Lease Agreement between Tenant and Landlord dated 2/24/2018 | First Financial Consulting Corp. | 5030 Broadway - Suite 711 New York, NY 10034 |
| Lease between Tombar International, Inc. and George Washington Bridge Bus Station Development Venture LLC dated ___/___/2011 | Tombar International, Inc. d/b/a Gateway Newstands | c/o Tobmar International, Inc., 240 Chrislea Road, Woodbridge, Ontario, Canada L4L 8V1 |
| Lease Agreement between GW&L Food Corp. and George Washington Bridge Bus Station Development Venture LLC dated 7/___/2010 <br><br> Limited Guaranty of Miguel Luna dated 7/30/2010 <br><br> First Amendment to Lease Agreement between | GW&L Food Corp. d/b/a Fine Fare | 4211 Broadway, New York, NY 10033 |

| | | |
|---|---|---|
| Tenant and Landlord dated 9/30/2011 | | |
| Lease between GWB 4971, Corp. and George Washington Bridge Bus Station Development Venture LLC dated September 18, 2014<br><br>Modification Letter from Landlord dated March 30, 2015<br><br>First Amendment to Lease between Tenant and Landlord dated October ___, 2017<br><br>Guaranty by Victor Sidberry dated August 28, 2014 | GWB 4971 d/b/a VS Berry | 730 East 165th Street, Bronx, NY 10456 |
| Lease between Inho Beauty Inc. and George Washington Bridge Bus Station Development Venture LLC dated 2/18/2018<br><br>Guaranty executed by Inho Shin dated 2/13/2018<br><br>First Amendment to Lease between Tenant and Landlord dated 9/10/2018 | Inho Beauty Inc. d/b/a In Beauty Supply | c/o Inho Beauty Inc., 1429 St. Nicholas Avenue, New York, NY 10033 |
| Lease between Juan Pablo Duarte Foundation and George Washington Bridge Bus Station Development Venture LLC dated 06/___/2019 | Juan Pablo Duarte Foundation | 4211 Broadway - Suite 23A, Attn: Laura Acosta, New York, NY 10033 |
| Lease Agreement between Marshalls of MA, Inc. and George Washington Bridge Bus Station Development Venture LLC dated 08/18/10 | Marshalls of MA, Inc. | 770 Cochituate Road, Framingham, MA 01701 |

| | | |
|---|---|---|
| First Amendment to Lease between Tenant and Landlord dated 08/30/11<br><br>Second Amendment to Lease between Tenant and Landlord dated 04/05/13<br><br>Third Amendment to Lease between Tenant and Landlord dated 12/13/13<br><br>Fourth Amendment to Lease between Tenant and Landlord dated 07/31/15<br><br>Fifth Amendment to Lease between Tenant and Landlord dated 02/12/18 | | |
| Lease between PNC Bank, National Association and George Washington Bridge Bus Station Development Venture LLC  dated 07/31/2016<br><br>First Amendment to Lease between Tenant and Landlord dated 07/25/2017 | PNC Bank, National Association | c/o PNC Realty Service, Two PNC Plaza, 620 Liberty Avenue - 19th FL, Pittsburgh, PA 15222-2401 |
| Lease between RCBS Media Group, LLC and George Washington Bridge Bus Station Development Venture LLC  dated 1/29/2016<br><br>Guaranty by Angel Cardenas dated 1/13/2016 | RCBS Media Group, LLC | 236 Fulton Avenue - Suite 214, Hempstead, NY 11550 |
| Standard Form of Store Lease between The Gap, Inc. and George Washington Bridge Bus Station Development Venture LLC dated 09/30/2014<br><br>Subordination, Non-Disturbance and | The Gap, Inc. | 2 Folsom Street, San Francisco, CA 94105 |

| | | |
|---|---|---|
| Attornment Agreement between Overlandlord, as Mortgagee, Tenant, and Landlord, as Landlord, dated 10/16/2014<br><br>First Lease Modification Agreement between Tenant and Landlord dated 09/30/2015 | | |
| Lease between Time Warner Cable New York City LLC and George Washington Bridge Bus Station Development Venture LLC dated 10/22/2014<br><br>Subordination, Non-Disturbance and Attornment Agreement among George Washington Bridge Bus Station and Infrastructure Development Fund, LLC, Tenant and Landlord dated 12/11/2014<br><br>Subordination Agreement; Acknowledgement of Lease Assignment Attornment and Non-Disturbance Agreement among Landlord, Tenant and GSNMF Sub-CDE 12, LLC dated __/__/2014<br><br>First Amendment to Lease between Tenant and Landlord dated 02/10/2016 SNDA Consent to First Amendment from Mortgagee to Landlord dated 03/15/2016 | Time Warner Cable New York City LLC | 120 East 23rd Street, New York, NY 10010 |
| Lease between Vista Eyecare, PLLC ("Tenant") and George Washington Bridge Bus | Vista Eyecare, PLLC | 817-819 West 181st Street, New York, NY 10033 |

| | | |
|---|---|---|
| Station Development Venture LLC dated 8/31/2015<br><br>Guaranty by Boris Nemirovskiy dated 7/27/2015<br><br>Guaranty by Eugene Orloff dated 7/27/2015<br><br>Guaranty by Michael Orloff dated 7/27/2015<br><br>Guaranty by Vladimir Dvoretsky dated 7/27/2015 | | |
| Lease between GWB Juice Bar LLC and George Washington Bridge Bus Station Development Venture LLC dated October 31, 2014<br><br>Modification Letter from Landlord dated March 30, 2015<br><br>First Amendment to Lease between Tenant and Landlord dated November 17, 2017<br><br>Consent to Assignment of Lease Interests between Landlord, Luis Perez and Tenant dated November 17, 2017<br><br>Guaranty by Ingrid Amparo and Nayla Mejia dated October 13, 2014 | GWB Juice Bar LLC | 275 West 238th, Unit 5, Bronx New York 10463 |